Neil Levine (Colo. Bar No. 29083)
Grand Canyon Trust
4438 Tennyson Street
Denver, Colorado 80212
Tel: 303-455-0604
nlevine@grandcanyontrust.org

Marc Fink (MN Bar No. 343407)
Center for Biological Diversity
209 East 7th Street
Duluth, Minnesota 55805
Tel: 218-464-0539
mfink@biologicaldiversity.org

Roger Flynn (Colo Bar No. 21078)
Western Mining Action Project
440 Main St., #2
Lyons, CO 80540
Tel: 303-823-5738
wmap@igc.org

Richard Hughes (NM Bar No. 1230)
Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg & Bienvenu LLP
1215 Paseo De Peralta
Santa Fe, New Mexico 87504
Tel: 505-988-8004

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
PRESCOTT DIVISION

| | |
|---|---|
| GRAND CANYON TRUST; CENTER FOR BIOLOGICAL DIVERSITY; SIERRA CLUB; and HAVASUPAI TRIBE,<br><br>Plaintiffs,<br><br>vs.<br><br>MICHAEL WILLIAMS, Forest Supervisor, Kaibab National Forest; and UNITED STATES FOREST SERVICE, an agency in the U.S. Department of Agriculture,<br><br>Defendants,<br><br>and<br><br>ENERGY FUELS RESOURCES INC.; and EFR ARIZONA STRIP LLC,<br><br>Defendant-Intervenors. | Case No. 13-8045-PCT-DGC<br><br>AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

INTRODUCTION

1.      Plaintiffs Grand Canyon Trust, Center for Biological Diversity, Sierra Club, and the Havasupai Tribe challenge Defendants Michael Williams, Forest Supervisor for the Kaibab National Forest, and the United States Forest Service's ("Forest Service") failure to comply with environmental, mining, public land, and historic preservation laws in relation to the Canyon Uranium Mine.  The Canyon Mine is located about 6 miles south of Grand Canyon National Park in the Kaibab National Forest.  The Forest Service originally approved the Canyon Mine in 1986 based on a Plan of Operations, a requirement of the Forest Service's mining regulations, and an Environmental Impact Statement (EIS) and Record of Decision (ROD), pursuant to the National Environmental Policy Act (NEPA). The Mine was completely shut down in 1992 when the uranium market dropped.  At that time, the operator -- Energy Fuels Nuclear -- had constructed some of the Mine's support facilities, but had not dug the mineshaft or extracted any uranium ore.  The Mine remained closed for 20 years.

2.      On September 13, 2011, Denison Mines -- a new operator that purchased the Canyon Mine -- informed the Forest Service that it intended to resume mining operations at Canyon Mine.  Subsequently, on June 25, 2012, the Forest Service determined that the Canyon Mine could re-open and begin mining operations based on the 1986 Plan of Operations and the 1986 EIS.  Since completion of the 1986 EIS, significant new information and changed circumstances have emerged concerning the Mine's operations and adverse environmental impacts.  Nonetheless, the Forest Service decided not to "supplement' the 1986 EIS, or require a modification of the 1986 Plan of Operations.3.

3.      After initial approval of the Canyon Mine, the Forest Service formally designated Red Butte and surrounding areas as a Traditional Cultural Property.  This designation means Red Butte is eligible for inclusion in the National Register of Historic Places and meets the definition of a "historic property" under the National Historic Preservation Act (NHPA).  The Forest Service also recognized that Red Butte is a sacred site to the Havasupai Tribe.  The Forest Service's 1986 approvals did not analyze the

*Amended Complaint for Declaratory & Injunctive Relief -- 2 --*

Canyon Mine's potential effects to Red Butte as a historic property under the NHPA. The Forest Service recently commenced consultation with the Havasupai Tribe concerning the Canyon Mine's impacts to Red Butte, and claims that it intends to continue consultation. The Forest Service is refusing to undertake and complete a NHPA Section 106 Process relating to adverse impacts to the Red Butte TCP, including consulting with the Tribe for the purposes of developing a Memorandum of Agreement, prior to allowing Canyon Mine to restart mining operations, as required under NHPA and its regulations, 16 U.S.C. § 470f, 36 C.F.R § 800.13(b)(1).

4.      In 2012, the U.S. Department of the Interior (Interior) withdrew over one-million acres of federal public lands in northern Arizona from mineral location and entry under the 1872 Mining Law (the "Withdrawal"). Interior's decision was designed to address the threats posed by uranium mining in and around Grand Canyon National Park. The Canyon Mine is located on lands subject to the Withdrawal. Due to the Withdrawal, mining cannot occur at Canyon Mine unless and until the Forest Service finds "valid existing rights" are present on the Mine's two mining claims. The Forest Service conducted an evaluation process and concluded that Canyon Mine contained valid existing rights on April 18, 2012. This valid existing rights determination authorized mining operations at Canyon Mine to resume. Prior to issuing its valid existing rights determination for the Canyon Mine, the Forest Service did not comply with NEPA and the NHPA. Further, the Forest Service's valid existing rights determination violated the Mining Law, the Forest Service 1897 Organic Act, Federal Land Policy and Management Act, the 2012 Withdrawal, and the Administrative Procedure Act ("APA") by not considering all costs associated with developing the Canyon Mine.

5.      Plaintiffs seek declaratory relief that the Forest Service has violated, and remains in violation of, the aforementioned environmental, mining, public land, and historic preservation laws in relation to Canyon Mine, and injunctive relief directing operations to cease and enjoining the Forest Service from authorizing or allowing any further mining related activities at the Canyon Mine site pending compliance with the law.

1

## JURISDICTION

2       6.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331, 5 U.S.C. § 701, et

3  seq., and 28 U.S.C. § 1346.  This action involves the United States as a defendant and

4  arises under the laws of the United States, including NEPA, the NHPA, and the APA.  An

5  actual, justiciable controversy exists between Plaintiffs and Defendants.  The requested

6  relief is proper under 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 705 and 706.  The challenged

7  agency actions and/or inactions are subject to this Court's review under the APA. 5 U.S.C.

8  §§ 702, 704, and 706.

9

## VENUE

10      7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because the

11  Canyon Mine is located on federal lands within Arizona.  The Grand Canyon Trust is

12  headquartered in Flagstaff, Arizona.  Plaintiff Center for Biological Diversity has offices in

13  Tucson and Flagstaff, Arizona.  Sierra Club has offices in Phoenix, Arizona.  The

14  reservation and ancestral homelands of the Havasupai Tribe are located in northern

15  Arizona.  Defendant U.S. Forest Service also has an office within the district.  The Canyon

16  Mine is located in Coconino County.

17

## PARTIES

18      8.      Plaintiff Grand Canyon Trust ("Trust") is a non-profit corporation

19  headquartered in Flagstaff, Arizona with over 3,500 members.  The mission of the Grand

20  Canyon Trust is to protect and restore the forests and canyon country of the Colorado

21  Plateau – its spectacular landscapes, flowing rivers, clean air, diversity of plants and

22  animals, and areas of beauty and solitude.  One of the Trust's goals is to ensure that the

23  Colorado Plateau is a region characterized by vast open spaces with restored, healthy

24  ecosystems, and habitat for all native fish, animals, and plants.

25      9.      Plaintiff Center for Biological Diversity ("Center") is a non-profit

26  corporation with more than 50,000 members dedicated to the preservation, protection, and

27  restoration of biodiversity and ecosystems throughout the world.  The Center works

28

*Amended Complaint for Declaratory & Injunctive Relief -- 4 --*

through science, law, and creative media to secure a future for all species, great or small, hovering on the brink of extinction.

10.     Plaintiff Sierra Club is a non-profit, public interest environmental organization with over 590,264 members, whose mission is to explore, enjoy and protect the planet.  The Sierra Club has over 11,000 members in Arizona as part of its Grand Canyon Chapter.

11.     Plaintiff Havasupai Tribe ("Havasupai Tribe") has resided on the banks of Havasu Creek in the Grand Canyon, on the upper Coconino Plateau and along the Colorado River since time immemorial.  The Indian Claims Commission determined that the Havasupai Tribe's aboriginal area, which had been exclusively occupied by the Tribe, generally extended from the Colorado River on the north to the Bill Williams Mountains on the south, and from the Little Colorado River on the east to the Aubrey Cliffs and the plateaus around Havasu Creek on the west. Havasupai Tribe v. United States, 20 Ind. Cl. Comm. 210 (1968).  The Canyon Mine site is located approximately in the center of this area.  The Havasupai Reservation was originally established by executive order in 1880, and was modified in 1882.  Additional lands were added in 1944 to protect springs that feed Havasu Creek, and, in the 1975 Grand Canyon Enlargement Act, the reservation was expanded to approximately 185,000 acres.  That Act prohibits commercial mining on the reservation.  The Havasupai Tribe has 696 tribal members.  Native plants, animals, springs, and other sites in Havasu Canyon, the adjacent Coconino Plateau, and along the Colorado River traditionally have been important to the Havasupai Tribe for subsistence, religious, ceremonial, medicinal and other purposes, and for traditional trails and trading routes.  The Havasupai Tribe is concerned about the impacts of Canyon Mine on its sacred sites and natural resources in the area.

12.     Plaintiffs Grand Canyon Trust, Center for Biological Diversity, and Sierra Club's members use and enjoy the Tusayan Ranger District of the Kaibab National Forest, including the public lands that are near the site of, or that will be affected by the operation of, the Canyon Mine.  Plaintiffs' members use and enjoy these national forest lands for

hiking, fishing, hunting, camping, and photography, and for engaging in other environmental, vocational, scientific, educational, religious, cultural, aesthetic, and recreational activities.  Plaintiffs' members intend to continue to use and enjoy these public lands frequently and on an ongoing basis in the future, including this spring, summer, and fall of 2014.  The Forest Service's failure to comply with laws described herein injures Plaintiffs and their members because uranium mining activities at the Canyon Mine, as well as associated activities such as truck traffic and ore haulage across public lands, injures Plaintiffs' ability to derive these benefits.  Plaintiffs also have a procedural interest in the proper management of these lands in full compliance with public land, environmental and historic preservation laws and regulations.  The Forest Service's legal violations deny Plaintiffs the ability to adequately participate in the public review process.  These violations also prevent Plaintiffs access to information concerning environmental impacts from the Canyon Mine.

13.    The members of the Havasupai Tribe have long utilized the area where the Canyon Mine is situated for a variety of religious, traditional and cultural purposes, including the performance of traditional ceremonies, gathering of native plants and other materials, and for other purposes, and their right of access to these lands for such purposes is specifically protected by 16 U.S.C. § 228i(c).  The tribal members' ability to continue these practices, especially with respect to the highly significant site of Red Butte, which is immediately adjacent to the Canyon Mine site, will be severely adversely impacted by the commencement of mining operations at the mine.

14.    The environmental, vocational, scientific, educational, religious, cultural, aesthetic, recreational, and procedural interests of Plaintiffs and their members have been and will continue to be adversely affected and irreparably injured by the uranium mining and related activities at the Canyon Mine.  These are actual, concrete injuries caused by the Forest Service's refusal to comply with environmental laws.  Plaintiffs' injuries will be redressed by the relief sought.

15.     Defendant Michael Williams is sued in his official capacity as the Forest Supervisor for the Kaibab National Forest.  Mr. Williams is the responsible official who oversees, regulates and approves mining activities located in the Kaibab National Forest.

16.     Defendant United States Forest Service is an agency within the United States Department of Agriculture, and is responsible for the lawful management of the federal lands within the Canyon Mine project area.  The Forest Service approved the Canyon Mine in 1986 and again in 2012, and refuses to comply with applicable laws.

<u>LEGAL BACKGROUND</u>

I.     <u>1872 Mining Law And National Forest Mining Laws</u>

17.     The 1872 Mining Law authorizes the exploration and extraction of valuable hardrock mineral deposits on lands belonging to the United States, subject to certain conditions. 30 U.S.C. §§ 22, 26.  It states in pertinent part: "All valuable mineral deposits in lands belonging to the United States … shall be free and open to exploration and purchase." <u>Id</u>. § 22.  Uranium is a hardrock mineral subject to the Mining Law.

18.     Congress authorized the Secretary of the Interior to "withdraw" an area that is otherwise open under the Mining Law. 43 U.S.C. § 1714(a); 43 C.F.R. § 2300.0-5(h). Mining in a withdrawn area is prohibited unless the claimant has valid existing rights, which means that the claimant has discovered a "valuable mineral deposit" on each mining claim.  According to the Forest Service's Manual, "valid existing rights must be verified where the lands in question have been withdrawn from mineral entry." Forest Service Manual Section 2818.3.

19.     The Forest Service Organic Act authorizes the agency to promulgate rules and regulations for the national forests "to regulate their occupancy and use and to preserve the forests thereon from destruction." 16 U.S.C. § 551. The Forest Service promulgated mining regulations pursuant to the Organic Act to "minimize adverse environmental impacts" to, among other things, air quality, water quality, scenic values, fisheries and wildlife. 36 C.F.R. §§ 228.1, 228.8.  The regulations also require companies to reclaim

1  Forest Service lands adversely impacted by mining activities and post reclamation bonds to

2  ensure funds are available to complete reclamation activities. Id. §§ 228.8(g), 228.13.

3       20.      Before mining may commence on Forest Service lands, an operator must

4  submit and the Forest Service must approve a "plan of operations" "if the proposed

5  operations will likely cause a significant disturbance of surface resources." 36 C.F.R. §§

6  228.4(a)(3), 228.5.  A plan of operations must include: the name of operators and their

7  lessees, assigns and designees; map of operations' area, included access roads and

8  resources to be disturbed; and detailed information about the type of operations, access

9  roads, duration of operations, a measures to be taken to comply with environmental

10  protection laws. Id. § 228.4(c).  The Forest Service is required to comply with NEPA upon

11  reviewing and approving a plan of operations. Id. § 228.4(f).  Supplements and

12  modifications of approved plans may be required when there are "unforeseen significant

13  disturbance of surface resources." Id. §§ 228.4(e), 228.5(c).

14  II.    The National Environmental Policy Act

15       21.      NEPA requires federal agencies to consider the environmental consequences

16  of their actions. 42 U.S.C. § 4321 et seq.  NEPA ensures that the agency will have

17  available, and will carefully consider, detailed information concerning significant

18  environmental impacts; it also guarantees that the relevant information will be made

19  available to a larger audience to ensure the public can play a role in both the

20  decisionmaking process and the implementation of the agency's decision.  NEPA directs

21  federal agencies to comply with its procedures "to the fullest extent possible," at the

22  earliest possible time. Id. § 4332.

23       22.      NEPA requires federal agencies to prepare a detailed EIS for any major

24  federal action that may significantly affect the quality of the environment. 42 U.S.C. §

25  4332(2)(C).  Agencies must evaluate the direct and indirect impacts of proposed actions, as

26  well as the cumulative impacts. 40 C.F.R. § 1502.16.  An EIS must be prepared if there are

27  substantial questions as to whether a proposed action may have a significant effect.  NEPA

28  regulations identify several "significance factors," including the degree to which the

proposed action may affect public health or safety, unique characteristics of the geographic area, the degree to which the effects are likely to be highly controversial, the degree to which the effects are highly uncertain or involve unknown risks, the degree to which the action is related to other actions with cumulatively significant impacts, the degree to which the action may adversely affect cultural or historic resources, and the degree to which the action may adversely affect threatened or endangered species. Id. § 1508.27(b).  Agencies must insure the professional and scientific integrity of an EIS. Id. § 1502.24.  Agencies must involve the public in their NEPA processes. Id. § 1506.6(a).

23.    An agency that has prepared an EIS cannot simply rest on the original document.  NEPA imposes a continuing duty on agencies to supplement previous environmental documents.  An agency must prepare a Supplemental EIS if there are substantial changes to the action that are relevant to environmental concerns, or there are significant new circumstances or information relevant to environmental concerns and bearing on the actions or its impacts. 40 C.F.R. § 1502.9(c).  In determining whether new circumstances or information is "significant," agencies consider the NEPA "significance factors." Id. § 1508.27(b).

III.    The National Historic Preservation Act And Executive Order 13007

24.    Congress enacted the National Historic Preservation Act to protect "historic properties," which means prehistoric or historic districts, sites, buildings, structures or objects that are included in or eligible for inclusion in the National Register of Historic Places, from actions of federal agencies.  The NHPA requires that federal agencies, prior to taking actions that might adversely affect any such property, work to develop ways to avoid or minimize such effects.  Congress amended the NHPA in 1992, providing that "[p]roperties of traditional religious and cultural importance to an Indian tribe . . . may be determined to be eligible for inclusion on the National Register." 16 U.S.C. § 470a(d)(6).

25.    Section 106 of the NHPA requires that any federal agency having authority over an "undertaking" "shall, . . . prior to the issuance of any license, . . . take into account the effect of the undertaking on any district, site, building, structure or object that is

included in or is eligible for inclusion in the National Register." 16 U.S.C. § 470f.  The NHPA defines undertaking as including activities "requiring a Federal permit, license, or approval." Id. § 470w(7).  The Advisory Council on Historic Preservation (ACHP) is charged with adopting regulations implementing Section 106. Id. § 470s.  The ACHP promulgated regulations that prescribe the details of the Section 106 Process and make clear that the Section 106 Process must be completed before an agency proceeds with any undertaking. 36 C.F.R. § 800.1(c).

26.     In a Section 106 Process, the agency: (1) determines whether a proposed undertaking has the potential to cause effects on a property that is included or eligible for inclusion in the National Register (36 C.F.R. § 800.3); (2) assesses, in consultation with the relevant State Historic Preservation Officer (SHPO) and any Indian tribe that attaches religious and cultural significance to the property, the potential adverse effects from the undertaking (id. § 800.5); and (3) in consultation with the SHPO, the tribe (or tribes), and, if it chooses to become involved, the ACHP, "develop[s] and evaluate[s] alternatives or modifications to the undertaking that could avoid, minimize or mitigate adverse effects" on the historic property, and, upon reaching agreement on such measures, executes a memorandum of agreement (MOA) embodying the terms of the agreement. Id. § 800.6. The undertaking must then be carried out in accordance with the terms of the MOA. Id. § 800.6(c).

27.     In 1996, President Clinton adopted Executive Order 13007, which provides procedural and substantive protection for Native American sacred sites.  Executive Order 13007 directs federal land management agencies, including the Forest Service, to:

(1) accommodate access to and ceremonial use of Indian sacred sites by Indian religious practitioners, and

(2) avoid adversely affecting the physical integrity of such sacred sites.

Executive Order 13007, § 1(a) (61 Fed. Reg. 26,771 (May 24, 1996)).  Executive Order 13007 defines a "sacred site" as "any specific discrete, narrowly delineated location on Federal land that is identified by an Indian tribe, or Indian individual determined to be an appropriately authoritative representative of an Indian religion, as sacred by virtue of its

*Amended Complaint for Declaratory & Injunctive Relief -- 10 --*

established religious significance to, or ceremonial use by, an Indian religious; provided that the tribe or appropriately authoritative representative of an Indian religion has informed the agency of the existence of such a site." Id. § 1(b)(iii).  The Executive Order also requires that Federal land management agencies adopt procedures to ensure notice is provided of actions that may restrict access or use of sacred sites, or adversely affect sacred sites. Id. § 2.

FACTUAL ALLEGATIONS

28.    The Canyon Mine is a uranium mine.  It is located in the Kaibab National Forest, approximately six miles south of the Grand Canyon National Park boundary.  Uranium ore at the Canyon Mine is located within a geologic formation known as a "breccia" (broken rock) pipe, a cylindrical formation that extends deep into the earth.  Within these breccia pipes, uranium ore is found at depths between 900 and 1400 feet.

29.    In the early 1980s, the Forest Service approved exploration activities on mining claims that discovered uranium ore at the Canyon Mine site.  These exploration boreholes encountered groundwater at depths between 140 feet and 2300 feet.  Exploration activities drained groundwater located beneath the Canyon Mine site, eliminating an estimated 1.3 million gallons per year from the region's springs that are fed by groundwater.

30.    In 1984, Energy Fuels Nuclear submitted to the Forest Service a proposed Plan of Operations for the Canyon Mine.  Energy Fuels Nuclear proposed to mine uranium on two unpatented mining claims for five to ten years.  Energy Fuels Nuclear claimed that during this period, the Canyon Mine will generate 200 tons of uranium ore per day.

31.    On September 26, 1986, the Forest Service signed the Record of Decision, approving a modified Plan of Operations and permitting mining operations at Canyon Mine.  The Forest Service's approval authorized the underground mining of the uranium and the disturbance of approximately 17 acres for the Mine's surface facilities.  A vertical mineshaft would be constructed adjacent to the breccia pipe, and a second adjacent vertical

shaft would be constructed for ventilation and safety purposes.  Several horizontal shafts would access the ore in the breccia pipe.

32.     The Forest Service's approval required that the transportation of uranium ore to a Utah uranium mill avoid Grand Canyon National Park.  The Forest Service's approval included the construction of an overhead powerline adjacent to an access road from Highway 64 to the mine site.  The approval also included a reclamation plan and a $100,000 reclamation bond.  The reclamation plan and bond addressed surface disturbances.  The approval also required monitoring and mitigation plans, including requirements for a surface water diversion structure and a monitoring water well drilled to a depth of 2500-3000 feet.  The Forest Service permitted the construction of a wastewater pond to store water removed from the mineshaft and surface runoff.  Prior to beginning mining operations, the Forest Service also required the collection of radiological air data for one year to establish a baseline.

33.     The Forest Service's approval permitted the onsite stockpiling of "waste rock" and up to 20,000 tons of uranium ore.  Waste rock is ore that contains uranium, but is deemed uneconomical by the operator.  The Forest Service did not limit the amount of waste rock that could be stockpiled and stored onsite.  The Forest Service's approval did not dictate the duration that waste rock could be stored in stockpiles onsite.

34.     The NEPA process that accompanied Mine approval began in December 1984 when the Forest Service initiated a scoping process.  In February 1986, the Forest Service completed the Draft EIS for the Canyon Mine.  The public was provided an opportunity to submit comments on the Draft EIS.  In August 1986, the Forest Service completed the Final EIS for the Canyon Mine.  Energy Fuels Nuclear began preparing the mine site for operations after the Forest Service completed its approval process.

35.     In 1988, the Havasupai Tribe challenged the Forest Service's approval of the Canyon Mine, challenging, among other things, the agency's environmental analysis in its EIS.  In 1991, the Ninth Circuit Court of Appeals upheld the EIS.

36.     In 1989, the U.S. Environmental Protection Agency ("EPA") promulgated new Clean Air Act regulations to regulate certain underground uranium mining operations. 54 Fed. Reg. 51,694 (Dec. 15, 1989), as amended at 65 Fed. Reg. 62,151 (Oct. 17, 2000). The regulations require operators to comply with specific standards for radon emissions and obtain a permit from EPA. 40 C.F.R. § 61, Subpart B.

37.     In the early 1990s, the price of uranium dropped.  Energy Fuels Nuclear closed Canyon Mine.  The mineshaft had not been dug.  Energy Fuels Nuclear did not inform the Forest Service that it was stopping operations.

38.     The Orphan Mine is located near the Canyon Mine, on the south rim of the Grand Canyon, and less than a mile from Grand Canyon Village within Grand Canyon National Park.  The Orphan Mine operated from 1959 to 1969.  In 1995, elevated levels of uranium and other radioactive materials were detected within Horn Creek, which flows into the Colorado River from the south rim of the Grand Canyon.  The mine continues to leach radioactive materials into Horn Creek.  The Park Service warns park visitors to not drink the water within Horn Creek "unless death by thirst is the only other option."  The National Park Service is currently undertaking remedial investigations and cleanup activities of the Orphan mine pursuant to the Comprehensive Environmental Response, Compensation, Liability Act.  Soil radiation levels around the Orphan Mine site are 450 times higher than normal.  The remediation costs for the Orphan Mine' surface area are estimated at $15 million.  The costs associated with remediating Horn Creek and the subsurface are unknown.

39.     In 1996, the U.S Fish and Wildlife Service introduced the California condor to northern Arizona.  The condor is listed as an "endangered" species under the Endangered Species Act, 16 U.S.C. § 1531, et seq.  The condor is attracted to mining structures and water pits typically maintained at mine sites like the Canyon Mine.  Condors are known to use the Canyon Mine site for foraging and the Canyon Mine site is located within an area designated as a condor management area.

40.     In 1997, Dennison Mines acquired the Canyon Mine from Energy Fuels Nuclear.  At that time, Denison Mines informed the Forest Service that operations were on "standby status."

41.     In 2005, the United States Geological Survey completed the Report, Hydrogeology of the Coconino Plateau and Adjacent Areas, Coconino and Yavapai Counties, Arizona.  Before this study, "little was known about the regional ground-water flow systems of the Coconino Plateau study area."  The study demonstrated that the deep regional "R-aquifer" (Redwall-Muav Aquifer) underlies the entire Coconino Plateau, and is recharged by faults, fissures, fractures and other geologic formations in the subsurface, including via perched smaller aquifers that lie above the R-aquifer.  The study also showed elevated levels of uranium contamination -- radioactive constituents and alpha particles -- in creeks, seeps and springs near former mine sites.  The Canyon Mine site overlays the R-aquifer.

42.     In 2008, the Forest Service reviewed water resources on the Coconino Plateau, including groundwater.  The Forest Service determined that fractured bedrock provides conduits for downward movement of water and groundwater recharge.  The agency's review also determined that local communities depend more on groundwater as their water sources than they did in the 1980s.

43.     In March 2008, the Grand Canyon Watersheds Protection Act was introduced in Congress.  This proposed legislation would permanently withdraw over one million acres of public and national forest lands in the vicinity of Grand Canyon National Park from location, entry, and patent under the Mining Law, subject to "valid existing rights." To date, this legislation has not been passed in Congress.  The Canyon Mine is located on public lands that are covered by the Grand Canyon Watersheds Protection Act.

44.     County, State, and Tribal governments have expressed support for protecting the Grand Canyon watershed from uranium mining.  The Coconino County Board of Supervisors passed a resolution on February 5, 2008, opposing uranium development on lands in the proximity of the Grand Canyon National Park and its watersheds.  The

Governor of Arizona wrote a letter to the Secretary of Interior on March 6, 2008, requesting the withdrawal of lands around the Grand Canyon from uranium development. The Arizona Department of Game and Fish wrote to Senator McCain on March 17, 2008, expressing concerns regarding the impacts to wildlife from proposed uranium development on lands in the proximity of Grand Canyon National Park, and identifying the Tusayan Ranger District as one of the areas of greatest concern.  The Tribal governments in the region, including Plaintiff Havasupai Tribe (which in 2005 amended its constitution to prohibit any exploration for or mining of uranium on its reservation), were unanimous in their support for a withdrawal of these lands in the Grand Canyon watershed from uranium development.

45.    On June 25, 2008 the U.S. House of Representatives' Committee on Natural Resources issued an "emergency resolution" pursuant to Section 204(e) of the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1714(e) and 43 C.F.R. § 2310.5 ("Emergency Resolution").  The Emergency Resolution directed the Secretaries of Interior and Agriculture to immediately withdraw the 1,068,908 acres of Federal lands subject to the Grand Canyon Watersheds Protection Act of 2008 from all forms of location and entry under the Mining Law for up to three years, subject to valid existing rights.  The Emergency Resolution sought to maintain the status quo until Congress fully considers the Grand Canyon Watersheds Protection Act.  The Canyon Mine is located on lands that are subject to the Emergency Resolution.

46.    On July 21, 2009, after "carefully considering the issue of uranium mining near Grand Canyon National Park," the Department of Interior issued a Segregation Order and Proposed Withdrawal ("Proposed Withdrawal").  The Proposed Withdrawal removed approximately one million acres of federal public lands in the Grand Canyon watershed from location and entry under the Mining Law for two years, subject to valid existing rights, while the Department of Interior evaluated whether to withdraw some or all of these lands from new mining claims for 20 years. 74 Fed. Reg. 35887 (July 21, 2009).  The Department of Interior reasoned that the Grand Canyon is an iconic American landscape

and World Heritage Site, which encompasses 1.2 million acres on the Colorado Plateau; currently draws 4.4 million visitors each year; is home to numerous rare, endemic, and specially-protected plant and animal species; and contains vast archeological resources and sites of spiritual and cultural importance to American Indians. The Secretary of Interior recognized that the Colorado River and its tributaries flow through the Grand Canyon and supply water to agricultural, industrial, and municipal users, including the cities of Tucson, Phoenix, Las Vegas, Los Angeles, and San Diego. The Secretary of Interior stated in a press release that the Proposed Withdrawal is necessary to "ensure that we are developing our nation's resources in a way that protects local communities, treasured landscapes, and our watersheds[.]" The Proposed Withdrawal covered the same lands identified in the Emergency Resolution and the Grand Canyon Watersheds Protection Act, and includes the Canyon Mine.

47.     On August 31, 2009, the State of Arizona Department of Water Quality issued a groundwater permit to Denison. This permit covered adverse impacts to groundwater encountered during mining operations, including the construction of the mine shaft.

48.     In 2010, the United States Geological Survey (USGS) issued a Report, "Hydrological, Geological, and Biological Site Characterization of Breccia Pipe Uranium Deposits in Northern Arizona." In this USGS evaluation, uranium and arsenic were two elements consistently detected in the areas disturbed by uranium mining in quantities above natural background levels. Samples from 15 springs and five wells in the region contained dissolved uranium concentrations greater than EPA's maximum allowed contaminants for drinking water. The USGS found that Horn Creek and Salt Creek Spring contained elevated levels of radioactivity from the Orphan Mine. The USGS further found elevated uranium concentrations within the Canyon Mine monitoring and water well. This USGS report also notes that fractures, faults, sinkholes, and breccia pipes occur throughout the area and provide pathways for downward migration of surface water and groundwater. The

USGS report further found that floods, flash floods, and debris flows occur in the region and can transport substantial volumes of trace elements and radionuclides.

49.    The Canyon Mine site is situated in a small meadow located just four miles north of a prominent topographical feature known as Red Butte.  Red Butte is one of the most important sites in the religious and cultural tradition of plaintiff Havasupai Tribe, and it also holds major religious significance for the Hopi, Navajo, Zuni and Hualapai Tribes. The Havasupai refer to it as "the Landmark," and it plays a central part in their origin story. The meadow where the mine site is located is also considered to be an extremely sacred site by the Havasupai, whose significance is tied directly to that of Red Butte.  In 2010, the Forest Service determined that Red Butte warranted designation as a Traditional Cultural Property (TCP), which made it eligible for listing on the National Register, because of its historic, cultural, and religious significance to the Havasupai and the other Indian tribes. The Canyon Mine site is within the boundaries of the Red Butte TCP.  The Forest Service TCP determination reflects the agency's awareness that the mine site is considered sacred by the Havasupai.  The meadow was determined to be a "contributing element" to the TCP. Red Butte and the meadow are not only important to the Havasupai as locations that are prominent in their religious beliefs, but the Havasupai people have come to these places and utilized them for traditional ceremonies and other activities for centuries, and their ability to continue to use these sites for traditional practices is vital to the continuation of their traditional religious practices.

50.    By letters dated August 22, 2011 and September 13, 2011, Denison Mines notified the Kaibab National Forest that it intended to start operations at the Canyon Mine under the original Plan of Operations and NEPA EIS and Record of Decision.  The Canyon Mine is one of several uranium mines in the region that had been previously approved, closed due to market conditions, and is now intending to start again because the market price for uranium increased.

51.     In October 2011, the Department of Interior's Bureau of Land Management issued the Final EIS that analyzed the Proposed Withdrawal.  Interior's preferred alternative was to withdraw over a millions acres of public lands from mining.

52.     On lands covered by the Withdrawal, the Forest Service may only allow mines to proceed if the claimant has a "valid existing right."  In late October 2011, the Forest Service began a process to evaluate whether the two claims that make up the Canyon Mine contain "valuable mineral deposits," such that valid existing rights are associated with the Canyon Mine and it would not be subject to the Withdrawal.  As part of this process, the Forest Service visited the mine site, Denison's offices, other Denison mines in the region, and the White Mesa uranium mill in Utah.

53.     On December 1, 2011, Denison received a "General" Aquifer Protection Permit from the State of Arizona Department of Water Quality.  This permit covered discharge from the Canyon Mine's ore stockpile.

54.     On January 9, 2012, the Department of Interior finalized the Withdrawal after issuing the Record of Decision.  The Withdrawal prohibits location and entry under the Mining Law, subject to valid existing rights, of approximately 1,006,545 acres of federal land in Northern Arizona for a 20-year period.  The Withdrawal includes the public lands where the Canyon Mine is located.

55.     The Withdrawal was based in part on the significant risks to groundwater and the water supply to millions of people in the Southwest from uranium mining in the Grand Canyon watershed.  The Withdrawal EIS acknowledges that there are uncertainties regarding subsurface water movement and radionuclide migration.  The EIS explained that the risks associated with uranium mining were extremely significant, although the probability that the risks would occur was low.  Through the Withdrawal, the Department of Interior determined that a twenty-year withdrawal will allow for additional data to be gathered and more thorough investigation of groundwater flow paths, travel times, and radionuclide contributions from mining.  The Department of Interior also determined that it was likely that the potential impacts to Tribal resources could not be mitigated.  According

1    to the Department of Interior, any mining within the sacred and traditional places of Tribal

2    peoples may degrade the values of those lands to the Tribes that use them.

3        56.    On January 26, 2012, the Forest Service completed a review under the

4    Endangered Species Act of the Canyon Mine because the California condor had been

5    introduced to the Canyon Mine project area in 1996.  The Forest Service concluded that the

6    Canyon Mine may affect the California condor, but was not likely to "jeopardize" the

7    condor's existence in the area.  The Forest Service did not provide public notice or an

8    opportunity to provide public input on this evaluation.

9        57.    On February 9, 2012, the U.S. Fish and Wildlife Service responded to the

10   Forest Service's evaluation of the Canyon Mine's impacts on the California condor.  The

11   Fish and Wildlife Service noted that the Forest Service did not provide a full description of

12   the transportation aspects of the Canyon Mine sufficient for the Fish and Wildlife Service

13   to determine the entire extent of the action area.  The Fish and Wildlife Service

14   recommended that a number of "conservation measures" be incorporated into the Canyon

15   Mine project to improve protection for condors, including covering the wastewater ponds

16   located on the Mine site and taking actions to prevent condor use of the Mine's powerlines

17   for perching and foraging.  These measures were not included in the Plan of Operations.

18   The Fish and Wildlife Service did not provide public notice or an opportunity to provide

19   public input on its review and recommendations.

20       58.    On April 18, 2012, the Forest Service completed its validity examination for

21   the Canyon Mine.  The Forest Service concluded that a discovery of a valuable mineral

22   deposit existed within the two Canyon Mine claims, known as claims Canyon 74 and

23   Canyon 75.  According to a summary published on the agency's website, "under present

24   economic conditions, the uranium deposit on the claims could be mined, removed,

25   transported, milled and marketed at a profit."  But for the Forest Service's April 18, 2012

26   validity determination, mining could not occur at Canyon Mine due to the Withdrawal.

27   The Forest Service did not provide public notice or an opportunity to provide public input

28   concerning the agency's validity determination for the Canyon Mine.

*Amended Complaint for Declaratory & Injunctive Relief -- 19 --*

59.     The Forest Service has developed a Forest Plan for the Kaibab National Forest pursuant to the National Forest Management Act.  Among other things, the Forest Plan is designed to "protect[] and preserv[e] the inherent right of freedom of American Indians to believe, express, and exercise their traditional religions."  The Forest Plan includes provisions applicable to the Red Butte Traditional Cultural Property, such as

(1) [c]omply with various legal mandates related to the management of heritage resources;

(2) [c]onsult with Indian tribes to obtain tribal advice and input in the development and implementation of projects proposed in areas of known socio-cultural or religious significance; and,

(3) [c]onsider rejection, denial, redesign or relocation of proposed resource uses or projects to allow in-place preservation of heritage resources in the following circumstances ... (c) Cultural values derive primarily from qualities other than research potential, and those values are fully realized only when the cultural remains exist undisturbed in their original context.

60.     In April 2012, the Forest Service issued a draft of a Revised Forest Plan for the Kaibab National Forest.  The draft identifies the Red Butte Management Area, which includes the Red Butte geologic formation of and the larger Red Butte Traditional Cultural Property.  The Forest Service identifies the following "guidelines" for this Management Area:

(1) Activities should be coordinated with tribes to minimize impacts to ceremonial activities;

(2) Temporary closures should be implemented upon request by the tribes to provide privacy for traditional activities, and;

(3) Commercial use such as outfitter guides, plant collection, and firewood cutting/collection in the Red Butte MA should not be permitted.

The Forest Service also identified desired future conditions for the Red Butte TCP:

(1) Traditional practitioners have access to TCPs for ceremonial use and privacy to conduct ceremonies;

(2) TCPs are preserved, protected, or restored for their cultural importance and are generally free of impacts from other uses;

(3) The significant visual qualities of TCPs are preserved consistent with the TCP eligibility determination, and;

(4) Traditional use of TCPs by the associated cultural groups is accommodated.

61.     On June 6, 2012, the National Park Service (Park Service) issued "Issues and Concerns Regarding Proposed Groundwater Developments Near the South Rim, Grand Canyon National Park," a report prepared by the Grand Canyon National Park, Division of Science and Resource Management.  The Park Service connected groundwater withdrawal with Grand Canyon's seeps and springs, and emphasized the significance of groundwater resources to the region's water supply and cultural resources.  The Park Service Report also concluded that groundwater recharge occurs through faults, fractures and breccia pipes because other geological forms have low permeability.  The Park Service further recognized the recent studies showing rapid groundwater recharge.

62.     On June 25, 2012, the Forest Service completed its "Canyon Uranium Mine Review."  This review was prepared without public input or involvement.  The Forest Service determined that no modification of the 1984 Plan of Operations was required, "and that there was no unforeseen significant disturbance of surface resources."  The Forest Service also determined that no supplemental environmental analysis under NEPA was required.

63.     In the Canyon Uranium Mine Review, the Forest Service also considered whether "there is any further federal undertaking subject to NHPA Section 106 compliance required before Canyon Mine resumes operation [], and if there is new information or changed circumstances to the original analysis [sic]."  The agency concluded that there were no new "undertakings" because proposed mining operation would occur in accordance with the previously approved Plan of Operations, and that the 1986 Section 106 Process had been completed in accordance with applicable law and standards.  The Forest Service therefore determined that treatment of Red Butte should be governed by 36 CFR § 800.13, which applies to "Post Review Discoveries," and that the Mine's impacts to Red Butte are "unanticipated effects."  The Forest Service made this finding despite the fact that it was aware of such effects for at least 25 years.  The Forest Service also concluded that, because some work at the Canyon Mine site occurred 20 years earlier, consultation with the tribes should be governed by 36 CFR § 800.13(b)(3).  This determination allowed the

1    Forest Service to avoid a full-scale Section 106 Process under 36 CFR § 800.6, including

2    the required consultation and development of an MOA that dictates the necessary steps to

3    minimize adverse effects on Red Butte, before mining operations at the Canyon Mine

4    resumed.  The Forest Service's Canyon Uranium Mine Review did not re-open the 1986

5    Section 106 Process.

6       64. On June 25, 2012, the same day that it gave the go-ahead to Denison Mines

7    to restart the development of Canyon Mine, Defendant Michael Williams sent a letter to

8    Don Watahomigie, Chairman of the Havasupai Tribe.  The letter informed the Chairmen

9    that the mine operator had notified the Forest Service that it intended to restart the mine.

10   The Forest Service summarized the agency's Canyon Uranium Mine Review regarding

11   potential impacts to Red Butte.  Williams acknowledged that impacts to Red Butte had not

12   been assessed in the prior Section 106 Process.  Williams informed the Chairmen that the

13   Red Butte TCP designation was a "new discovery" under the NHPA and mining at Canyon

14   Mine would cause "unanticipated effects" to Red Butte.  Nonetheless, Williams noted that

15   the Forest Service decided that there was no reason to conduct a new Section 106 Process.

16   Williams invited the Chairman to take part in a consultation "to discuss the project and

17   begin to identify the actions to address the adverse effects to the Red Butte TCP."

18      65. In undated letter sent on or about July 11, 2012, Chairman Watahomigie

19   informed the Forest Service that the tribe wanted to move forward with a Section 106

20   Process.  In a subsequent letter to Forest Tribal Liaison Michael Lyndon on July 23, 2012,

21   the Chairmen stated the tribe's position that construction had not yet "commenced" at the

22   mine site and, pursuant to 36 C.F.R. § 800.13(b)(1), consultation must take place in

23   accordance with 36 C.F.R. § 800.6.  He also stated that the Plan of Operations for the mine

24   should be modified so as to incorporate measures to minimize adverse impacts to Red

25   Butte.

26      66. By letter dated August 1, 2012, the ACHP advised the Forest Service that it

27   did not believe it would be appropriate for the Forest Service to address impacts to Red

28   Butte under § 800.13(b)(3), and that "consultation in accordance with Section 800.13(b)(1)

*Amended Complaint for Declaratory & Injunctive Relief -- 22 --*

to develop and execute a Section 106 agreement is the appropriate way forward."   Section 800.13(b)(1) directs the agency to proceed with consultations with the tribes, the Arizona SHPO and, if it participates, the ACHP, to develop an MOA, under § 800.6, to address measures to avoid or mitigate adverse impacts to historic properties.  The Arizona SHPO also advised the Forest Service that it believed that proceeding under § 800.6 was required by NHPA in this situation.  The Forest Service disregarded the views of the ACHP and the SHPO.

67.     Since then, only one consultation meeting has occurred, at which the Forest Service made clear that it had no intention of requiring any modifications to the Plan of Operations.  The Forest Service stated that the mine operator would implement any agreed-on mitigation measures "voluntarily."  The Forest Service claims the consultation process will proceed.  Ground-disturbing activities at the Canyon Mine site have begun and are continuing.

68.     On June 29, 2012, the Canadian company Energy Fuels Resources acquired the Canyon Mine and other uranium mines in the Grand Canyon Watershed from Denison Mines.  Energy Fuels also purchased the White Mesa mill in Blanding, Utah from Denison Mines.

69.     On September 13, 2012, the Forest Service issued to Energy Fuels a "Commercial Fuelwood Permit" for the "Canyon Mine Power Line Maintenance Project." Energy Fuels required the permit to clear trees that were impeding the powerline that supplied energy to the mine site.  This permit expired on December 15, 2012.  Numerous old growth ponderosa pine trees were cut during the fall of 2012 pursuant to this Forest Service permit.  The Forest Service did not prepare any NEPA analysis, provide public notice, or allow for public comment prior to issuing this permit.

## CLAIMS FOR RELIEF

### *First Claim*
*Violation of National Environmental Policy Act - Approving Mining*
*On Lands Subject to Withdrawal*

70.     Plaintiffs hereby incorporate by reference all preceding paragraphs.

71.     On January 9, 2012, the Secretary of Interior issued the Withdrawal.  The Withdrawal includes public lands managed by the Forest Service, within the Kaibab National Forest.  The Canyon Mine is within the Kaibab National Forest, and the area of the Withdrawal.

72.     Mining claims with "valid existing rights" are exempt from the Withdrawal. 77 Fed. Reg. 2,563 (Jan. 18, 2012) (proclaiming withdrawal is "[s]ubject to existing rights").  A valid existing right requires finding that the relevant claims contain a "valuable mineral deposit."  Absent a valuable mineral deposit, the claim lacks valid existing rights and mining operations may not occur within the area of the Withdrawal.  According to the Forest Service Manual at § 2803.5, the agency must "[e]nsure that valid existing rights have been established before allowing mineral or energy activities in congressionally designated or other withdrawn areas."  The Forest Service evaluates and determines a claim's validity through a Mineral Report.

73.     The Forest Service approved the Canyon Mine in 1986 through a plan of operations.  That Forest Service's approval did not include a finding that the Mine's claims contain valid existing rights.  The Forest Service did not evaluate or determine whether or not a valuable mineral deposit existed within the Canyon Mine claims prior to the agency's 1986 Record of Decision for the Canyon Mine, or at any time prior to the Withdrawal.

74.     In 2011, the Forest Service began an administrative process to determine whether the Canyon Mine's claims contain valid existing rights.  On April 18, 2012, the Forest Service completed its valid existing rights determination with a Mineral Report.  In the Report, the agency stated that:

> The purpose of this investigation is to conduct a valid existing rights determination on the subject claims. It is Forest Service policy (FSM 2803.5) to only allow operations on mining claims within a withdrawal that have valid existing rights (VER). This VER determination was prompted by a request to resume mining operations at Denison's Canyon Mine, within the Canyon 74-75 claim block. … The applicable dates to establish 'validity' in this particular case are July 21, 2009 (the initial segregation date), and the date of the mineral exam …

In the Report, the Forest Service determined that the two mining claims associated with the Canyon Mine contain a valuable mineral deposit.  In that determination, the Forest Service

1   concluded that under present economic conditions, the claims could be mined, removed,

2   transported, milled and marketed at a profit.  The Forest Service has discretion to consider

3   whatever costs are appropriate in evaluating whether claims could be mined, removed,

4   transported, milled and marketed at a profit.

5        75.    Based on this valid existing rights determination, the Forest Service approved

6   the Canyon Mine notwithstanding the Withdrawal.  The Forest Service's valid existing

7   rights determination was a pre-requisite for mining operations to resume at the Canyon

8   Mine due the Withdrawal.

9        76.    The Forest Service's April 18, 2012 valid existing rights determination for

10  the Canyon Mine is a major federal action significantly affecting the environment. See e.g.,

11  42 U.S.C. 4332(2)(C); 40 C.F.R. §§ 1508.18, 1508.27.  The Forest Service was required to

12  involve the public, consider alternatives, and evaluate the potential environmental impacts

13  resulting from the validity determination for the Canyon Mine in an environmental

14  assessment or environmental impact statement, pursuant to NEPA. Id; 40 C.F.R. §§ 1501.4,

15  1502.4, 1506.6.

16       77.    The Forest Service's failure to comply with NEPA before and in connection

17  with its April 18, 2012 valid existing rights determination violated NEPA and constitutes

18  agency action that has been unlawfully withheld and unreasonably delayed, within the

19  meaning of the judicial review provisions of the APA. 5 U.S.C. § 706(1).  This violation

20  and inaction renders its April 18, 2012 valid existing rights determination arbitrary,

21  capricious, an abuse of discretion, not in accordance with law, without observance of

22  procedure required by law, and in excess of statutory jurisdiction, authority, or limitations,

23  within the meaning of the judicial review provisions of the APA. 5 U.S.C. § 706(2).

24  *Second Claim*<br>*Violation of National Historic Preservation Act - Approving Mining*<br>*On Lands Subject to Withdrawal*

25

26       78.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

27

28

79.     The Forest Service's valid existing rights determination is an undertaking under Section 106 of the NHPA.  Mining at the Canyon Mine under the terms of the Withdrawal could not occur but for the Forest Service's valid existing rights determination.

80.     In 2010, Red Butte was designated a TCP.  A TCP is eligible for inclusion in the National Register of Historic Places.  Red Butte is a place of enormous cultural and religious significance to Plaintiff Havasupai Tribe, and is also of religious significance to other Indian tribes in the region.

81.     Mining at the Canyon Mine will change the character and use of the Red Butte TCP, and will adversely impact the Red Butte TCP.

82.     The Forest Service did not initiate and complete any NHPA Section 106 Process addressing the Canyon Mine's adverse impacts to the Red Butte TCP before approving mining activities through valid existing rights determination.

83.     This failure to initiate and complete a Section 106 Process violated the NHPA.  See 16 U.S.C. § 470f; 36 C.F.R. § 800.1(a) & (c).  The Forest Service's failure to comply with the NHPA before and in connection with its April 18, 2012 valid existing rights determination constitutes agency action that has been unlawfully withheld and unreasonably delayed, within the meaning of the judicial review provisions of the APA. 5 U.S.C. § 706(1).  This violation and agency inaction render the Forest Service's valid existing rights determination arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. Id. § 706(2).

*Third Claim*
*Violation of National Historic Preservation Act – Failure To*
*Complete Section 106 Process*

84.     Plaintiffs hereby incorporate by reference all preceding paragraphs.

85.     The Forest Service conducted a Section 106 Process in connection with approving the 1986 Plan of Operations for Canyon Mine.  In that Section 106 Process, the Forest Service did not analyze impacts to Red Butte.

86.     Since the original Section 106 Process, the NHPA was amended so as to include tribal cultural and religious sites as "historic properties" that are eligible for listing on the National Register.  Since the original Section 106 Process, the Forest Service designated Red Butte as a TCP.  As a TCP, Red Butte is now eligible for inclusion on the National Register of Historic Places.  The designation of Red Butte as a TCP is newly discovered information.  Mining activities will cause adverse effects to the Red Butte TCP.

87.     Section 106 of the NHPA imposes a continuing duty on the Forest Service. In 2011, when the Forest Service was notified that operations at Canyon Mine would be restarted, no construction activities had occurred at the mine site for 20 years.  Before operations were commenced at Canyon Mine, the Forest Service was obligated to reopen and complete a Section 106 Process, and consider the Mine's likely adverse impacts on the Red Butte TCP and develop measures to avoid, minimize or mitigate those impacts. Construction activities to prepare Canyon Mine for mining operations were initiated in the fall 2012.  The Forest Service has not initiated or completed a Section 106 Process regarding impacts to the Red Butte TCP.

88.     The Forest Service's failure to initiate and complete a Section 106 Process before construction activities began violated NHPA, 36 C.F.R. §§ 800.13(c) & (b)(1), and constitutes agency action that has been unlawfully withheld and unreasonably delayed. 5 U.S.C. § 706(1).

### Fourth Claim
#### Violation of Mining Law, Federal Land Policy and Management Act, Withdrawal, 1897 Organic Act, and Administrative Procedure Act – Forest Service Valid Existing Rights Determination For Mining On Lands Subject to Withdrawal

89.     Plaintiffs hereby incorporate by reference all preceding paragraphs.

90.     In its valid existing rights determination for the Canyon Mine, the Forest Service concluded that mining claims at Canyon Mine contain a valuable mineral deposit, and thus mining operations could proceed notwithstanding the Withdrawal.  The Forest Service's analysis was based on the "prudent-person test" (as refined by the "marketability test"), which requires that "there be, at the time of discovery, a market for the discovered material that is sufficiently profitable to attract the efforts of a person of ordinary

prudence."  Stated another way, the "discovered mineral deposits are of such a character that a person of ordinary prudence would be justified in further expenditure of his labor and means with a reasonable prospect of success, in developing a valuable mine."

91.     In the valid existing rights determination, the Forest Service concluded that the mining claims are so profitable as to satisfy the prudent person/marketability tests.  In this determination, the Forest Service failed to consider all relevant factors including costs related to Canyon Mine approvals, operations and reclamation.  For example, the Forest Service did not include reclamation costs.  The Forest Service did not include the costs of groundwater monitoring.  The Forest Service did not consider the costs of remediating contamination of the Colorado River and groundwater caused by mining activities.  The Forest Service did not evaluate the costs associated with expanding the wastewater pond, clearing the utility corridor of trees, or minimizing adverse impacts of the Mine on public land resources, including Tribal resources such as the Red Butte TCP or the California condor.  The Forest Service did not include all costs associated with compliance with environmental and other applicable laws, including the Clean Air Act radon emissions regulations.  The Forest Service did not account for the costs of potential mitigation measures.  These costs are relevant to the profitability of Canyon Mine's mineral deposits, and must be fully considered to determine whether each claim contains the requisite discovery of a valuable mineral deposit.

92.     The Forest Service's valid existing rights determination was arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. § 706(2).

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court:

A.     Declare that the Forest Service is in violation of NEPA, the NHPA, the Organic Act, FLPMA, the 2012 Withdrawal, the 1872 Mining Law, the implementing regulations and policies of these laws, and the APA;

1      B.      Set aside and vacate any approvals or authorizations of exploration and

2   mining operations at the Canyon Mine and related decisions and activities;

3      C.      Enjoin the Forest Service from authorizing or allowing any further uranium

4   exploration or mining-related activities at the Canyon Mine unless and until the Forest

5   Service fully complies with all applicable laws;

6      D.      Award to Plaintiffs their costs, expenses, expert witness fees, and reasonable

7   attorney fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 and the NHPA,

8   16 U.S.C. § 470w-4; and

9      E.      Grant Plaintiffs such further relief as may be just, proper, and equitable.

10                                          Respectfully submitted,

11   Dated: April 22, 2014                    */s/ Marc D. Fink*
                                             Neil Levine
12                                           Marc D. Fink
                                             Roger Flynn
13                                           Richard Hughes

14                                           Attorneys for Plaintiffs

<u>CERTIFICATE OF SERVICE</u>

       I certify that on April 23, 2014, I filed a true and exact copy of Plaintiff's AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF with the Court's CM/ECF system, which will generate a Notice of Filing and Service on the following:

BEVERLY F. LI
Trial Attorney, Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Email: beverly.li@usdoj.gov

Attorney for Federal Defendants

Bradley Joseph Glass
David J DePippo
Michael K Kennedy
Gallagher & Kennedy PA
2575 E Camelback Rd., Ste. 1100
Phoenix, AZ 85016-9225
Email: brad.glass@gknet.com
Email: david.depippo@gknet.com
Email: mkk@gknet.com

Attorneys for Defendants-Intervenors

<u>*s/ Marc D. Fink*</u>
Marc D. Fink