**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Grand Canyon Trust, et al., | No. CV-13-08045-PCT-DGC |
| Plaintiffs, | **ORDER** |
| v. | |
| Michael Williams, et al., | |
| Defendants. | |

The parties have filed cross-motions for summary judgment.  Docs. 140, 146, 147.  The motions are fully briefed and the Court heard oral argument on March 18, 2015.  For the reasons stated below, Defendants' and Defendant-Intervenors' motions for summary judgment will be granted and Plaintiffs' motion for summary judgment will be denied.

**I.     Background.**

Plaintiffs include the Havasupai Tribe and various environmental groups: Grand Canyon Trust, Center for Biological Diversity, and the Sierra Club.  Defendants are the United States Forest Service; Michael Williams, Supervisor of the Kaibab National Forest; and Intervenors Energy Fuels Resources (USA), Inc. and EFR Arizona Strip, LLC.

This case arises out of the proposed renewal of operations at the Canyon Mine in Northern Arizona.  The Canyon Mine is a breccia pipe uranium mine located six miles south of Grand Canyon National Park, in the Kaibab National Forest, and four miles

1    north of Red Butte, a culturally and religiously significant site for the Havasupai and

2    other tribes.  Doc. 115 ¶¶ 2, 49.

3         In October 1984, Energy Fuels Nuclear, Inc. ("EFN") submitted to the Forest

4    Service a proposed Plan of Operations for the Canyon Mine (the "Plan").  A.R. 193-221.

5    Pursuant to the National Environmental Policy Act ("NEPA"), the Forest Service

6    completed an Environmental Impact Statement ("EIS") to address the potential

7    environmental impacts to the area and considered input from federally recognized Indian

8    tribes.  A.R. 461-693.  On September 26, 1986, the Forest Service issued a Record of

9    Decision ("ROD") approving a modified version of the Plan.  A.R. 915-29.  Several

10   administrative appeals followed (A.R. 3932), and the Deputy Regional Forester and Chief

11   of the Forest Service both affirmed the ROD.

12        The Havasupai Tribe filed a federal court lawsuit challenging approval of the

13   Canyon Mine.  *See Havasupai Tribe v. United States*, 752 F. Supp. 1471 (D. Ariz. 1990).

14   Among other arguments, the tribe claimed that the EIS failed to comply with NEPA.[1]

15   Following a thorough analysis of the EIS, the ROD, and the administrative record, the

16   District Court granted summary judgment in favor of the Forest Service.  *Id.* at 1489-

17   1505.  The Ninth Circuit affirmed in August of 1991.  *See Havasupai Tribe v. United*

18   *States*, 943 F.2d 32 (9th Cir. 1991).

19        Shortly thereafter, EFN began constructing the mine.  EFN built access roads,

20   storage buildings, a power line, a perimeter fence, diversion structures, a holding pond, a

21   head frame and hoist, and support buildings.  A.R. 10487; Doc. 146-1 at 17; Hangan

22   Declaration, Doc. 53-4, ¶ 4.[2]  Work on the mine shaft was started, and proceeded to a

23

24   [1] The tribe's specific NEPA arguments included the following: the EIS (1) failed
     to consider the "no-action alternative" of not approving the Plan; (2) failed to give
25   adequate consideration to the tribe's religious and cultural interests in the site; (3) was
     based on incomplete hydrogeological information; (4) failed to adequately consider the
26   environmental impact of disposal of radioactive waste; and (5) failed to adequately
     consider the environmental cumulative impacts of mining in the region.  *Havasupai*
27   *Tribe*, 752 F. Supp. at 1490.

28   [2] When the Court cites to page numbers in documents filed in the docket (Doc.),
     the citation will be to numbers at the top of the page assigned by the Court's CM/ECF
     system, not to numbers at the bottom of the page as assigned in the original document.

depth of 50 feet.  A.R. 10487.  When uranium prices fell in 1992, EFN placed the mine on stand-by status.  For the next several years the mine was maintained under the interim management portions of the Plan.  A.R. 10314.

In 2010, the Forest Service designated Red Butte and the surrounding area, including the location of the Canyon Mine, as a Traditional Cultural Property ("TCP"), thereby making it eligible to be included in the National Register of Historic Places due to its "ongoing, and historic cultural and religious significance to multiple tribes." A.R. 10616.

In January 2012, the Secretary of the Department of the Interior ("DOI"), pursuant to the Federal Land Policy and Management Act ("FLPMA"), 42 U.S.C. § 1714(a), withdrew approximately 633,547 acres of public lands and 360,002 acres of National Forest System lands for up to 20 years from location and entry under the Mining Law of 1872 (the "Withdrawal").  77 Fed. Reg. 2317- 01 (Jan. 17, 2012); A.R. 10308-31.  The Withdrawal, which included the location of the Canyon Mine, had been proposed by DOI in 2009.  74 Fed. Reg. 35,887-01 (July 21, 2009).  The DOI undertook extensive study and preparation of an EIS before finalizing the Withdrawal.  The final EIS noted the existence of the Canyon Mine and stated its assumption that the mine would continue operations.  A.R. 8657.

In August 2011, Energy Fuels Resources (USA), Inc. ("Energy Fuels"), a successor owner of the Canyon Mine, notified the Forest Service that it intended to resume operations under the Plan approved in 1986.  A.R. 8547.  In response, the Forest Service decided to complete a valid existing rights determination ("VER Determination") with respect to the Canyon Mine.  The purpose of the VER Determination was to confirm that the owner had valid rights to the uranium mineral deposits.  Although Energy Fuels had asserted in its initial letter to the Forest Service that it did not believe any additional government approvals were required before the mine reopened (A.R. 443), Energy Fuels agreed to withhold shaft sinking until the VER Determination was complete (Doc. 123-2 at 2-3).  The VER Determination was finished on April 18, 2012, and found that Energy

1    Fuels had valid existing mineral rights at the Canyon Mine.  A.R. 10483-528.

2         The Forest Service also undertook a "Mine Review."   A.R. 10592-637.   The

3    review was conducted by a 13-person interdisciplinary team with expertise in minerals

4    and geology, surface and groundwater, air quality, transportation, tribal consultation,

5    heritage resources, vegetation, NEPA, and socioeconomic issues.  A.R. 10597.  Among

6    other matters, the team evaluated the sufficiency of the Plan and the original EIS and

7    ROD; historical and religious issues related to local tribes, including tribal consultation in

8    connection with the EIS and ROD; sensitive tribal sites, including Red Butte; the effect

9    of resumed operations on the quality of air, surface water, and groundwater; and the

10   effect of resumed mine operations on wildlife and any threatened, endangered, or

11   sensitive species.  A.R. 10592-637.

12        The Mine Review was completed on June 25, 2012, and concluded that operations

13   could resume at the Canyon Mine under the original Plan.  The Mine Review made this

14   finding:

15        [T]he Forest [Service] undertook a review of the 1986 Environmental
16        Impact Statement and Record of Decision, and associated documents.
          Resource specialists from the Kaibab National Forest and Southwestern
17        Regional Office reviewed the documents to determine if any modification
          or amendment of the existing Plan of Operations was required and whether
18        there was any new information or changed circumstances indicating
          unforeseen significant disturbance of surface resources.  It was determined
19        that no amendment or modification of the Plan of Operation was
          required. . . . Therefore, [Energy Fuels] will resume operations under the
20        existing Plan of Operations.
21

22   A.R. 10594.[3]

23        Upon learning that the mine would be reopened, the Arizona State Historic

24   Preservation Office ("AZSHPO") advised the Forest Service that it should undertake a

25   full consultation under § 106 of the National Historic Preservation Act ("NHPA"), 16

26   _____

27        [3] The Mine Review also concluded that the Plan remained in effect in 2012.
     "According to the regulations, the plan covers the entire operation and is in effect from
28   approval until the time that final reclamation is completed. . . .  The approved 1986 [Plan]
     is currently in effect."  A.R. 10598.

U.S.C. § 470f.  A.R. 10139.  Section 106 requires a federal agency charged with issuing a federal license for an "undertaking" to consult with various interested parties and evaluate the potential effects on TCPs, including identification of the affected properties, a determination of the potential adverse effects to the properties, and an identification of methods of mitigation.   36 C.F.R. §§ 800.2-800.7.

The Mine Review concluded that a full § 106 process was not necessary. A.R. 10593-637.  Instead, the Forest Service undertook a reduced consultation process under 36 C.F.R. § 800.13(b)(3).  The Forest Service sent letters to tribal leaders as well as the Advisory Council on Historic Preservation ("ACHP"), notifying them of renewed operations at the Canyon Mine and offering to meet and discuss potential adverse effects to the environment and areas of religious and cultural significance.  A.R. 10690-91.  The tribes and the ACHP urged the Forest Service to undertake a full § 106 review, but the Forest Service declined.  A two-day consultation meeting was held with the tribes in January 2013.

Plaintiffs filed this lawsuit on March 7, 2013, seeking declaratory and injunctive relief under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  Doc. 1. Plaintiffs' amended complaint alleges four claims:  (1) the Forest Service violated NEPA by not conducting an EIS in connection with the VER Determination; (2) the Forest Service violated the NHPA by failing to complete a full § 106 review prior to approving resumed operations at the Canyon Mine; (3) the Forest Service violated the NHPA by conducting a review under § 800.13(b)(3); and (4) the VER Determination failed to consider all relevant cost factors and therefore is arbitrary, capricious, and not in accordance with the law.  All parties move for summary judgment.

## II.    Standard of Review.

The APA allows a court to compel agency action unlawfully withheld or unreasonably delayed.  5 U.S.C. § 706(1).  A claim to compel action may proceed "only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*."  *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004)

1  (emphasis in original); *see Hells Canyon Preservation Council v. U.S. Forest Serv.*, 593

2  F.3d 923, 932 (9th Cir. 2010).

3        A court may set aside a final agency action under the APA only if it is "arbitrary,

4  capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.

5  § 706(2)(A).  "This standard of review is 'highly deferential, presuming the agency

6  action to be valid and affirming the agency action if a reasonable basis exists for its

7  decision.'"  *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140

8  (9th Cir. 2007) (quoting *Independent Acceptance Co. v. California*, 204 F.3d 1247, 1251

9  (9th Cir. 2000)).  The APA does not allow a court to overturn an agency action simply

10  because the court disagrees with the action.  *See River Runners for Wilderness v.*

11  *Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010).

12  **III.**  **Was the VER Determination Required?**

13        Plaintiffs argue that the VER Determination was required by law because of the

14  Withdrawal, and therefore constituted "agency action" reviewable under the APA, a

15  "major federal action" that triggered NEPA, and an approval of a new "undertaking" that

16  triggered § 106 review under the NHPA.  Because the nature of the VER Determination

17  affects so many issues in this case, the Court will address it before considering other

18  arguments made in the summary judgment briefing.

19        **A.**  **Nature of the VER Determination.**

20        The purpose of the VER Determination was to evaluate whether the owners of the

21  Canyon Mine had valid legal rights to the uranium ore they would be mining.  As part of

22  the Determination, certified mineral examiners employed by the Forest Service visited

23  the mine site, reviewed mining claims records, evaluated ore deposits, toured facilities

24  operated by the owner, and conducted an economic evaluation of the mine.  A.R. 10482-

25  527.  The examiners concluded that the mining claims "were valid at the time of the

26  [Withdrawal] and continue to be valid at the present time."  A.R. 10482.

27        The Forest Service completed the VER Determination before approving renewed

28  operations at the Canyon Mine, but the determination itself had no binding legal effect.

The Forest Service does not have responsibility for determining the validity of mining claims on federal lands.  That responsibility has been delegated to the DOI, and specifically to the Bureau of Land Management ("BLM") within the DOI (the Forest Service is in the Department of Agriculture).  The DOI, not the Forest Service, has adjudicative authority to declare mining claims valid or invalid.  *Cameron v. United States*, 252 U.S. 450, 460 (1920) (Secretary of Interior charged with determining validity of mining claims); Forest Service Manual ("FSM") § 2814.11 (A.R. 7284).

Because the Forest Service supervises vast stretches of federal land that include mining operations, however, it can perform VER Determinations under an interagency agreement with BLM.  FSM § 2814.11 (A.R. 7284); Linden Declaration, Doc. 53-2, ¶ 6. These determinations are made for internal purposes.  As the First Service Manual explains, they enable the Forest Service to make "a decision on whether or not to contest the claim."  FSM § 2819.1 (A.R. 7312).  But the actual claim contest must be adjudicated by BLM and the DOI.  FSM §§ 2814.11, 2819.1 (A.R. 7284, 7312).  As the Forest Service Manual confirms: "No adjudicative power has been given to the Forest Service. Thus, statements about validity [of mining claims] are statements of belief and not formal determinations."  FSM § 2819 (A.R. 7311).

Plaintiffs do not dispute these basic facts.  They argue, however, that things changed when the land on which the Canyon Mine is located was withdrawn by the Secretary of the Interior.  They argue that the Withdrawal, not statutes or regulations governing mining generally, required that a VER Determination be completed before the Canyon Mine could resume operations.

**B.     Legal Effect of the Withdrawal.**

The Withdrawal affected more than one million federally-owned acres north and south of the Grand Canyon, closing them to mineral location and entry for a period of 20 years.  77 Fed. Reg. 2317-01 (Jan. 17, 2012); A.R. 10308-31.  The Withdrawal did not prohibit all uranium mining on the withdrawn lands.  Rather, it prohibited "location and entry," which is the process by which an individual enters public lands to find and

establish a valid mining claim.  *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 750 n.3 (D.C. Cir. 2007).

Prior to the Withdrawal, the lands were open for location and entry.  The Mining Law of 1872 provides that "all valuable mineral deposits in lands belonging to the United States . . . shall be free and open to exploration and purchase[.]"  30 U.S.C. § 22. Individuals can enter federal land, explore for minerals, and stake their right to a claim by "[e]stablishing the exterior lines of a mining claim or site" and "[r]ecording a notice or certificate of location."  43 C.F.R. § 3832.1.  Such claims can then become the subject of proposed plans for the operation of a mine.  The Withdrawal removed the land from this open exploration and claim process and thereby foreclosed the establishment of new mining claims in the future.

The Withdrawal did not extinguish mining rights that already existed.  To the contrary, it was "subject to valid existing rights."  A.R. 10310.  This means that existing mines like the Canyon Mine could continue to operate.  Indeed, the Withdrawal's EIS specifically contemplated that four uranium mines, including the Canyon Mine, would continue in operation.  A.R. 10314 ("There are four mines within the withdrawal area that have approved plans of operations that predate the Secretary's withdrawal proposal.  The Pinenut, Kanab North, and Canyon mines were approved in the late 1980s and are operating under the interim management plans[.]").

The Withdrawal also contemplated that claim owners with valid existing rights at the time of the Withdrawal, but no operating mine, could submit a plan of operation for a uranium mine for approval:

> Withdrawals under section 204 of the FLPMA must be made subject to valid existing rights, which means that new mineral exploration and development could still be authorized under the withdrawal on valid existing mining claims.  The . . . scenarios developed for the EIS indicate that potentially 11 mines could develop with a full withdrawal, including the four mines currently approved[.]

A.R. 10314-15.

The Withdrawal also addressed when VER Determinations would be required.  It stated that *new* plans of operations would be approved only if BLM or the Forest Service first determined that the parties submitting the plans had valid existing mineral rights at the time of the Withdrawal:

> On withdrawn lands, neither the BLM nor the Forest Service will process a *new* . . . plan of operations until the surface managing agency conducts a mineral examination and determines that the mining claims on which the surface disturbance would occur were valid as of the date the lands were . . . withdrawn.

*Id.* (emphasis added).

This is consistent with relevant regulations and guidance documents.  BLM regulations specifically address the rules that apply to withdrawn lands.  They state that, after the date of a withdrawal, "BLM will not *approve* a plan of operations . . . until BLM has prepared a mineral examination report."  43 C.F.R. § 3809.100(a) (emphasis added).  They do not suggest that a VER Determination is required for an already-approved plan of operations.

Section 8.1.5 of the BLM Surface Management Handbook addresses previously approved plans:

> [A]pproved Plans of Operations that were in place prior to the withdrawal or segregation date *are not subject to the mandatory valid existing rights determination procedures at 43 C.F.R. 3809.100(a).*  These operations may continue as accepted or approved and do not require a validity determination unless or until there is a material change in the activity. . . .

A.R. 11602.

This guidance comes from BLM, not the Forest Service.  But as noted above, BLM is the primary agency responsible for determining mining claim validity, and its parent, DOI, is the agency that withdrew the lands at issue in this case.  The guidance of BLM on the effect of the Withdrawal is therefore highly relevant.  In addition, when the Forest Service was asked in a public forum whether it had regulations specifying when a VER Determination would be required on withdrawn lands, it provided this answer:

> The Department of Interior (BLM) is the adjudicator of mining claims for the federal mineral estate including minerals located on National Forest System Lands.  The BLM does have regulations addressing when to require a valid existing rights determination for lands that have been segregated or withdrawn at 43 C.F.R. 3809.100(a).  *It is the policy of the Forest Service to be consistent with BLM direction.*  Once the lands have been segregated or withdrawn, the Forest Service will not *approve* a plan of operation without first determining if valid existing rights exist.

A.R. 7691 (emphasis added); *see also* Linden Declaration, Doc. 53-2, ¶¶ 6-7.

From these sources, the Court concludes that a VER Determination was not legally required before operations at the Canyon Mine could resume.  The Canyon Mine Plan of Operations had been approved in 1986.  A resumption of operations at the mine did not require approval of a new plan.  Thus, the relevant regulations and policy statements did not require a VER Determination.

Plaintiffs argue that the Withdrawal was "subject to valid existing rights" (A.R. 10310) and that a VER Determination was therefore required.  But there is a difference between valid existing rights and a valid existing rights determination, and neither the Withdrawal nor the FLPMA requires a determination.  The fact that the Withdrawal was "subject to valid existing rights" meant that it did not extinguish valid rights in existence at the time of the Withdrawal; it says nothing about when or how a review of those rights must occur.  When the Withdrawal did address the requirement of VER Determinations, it said they would be required only for "new" plans of operations. A.R. 10314-15.

Plaintiffs also cite to a statement from § 2803 of the Forest Service Manual which directed the Service to "[e]nsure that valid existing rights have been established before allowing mineral or energy activities in congressionally designated or withdrawn areas." Doc. 140-5 at 2.  Plaintiffs argue that this sentence requires the Forest Service to complete a VER Determination before any mineral activity can occur on withdrawn lands, even activity at an already-approved mine.  The Court does not read the sentence

so broadly.  In light of the very specific guidance provided in the BLM regulations and Handbook, and the Forest Service's publicly stated policy of following that guidance, the Court reads the word "allowing" in this sentence to mean that the Forest Service will not allow *new* mining activities on withdrawn lands without first completing a VER Determination.  This reading comports with the Forest Service's own statement that "[o]nce the lands have been segregated or withdrawn, the Forest Service will not *approve* a plan of operation without first determining if valid existing rights exist."  A.R. 7691 (emphasis added).  It also squares with the Withdrawal's requirement of a VER Determination only for a "new" plan of operations.  A.R. 10314-15.[4]

In summary, because no new plan was required for the Canyon Mine after the Withdrawal, the relevant regulations and guidance documents did not require a VER Determination.  Mining could have resumed without one.

### C.  The Practical Effect of the VER Determination.

Although not a legal requirement, the record suggests that completion of the VER Determination was a practical requirement before the Canyon Mine resumed operations. On September 23, 2011, the Forest Supervisor, Michael Williams, wrote a letter to the executive vice president of Energy Fuels.  Mr. Williams explained that '[a] mineral exam is scheduled to determine if your company has valid existing rights for the Canyon Mine location.  This is a requirement for any public domain lands managed by the Forest Service that have been withdrawn from mineral entry[.]"  A.R. 12429; Doc. 126-12 at 1.

In a conference call with the Kaibab Paiute Tribe on January 10, 2012, in which Mr. Williams participated, an employee of the Forest Service explained that "the mineral exam will need to be completed before they start work at the Canyon Mine."  A.R. 10335; Doc. 118-15 at 1.  The next day, in a telephone conversation with the

---

[4] The Court reaches the same conclusion with respect to § 2813.3 of Forest Service Manual cited by Plaintiffs: "Otherwise the use of validity determinations should be limited to situations where valid existing rights must be verified where the lands in question have been withdrawn from mineral entry[.]"  A.R. 7310.  The "situations" where such rights must be verified, as shown above, are the approval of new mining operations on withdrawn lands.

Hualapai Tribe, Mr. Williams stated that Energy Fuels "would not be able to move forward without VER under the mineral withdrawal." A.R. 10342; Doc. 118-18 at 1.

The VER Determination itself suggested that it was required for renewed operation of the mine: "It is Forest Service policy (FSM 2803.5) to only allow operations on mining claims within a withdrawal that have valid existing rights (VER)." A.R. 10486; *see also* 10487, 10489.  Although this statement is correct to the extent it suggests that mining operations on withdrawn lands must have valid existing rights, it is incorrect, for the reasons explained above, to the extent it suggests that a VER Determination was legally required before the Canyon Mine could resume operations. The Forest Service concedes that the legal understanding of some of its employees was incorrect, but this does not change the fact that these employees took the position with Energy Fuels and the tribes that a VER Determination was required.

Other communications make clear that Energy Fuels chose not to proceed with renewed operations until the VER Determination was finished.  A letter from Energy Fuels' executive vice president to Forest Service employees concerning the process of the VER Determination stated: "We would like to get the sample analysis turned around as early as possible so that we can hopefully close this out and proceed with our production plans." Doc. 118-16 at 1.  An email from a Forest Service employee to representatives of the Kaibab Paiute Tribe, sent the day after the January 10, 2012 conference call mentioned above, contained this statement: "I called our geologist, and was told that [Energy Fuels] will not be doing any 'shaft sinking' at the site until the mineral exam is completed." A.R. 10348; Doc. 126-13 at 1.

Thus, even though the law did not require the VER Determination, these communications show that the Forest Service, Energy Fuels, and interested tribes all understood that mine operations would not resume until it was completed.  It was a practical if not a legal requirement.

**IV.   Threshold Matters.**

Defendants raise four threshold matters: (1) Plaintiffs lack Article III standing on

- 12 -

two claims, (2) Plaintiffs lack prudential standing on claim four, (3) the VER Determination is not a final agency action subject to judicial review, and (4) collateral estoppel bars two claims.

### A.   Article III Standing.

"To satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

Defendants argue that Plaintiffs lack standing to bring claims one and four.  Claim one asserts that the Forest Service, in completing the VER Determination, violated NEPA by not conducting an EIS.  Claim four asserts that the VER Determination failed to account for several costs.  Defendants argue that Plaintiffs' "concrete interests" stem not from the VER Determination, but from the Plan approved in 1986.  Several of the declarations submitted by Plaintiffs do not address the VER Determination; rather, they appear to seek modification of the Plan.  Thus, Defendants argue, Plaintiffs have failed to demonstrate any injury traceable to the VER Determination.[5]

Plaintiffs argue that they suffered "concrete injuries to their environmental, cultural and procedural interests [that] stem directly from the [VER Determination] and the agency's failure to comply with NEPA and the NHPA." Doc. 151 at 6.  They assert that the VER Determination permitted mining to resume and thus threatens their interests in the land surrounding the Canyon Mine.  Plaintiffs have submitted the declarations of

---

[5] Defendants also argue that Plaintiffs lack standing to bring claim two. Defendants characterize the claim as a direct challenge to the VER Determination, but claim two asserts that the Forest Service was required to conduct a consultation under § 106 of the NHPA before allowing mining to continue. *See* Doc. 151 at 7. It does not concern the VER Determination. Defendants' arguments, which focus entirely on the VER Determination, are therefore insufficient to challenge Plaintiffs' standing to bring claim two.

Don Watahomigie and Rex Tilousi on behalf of the Havasupai Tribe, Roger Clark on behalf Grand Canyon Trust, Kim Crumbo on behalf of the Sierra Club, and Robin Silver on behalf of the Center for Biological Diversity.  Docs. 37-7, 37-8.  They also submitted supplemental declarations of Clark and Silver.  Docs. 151-1, 151-2.

Declarations of the tribal representatives show that they have historical and religious interests in the lands surrounding the mine and on which the mine is located. The Court concludes that federal action taken without due consideration of environmental or historical impacts of the mine would constitute a concrete and particularized injury to the tribes.

"[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."  *Friends of the Earth*, 528 U.S. at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)).  Plaintiffs have done just that.  Roger Clark states that resumption of mining "interfere[s] with my enjoyment of the lands within and surrounding Grand Canyon National Park[.]"  Doc. 151-1, ¶ 20. He claims he decided not to visit the park on several occasions because of the "constant dust, noise, and traffic from trucks constructing roads and developing the Canyon Mine." *Id.*, ¶ 6.  Robin Silver states that the mining activities "threaten to destroy my aesthetic enjoyment of the Red Butte area due to dust, heavy truck traffic, light pollution and noise," and also "limit and interfere with my local photographic opportunities." Doc. 151-2, ¶¶ 12, 13.  Silver also notes the environmental impacts caused by mining. *Id.*, ¶¶ 13-17.  In addition, several declarants state they are harmed because the Forest Service's failure to comply with NEPA deprived them of the opportunity to comment on and participate in the Forest Service decision.  *See* Doc. 37-8.

Plaintiffs' declarations are sufficient to establish injury in fact and are fairly traceable to the VER Determination, which they assert permitted mining to resume.  *See Cantrell v. City of Long Beach*, 241 F.3d 674, 682 (9th Cir. 2001) ("Once a plaintiff has established an injury in fact under NEPA, the causation and redressability requirements

1    are relaxed.").  Therefore, the first two elements of standing are met.

2          Defendants argue that Plaintiffs have failed to demonstrate the third requirement –

3    redressability.    They argue that the VER Determination did not create any legal

4    consequences and was not required.  If the Court were to invalidate it, they argue, a new

5    VER Determination would not be required and mining would resume.

6          This redressability position is essentially an argument on the merits.  Defendants

7    assert that Plaintiffs will fail to prove that the VER Determination was necessary and

8    therefore invoked NEPA and NHPA requirements, and thus will fail in obtaining relief

9    for their grievances.  But the Court cannot consider the merits when deciding standing.

10   The Court must assume the truth of Plaintiffs' claims and that Plaintiffs will succeed on

11   the merits.  *See Friends of the Earth*, 528 U.S. at 180-81 (the plaintiff must show that the

12   injury will be redressed "by a favorable decision"); *Warth v. Seldin*, 422 U.S. 490, 503

13   (1975) (court must take the allegations of the complaint as true); *City of Waukesha v.*

14   *E.P.A.*, 320 F.3d 228, 235 (D.C. Cir. 2003) ("Indeed, in reviewing the standing question,

15   the court must be careful not to decide questions on the merits . . . and must therefore

16   assume that . . . the plaintiffs would be successful in their claims.").  Thus, even though

17   the Court has concluded above, for convenience in the organization of this order, that the

18   VER Determination was not legally required, it must assume that Plaintiffs will prevail

19   when deciding whether they have standing to pursue their claims.

20         If Plaintiffs succeed on their claim that Defendants violated NEPA and the NHPA,

21   the Court will order NEPA and NHPA procedures to be followed.  *See Pit River Tribe v.*

22   *U.S. Forest Service*, 469 F.3d 768, 779 (9th Cir. 2006).  This could certainly redress

23   Plaintiffs' procedural and aesthetic injuries.  Thus, Plaintiffs have satisfied the elements

24   of standing on claims one and four.  *See W. Watersheds Project v. Kraayenbrink*, 632

25   F.3d 472, 482-83 (9th Cir. 2011) (an organization has standing to bring suit on behalf of

26   its members where a member would have standing to sue in his own right, the interests at

27   stake are germane to the organization's purpose, and neither the claim asserted nor the

28

1    relief requested requires participation of the member in the suit).[6]

2        **B.    Prudential Standing on Claim Four.**

3        Defendants argue that Plaintiffs lack prudential standing to bring claim four,

4    which challenges the substance of the VER Determination.   At oral argument, Plaintiffs

5    stated that claim four is tied to the Mining Law of 1872, which sets forth the process by

6    which miners establish valid rights to mineral deposits.[7]  30 U.S.C. §§ 22-54.

7        To establish their alleged violation of the Mining Law, Plaintiffs cite several cases

8    articulating and applying tests for determining whether mining claims are valid.  *See, e.g.,*

9    *Independence Min. Co. v. Babbitt*, 105 F.3d 502, 506-07 (9th Cir. 1997) (a validity

10   determination requires the mineral examiner to do a "field examination; collect and

11   analyze samples; estimate the value of the mineral deposit and the cost of extracting,

12   processing and marking the minerals, including the costs of complying with any

13   environmental and reclamation laws"); *Lara v. Sec'y of Interior*, 820 F.2d 1535, 1541

14   (9th Cir. 1987) (applying "prudent-man test"); *Hjelvik v. Babbitt*, 198 F.3d 1072, 1074

15   (9th Cir. 1999) (applying "marketability test").   They also cite Interior Board of Land

16   Appeals decisions on the nature of valid claims.  *See, e.g., Great Basin Mine Watch*, 146

17   IBLA 248 (1999); *Moon Mining v. HECLA Mining*, 161 IBLA 334 (2004).   Plaintiffs

18   argue that the Court should apply this law to the VER Determination and find it deficient.

19       But the Supreme Court has "interpreted [§ 702] of the APA to impose a prudential

---

[6] The Court also notes that one who challenges the violation of "a procedural right to protect his concrete interests can assert that right without meeting all the normal standards" for traceability and redressability.  *Lujan*, 504 U.S. at 572 n. 7.  Such a litigant need only demonstrate that he has "a procedural right that, if exercised, *could* protect [his] concrete interests and that those interests fall within the zone of interests protected by the statute at issue."  *Defenders of Wildlife v. U.S. Envtl. Prot. Agency*, 420 F.3d 946, 957 (9th Cir. 2005), rev'd in part on other grounds by *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007); *see also Natural Res. Def. Council v. Jewell*, 749 F.3d 776, 782-83 (9th Cir. 2014).  Plaintiffs' NEPA and NHPA claims satisfy this requirement.

[7] Alternatively, Plaintiffs assert that claim four is brought as a stand-alone APA claim.  Such a claim fails because "there is no right to sue for a violation of the APA in the absence of a 'relevant statute' whose violation 'forms the legal basis for [the] complaint.'"  *El Rescate Legal Servs., Inc. v. Exec. Office of Immigration Review*, 959 F.2d 742, 753 (9th Cir. 1991) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990)).

standing requirement" in addition to the requirements of Article III.  *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 488 (1998).  "For a plaintiff to have prudential standing under the APA, 'the interest sought to be protected by the complainant [must be] arguably within the zone of interests to be protected or regulated by the statute . . . in question.'"  *Id.* (quoting *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153 (1970)).  This test "is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff."  *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 399-400 (1987).  But APA claims cannot be asserted when "the plaintiff is not the subject of the contested regulatory action" and "the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot be reasonably assumed that Congress intended to permit the suit."  *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 940 (9th Cir. 2005) (quoting *Clarke*, 479 U.S. at 399).  Importantly, "whether a plaintiff's interest is within the zone of interests protected by a statute 'is to be determined not by reference to the overall purpose of the Act in question . . . , but by reference to the particular provision of law upon which the plaintiff relies.'"  *Id.* (quoting *Bennett*, 520 U.S. at 175-76).

The Court is not aware of any case applying the "zone of interests" test to the Mining Law, and the parties have cited none.  The Court must therefore look to the "obvious purpose" of the "particular provision" to which Plaintiffs tie their claim, *Bennett*, 520 U.S. at 176, and determine whether Plaintiffs' interests "are among the sorts of interests [the statute was] specifically designed to protect," *Nat'l Wildlife Fed'n*, 497 U.S. at 886.

Section 22 of the Mining Law provides that "all valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to exploration and purchase[.]"  30 U.S.C. § 22.  "[A] private citizen may enter federal lands to explore for mineral deposits" and, if a discovery is made, "perfect[] the claim by properly staking it and complying with other statutory requirements."  *California Coastal*

*Comm. v. Granite Rock Co.*, 480 U.S. 572, 575 (1987).  The Mining Law's "obvious intent was to reward and encourage the discovery of minerals that are valuable in an economic sense."  *United States v. Coleman*, 390 U.S. 599, 602 (1968).

Plaintiffs do not fall within the zone of interests protected or regulated by the Mining Law.  That law regulates mineral interests and provides procedures by which mining claims may be discovered and protected.  The purpose of a VER Determination, including the determination in this case, is to confirm that valid mineral rights have been acquired.  Plaintiffs' interests are environmental and historical.  They do not claim to hold mineral rights at the Canyon Mine site, nor do they assert economic interests in those mineral rights.

Claim four alleges that the VER Determination is flawed – that it failed to consider and properly evaluate relevant information when it concluded that the Canyon Mine had valid existing mineral rights.  In essence, claim four challenges Energy Fuels' rights in the uranium at the Canyon Mine.  But Plaintiffs do not assert competing interests in the uranium; they have not engaged in the procedures established by the Mining Law for acquiring mineral interests; and they did not participate in the VER Determination.  Nor does the Mining Law protect the environmental and historical interests Plaintiffs assert in this case.  Other statutes such as NEPA and NHPA protect such interests, but the Mining Law does not.

Because Plaintiffs' interests are not "marginally related to . . . the purpose implicit" in the Mining Law, *see Ashley Creek*, 420 F.3d at 940, they lack prudential standing to bring claim four.  To hold otherwise would give environmental groups and tribes the right to challenge every grant of private mineral rights under the Mining Law.  Mineral claimants would be forced into the courts, the costs associated with validating rights would increase, and the "obvious purpose" of the Mining Law – to reward and encourage mineral discovery – would be undermined.

The Ninth Circuit has often held that purely economic interests are inconsistent with the environmental interests protected by NEPA.  *See, e.g., id.* at 945; *Nevada Land*

1   *Action Ass'n v. U.S. Forest Service*, 8 F.3d 713, 716 (9th Cir. 1993);  *W. Radio Servs. Co.*

2   *v. Espy*, 79 F.3d 896, 903 (9th Cir. 1996); *Ranchers Cattlemen Action Legal Fund United*

3   *Stockgrowers of Am. v. U.S. Dep't Agric.*, 415 F.3d 1078, 1103-04 (9th Cir. 2005).  Thus,

4   plaintiffs asserting economic injuries lack prudential standing under NEPA.   "The

5   purpose of NEPA is to protect the environment, not the economic interests of those

6   adversely affected by agency decisions."  *Nevada Land Action*, 8 F.3d at 716.  This case

7   presents the same situation in reverse – the "obvious purpose" of the Mining Law is to

8   protect economic interests in mineral deposits, not the environmental or historical

9   interests held by Plaintiffs.[8]

10        Plaintiffs' argue that *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v.*

11   *Patchak*, 132 S. Ct. 2199 (2012), compels a different result.  In *Patchak*, the Supreme

12   Court held that the owner of property near the site of a proposed Indian casino had

13   prudential standing to challenge the decision of the Secretary of the Interior to acquire

14   nearby property under the Indian Reorganization Act.  *Id.* at 2211-12.  The government

15   argued that the owner's interests in the land's use were not within the zone of interests of

16   the Act, which focused on land acquisition.  *Id.* at 2210.  The Court disagreed, finding

17   that the Act dealt with land use generally and required the Secretary to consider

18   "potential conflicts of land use that may arise" from acquisitions.  *Id.* at 2211 (internal

19   quotations and citations omitted).   Consequently, the owner's interests arguably fell

20   within the zone of interests protected by the Act, as "neighbors to the use . . . are

21   reasonable – indeed, predictable – challengers" to the agency decision.  *Id.* at 2212.

22        Unlike *Patchak*, Plaintiffs' interests do not arguably fall within the zone of

23   interests protected by the Mining Law.  The statute in *Patchak* required the government

24   to consider interests like those asserted by the plaintiffs.  Plaintiffs have cited no

---

26        [8] Plaintiffs also argue their APA claim is tied to the FLPMA.  The Court rejects
27   this argument because the sections of the statute to which Plaintiffs cite do not relate to
     validity determinations or mineral examinations.  *See* 43 U.S.C. §§ 1701(a)(4), 1702(j),
     1714(a).   These sections deal with the DOI's authority to withdraw land and do not
28   provide the Court with any relevant law to apply in deciding claim four.  *See* 5 U.S.C.
     § 701(a)(2).

provision of the Mining Law that requires the government to consider their environmental or historical interests when assessing the validity of mineral claims. And the specific section of the Mining Law at issue here, which must be the focus of the Court's prudential standing analysis, is designed to open up federal land to mineral exploration and the establishment of valid mining claims. 30 U.S.C. § 22. It says nothing about the interests asserted by Plaintiffs. Nor can it be said that Plaintiffs are foreseeable challengers of a BLM or Forest Service decision validating mineral rights, especially when they have not cited a single case involving such a challenge.

Plaintiffs also cite *Thomas v. Morton*, 408 F. Supp. 1361, 1370 (D. Ariz. 1976), for the proposition that the general public has a "paramount interest" in protecting lands from the effects of invalid mining claims. But *Thomas* involved a mineral claim contest between private parties, not a suit by environmental plaintiffs. It does not support Plaintiffs' argument that the Mining Law protects Plaintiffs' interests.

In sum, the Court finds that Plaintiffs do not fall within the zone of interests protected by the Mining Law, and thus do not have prudential standing to bring claim four. The Court will grant Defendants' motion for summary judgment on that claim.

### C.   Final Agency Action.

In their motion to dismiss, Defendants argued that several of Plaintiffs' claims should be dismissed because the VER Determination did not constitute a final agency action subject to judicial review. Doc. 71. The Court disagreed, finding that the VER Determination "marked the consummation of the Forest Service's validity determination" and was "a practical requirement before the Canyon Mine resumed operations" under *Bennett v. Spear*, 520 U.S. at 154. Doc. 131 at 7. The Court found, for reasons discussed above, that the VER Determination was a practical if not a legal requirement. *Id.* at 9. Relying on Supreme Court and Ninth Circuit authority, the Court then concluded that such a practical requirement could satisfy the second prong of the *Bennett* test, which requires that the agency action be "one by which rights or obligations have been determined, or from which legal consequences will flow." 520 U.S. at 178 (quotation

marks and citation omitted); Doc. 131 at 9-10.

Defendants now argue that the Court erred in concluding that practical effects can satisfy the second prong of *Bennett*.  Defendants rely primarily on *Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084 (9th Cir. 2014), a case decided two days before the Court issued its order on the motion to dismiss.  The Court has reviewed *Columbia Riverkeeper* and does not find it contrary to the Court's previous decision.  *Columbia Riverkeeper* appears to confirm that practical effects can satisfy the second prong of the *Bennett* test: "We agree that an agency's characterization of its action as being provisional or advisory is not necessarily dispositive, and courts consider whether the *practical effects* of an agency's decision make it a final agency action, regardless of how it is labeled."  761 F.3d at 1094-95 (emphasis added).

The court in *Columbia Riverkeeper* was faced with a very different set of facts.  The Ninth Circuit found that the letter of recommendation in question did not, as a practical matter, have the effect of permitting shipment of liquefied natural gas.  As the Ninth Circuit explained: "Nor does the record support Riverkeeper's argument that, as a practical matter, FERC always complies with the Coast Guard's letter of recommendation, which effectively gives it the force of law."  *Id.*

The record is quite different in this case.  The Court finds that the VER Determination, as a practical matter, had to be completed before the Canyon Mine could reopen.  The Court therefore continues to conclude that the VER Determination constituted final agency action under the *Bennett* test.[9]

---

[9] The Court admits that it has serious doubts as to whether a purely practical effect can satisfy the second prong of the *Bennett* test.  Such a holding seems inconsistent with *Bennett*'s requirement of actions "by which rights or obligations have been determined, or from which legal consequences will flow."  520 U.S. at 178.  But the cases discussed in the Court's ruling on the motion to dismiss (Doc. 131 at 9-10) and the language quoted above from *Columbia Riverkeeper* seem to indicate that practical results can suffice.  Were it not for these cases, the Court would find that the VER Determination is not a reviewable agency action for the same reasons as *Fairbanks North Star Borough v. U.S. Army Corps of Engineers*, 543 F.3d 586, 594 (9th Cir. 2008).

### D.     Collateral Estoppel.

Defendants argue that claims two and three are barred by collateral estoppel because those claims were litigated in *Havasupai Tribe* following the approval of the Canyon Mine Plan.  Doc. 147-1 at 7.  Defendants dedicate only one paragraph of their combined 66 pages of opening briefs to this issue, for good reason. The Court previously rejected a similar argument based on *res judicata*.  Doc. 131 at 14-15.  The Court held that the claims brought by the Havasupai Tribe and others in 1988, more than 20 years before the Red Butte area was designated as a TCP, were not the same as the claims asserted under the NHPA in the amended complaint.  *Id.*  The Court continues to hold that view.  Although Defendants argue that the consultation procedures under NEPA and the NHPA are essentially the same, the authorities they cite do not support this conclusion.  Regulations do suggest that such consultations can occur at the same time, but they specifically identify matters that should be addressed under the NHPA that are not addressed under NEPA.  *See* 36 C.F.R. §§ 800.8(a), (c).  Collateral estoppel bars "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment."  *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008).  Because issues raised in the amended complaint under the NHPA were not litigated in the earlier litigation, collateral estoppel does not apply.

## V.     NEPA Compliance – Claim One.

"NEPA is a procedural statute that does not 'mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions.'"  *Sierra Club v. Bosworth*, 510 F.3d 1016, 1018 (9th Cir. 2007) (citation omitted).  NEPA requires federal agencies to perform environmental analysis before taking "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  Plaintiffs claim that the VER Determination was a major federal action and that the Forest Service therefore violated NEPA by failing to perform an EIS in connection with the determination.

When the Forest Service received the proposed plan of operations for the Canyon Mine in 1984, it complied with NEPA and prepared a full EIS.  A.R. 461-693.  On the basis of the EIS, the Forest Service issued the ROD and took the "major federal action" of approving the Canyon Mine Plan on September 26, 1986.  A.R. 915-29.  The EIS and ROD were subsequently upheld in two levels of appeal within the Forest Service, by this Court, and by the Ninth Circuit Court of Appeals.  Thus, there can be no doubt that full NEPA compliance occurred before operation of the Canyon Mine was approved.

Plaintiffs allege that the VER Determination constituted a new major federal action that triggered the need for another EIS of the Canyon Mine.  The Court does not agree.  As explained above, the VER Determination was not required as a matter of law before the Canyon Mine could resume operations.  In addition, after completing the Mine Review, the Forest Service concluded that no modification or amendment of the existing Plan was necessary for mining activities to resume.   A.R. 10594.   Thus, the Plan approved in 1986 after a full EIS evaluation continued to govern operations at the Canyon Mine.

The Ninth Circuit has held "that where a proposed federal action would not change the status quo, an EIS is not necessary."  *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 646 (9th Cir. 2014) (quoting *Upper Snake River Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232, 235 (9th Cir. 1990)).  The Ninth Circuit has also held that EIS requirements do not apply to mere continued operation of a facility.  *See Upper Snake River*, 921 F.2d at 234-35 (holding that agency need not prepare an EIS before adjusting water flow from a dam because continued operation of the dam would have consequences "no different than those in years past"); *Burbank Anti-Noise Group v. Goldschmidt*, 623 F.2d 115, 116 (9th Cir. 1980) ("An EIS need not discuss the environmental effects of mere continued operation of a facility."); *City & Cnty. of San Francisco v. United States*, 615 F.2d 498, 501 (9th Cir. 1980) (finding EIS adequate where Navy evaluated effects of shipyard lease only in comparison to the decades-long prior use of the facility as a shipyard, rather than "as if the Navy were proposing to

establish this multi-million dollar industrial complex for the first time").

Like the above-cited authorities, a resumption of mining activities under the Plan approved by the Forest Service after full NEPA review did not constitute a new major federal action that required preparation of another EIS.  The major federal action was the same as approved in 1986 – mining under the Plan of Operations.

Plaintiffs argue that "[i]f a federal approval is needed for a project, that approval action is a NEPA 'major federal action.'"  Doc. 140-1 at 21.  They assert that the VER Determination was an "approval" needed before mining could resume, and that the VER Determination therefore constituted a new major federal action requiring full NEPA compliance.  The Court finds this argument unpersuasive for two reasons.  First, as noted above, the VER Determination was not a required approval for mining operations to continue.  The premise of Plaintiffs' argument is therefore incorrect.  Second, the law does not provide that every federal approval amounts to a major federal action.  This point was made clear in *Center for Biological Diversity v. Salazar ("CBD")*, 791 F. Supp. 2d 687 (D. Ariz. 2011), and the Ninth Circuit opinion affirming that decision.

*CBD* involves facts nearly identical to this case.  The uranium mine at issue in *CBD*, known as the Arizona 1 Mine, is located on the north side of Grand Canyon National Park and is owned and operated by Energy Fuels.  *CBD*, 791 F. Supp. 2d at 690.  A plan of operations for the Arizona 1 Mine was approved by BLM in 1988 after completion of a full EIS.  *Id.*  When uranium prices fell in the 1990s, the Arizona 1 Mine was placed on stand-by status.  *Id.*  Several years later, in 2007, the owner provided notice that it intended to resume mining under the original plan of operations.  BLM required the mine owner to update its reclamation bond and obtain a clean air permit, and then approved the renewed operations.  *Id.*  The plaintiffs, which included some Plaintiffs in this case, brought an APA action claiming that BLM's approval of the renewed mining operations constituted a major federal action that required a supplemental EIS.  *Id.*  The plaintiffs pointed to the update of the reclamation bond and the clean air permit as new steps that made the renewed mine operation a major federal action under NEPA.

- 24 -

The Court disagreed.  It found that a supplemental EIS was not required because BLM had complied with NEPA in 1988 when it approved the original plan of operations for the Arizona 1 Mine.  *Id.* at 698.  The Court found that BLM's approval of the updated bond and the requirement of an air permit did not amount to a major federal action because they were "not an approval of a specific project by permit or regulatory decision."  *Id.* at 704 (internal quotations omitted).  Instead, the Court found that the "major federal action was taken more than 20 years ago" when BLM approved the mine's plan of operations after a full NEPA review.  *Id.*

The Ninth Circuit affirmed.  *Center for Biological Diversity v. Salazar*, 706 F.3d 1085 (9th Cir. 2013).  The Ninth Circuit noted that approval of the mine's plan of operations in 1988 undoubtedly was a major federal action, but that it was completed when the plan was approved.  *Id.* at 1095.  "Before that action was complete, BLM performed the requisite environmental analysis."  *Id.*  "Accordingly, as far as the 1988 plan of operations is concerned, appropriate NEPA review took place and there is no ongoing 'major Federal action' that could require [EIS] supplementation."  *Id.* (quotation marks and citation omitted).  The fact that BLM required additional steps to be completed before mining could resume did not alter this conclusion.  Those additional steps – updating of the bond and obtaining of the air permit – did not approve any new specific project and constituted mere ministerial tasks.  *Id.* at 1095-96.

These holdings apply to the Canyon Mine.  A full NEPA analysis was performed by the Forest Service when the Plan was approved in 1986.  The major federal action – plan approval – was completed at that time.  The fact that the Forest Service elected to conduct a VER Determination before the mine resumed operations, and that the owner agreed to wait until the determination was finished, did not constitute a new major federal action.  The VER Determination was not a legal requirement.  Nor were the resumed mine operations going to vary from the previously approved Plan.  Like the bond update and the air permit required in *CBD*, the VER Determination was not an approval of a new

project.[10]

Plaintiffs argue that this conclusion conflicts with *Pit River Tribe*, which involved BLM's extension of expired leases on federal land for development of a geothermal plant. 469 F.3d at 768. The Ninth Circuit, in an opinion by the same judge who authored the Ninth Circuit opinion in *CBD*, held that extending the leases required preparation of an EIS because, without the extension, the lessee would have retained no rights on the leased property. *Id.* at 784. Extension of the leases thus constituted an affirmative grant of the right to build a geothermal plant. *Id.* ("Without the affirmative re-extension of the 1988 leases, Calpine would have retained no rights at all to the leased property and would not have been able to go forward with the Fourmile Hill Plant.").

Unlike the leases in *Pit River Tribe*, which would have expired without affirmative action by the government, the approved Plan for the Canyon Mine had no time limit. The interim management provisions of the Plan continued to govern the mine while on stand-by status. Energy Fuels' rights under the Plan were never terminated and did not require affirmative renewal. *See Center for Biological Diversity*, 706 F.3d at 1091-94 (holding that approved plan of operation for uranium mine remained in effect through periods when mine was inactive); 43 C.F.R. § 3809.423 (plan of operation remains in effect unless terminated by agency); A.R. 10598 (Mine Review determination that the Plan for the Canyon Mine had no time limit and remained in effect in 2012). The expiration of the leases in *Pit River Tribe* stripped the developer of all rights on the land. Here, the Withdrawal had no such effect, and the Court's decision does not conflict with the holding in *Pit River Tribe*.[11]

---

[10] The Forest Service's Mine Review reached the same conclusion: "No new federal action subject to further NEPA analysis is required for resumption of operations of the Canyon Mine. The existing [Plan] remains in place and in effect, and there is no need for any amendment or modification of the [Plan]." A.R. 10629.

[11] Plaintiffs claim that another company, VANE Minerals LLC, recognized that the Withdrawal changed its legal rights to mine. VANE's activities, however, involved exploratory drilling and a request for approval of a *new* plan of operations. Doc. 140-9. As noted above, the Withdrawal specifically required that *new* plans of operations be approved only after a VER Determination was completed.

In sum, the Withdrawal had no effect on the operations at Canyon Mine, the VER Determination was not legally required, mining was to continue under the Plan that had been subjected to full NEPA review in 1986, and the VER Determination did not alter or amend the Plan.  As noted above, EIS requirements do not apply to mere continued operation of a NEPA-approved facility.  As in *CBD*, the major federal action in this case occurred more than twenty years ago and remains unchanged.  Because issuance of the VER Determination did not trigger NEPA or require a new EIS, Defendants are entitled to summary judgment on claim one.

## VI.    NHPA Compliance – Claims Two and Three.

Before a federal agency implements, assists, or licenses an "undertaking," the NHPA requires the agency to "take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register" of Historic Places.  16 U.S.C. § 470f.  For purposes of this case, an "'undertaking' means a project, activity, or program . . . requiring a Federal permit, license, or approval[.]"  16 U.S.C. § 470w(7)(C).

NHPA regulations are promulgated by the ACHP.  The regulations guide federal agencies in implementing the § 106 consultation process, which requires the agency to identify the affected historical properties, determine potential adverse effects, and identify methods of mitigation.  36 C.F.R. §§ 800.2-800.7.  The regulations also require consultation with the public, the ACHP, the AZSHPO, and Indian tribes that "attach religious and cultural significance to historic properties that may be affected by an undertaking."  *Id.*, § 800.2(c)(2)(ii).

Plaintiffs allege in claim two that the Forest Service was obligated to complete a full NHPA § 106 consultation because resumed operation of the Canyon Mine was an "undertaking" within the meaning of the NHPA.  They allege in claim three that the Forest Service erred in applying the NHPA process set forth in § 800.13(b)(3), rather than (b)(1), and did not comply with (b)(3) in any event.  The Court will address these claims

1  separately.[12]

2  **A.   Was There an Undertaking?**

3      An undertaking is a "project, activity, or program funded in whole or in part under

4  the direct or indirect jurisdiction of a Federal agency, including . . . those requiring a

5  Federal permit license, or approval[.]"  16 U.S.C. § 470w(7)(C).  The standards for the

6  existence of a federal undertaking are similar to those for a major federal action under

7  NEPA.  *See Dugong v. Rumsfeld*, 2005 WL 522106, at *12 (N.D. Cal. March 2, 2005)

8  (citing cases from the Ninth, D.C., Fourth, and Fifth Circuits which noted the similar

9  standards).  Plaintiffs claim that the VER Determination constituted a permit, license, or

10  approval, and that the resumption of mining at the Canyon Mine was therefore an

11  undertaking requiring full NHPA compliance.  The Court disagrees for two reasons.[13]

12      First, for the resumed mining operations to constitute an undertaking, the VER

13  Determination must have been "a Federal permit license, or approval[.]"  16 U.S.C.

14  § 470w(7)(C).  As explained above, however, the VER Determination was not legally

15  required before Energy Fuels could resume operations of the Canyon Mine.  The Court

16  cannot conclude that it constituted a federal permit, license, or approval when mining

17  operations could have resumed without it.

18      Second, operations at the Canyon Mine are to resume under the original Plan.

19  There is no new plan.  If mining is the "undertaking" for purposes of the NHPA, that

20  undertaking was approved in 1986.  With no modification to the Plan and no requirement

21  of a VER Determination, there is no new undertaking subject to NHPA compliance.

22  _____

23      [12] As Defendants note, claims two and three as described in Plaintiffs' summary

24  judgment briefing go well beyond the claims laid out in the amended complaint, which
   simply allege that the Forest Service failed to initiate and complete a § 106 process.

25  Doc. 115 at 25-27.  The Court nonetheless will address the claims as described in the
   summary judgment briefing.

26      [13] Plaintiffs alleged in their amended complaint that the VER Determination, not

27  the resumed operation of the mine, constituted the "undertaking" for NHPA purposes.
   Doc. 115, ¶ 79.  In their summary judgment briefing and during oral argument, Plaintiffs

28  clarified their position.  They claim that the undertaking is the resumed operation of the
   mine and that the VER Determination is the license, permit, or approval for that
   undertaking.  *See* Docs. 140-1 at 34; 151 at 28.

Plaintiffs admit in their amended complaint that a § 106 process was completed in 1986.   Doc. 115, ¶ 85 ("The Forest Service conducted a Section 106 Process in connection with approving the 1986 Plan of Operation for Canyon Mine.").  As described in the Mine Review, the 1986 process included consultation with AZSHPO and ACHP to develop a plan for archeological tests; archeological review of the proposed mine site and access roads; a cultural resources survey of the proposed power line location; notice to and responses from the Havasupai, Hopi, Hualapai, and Navajo tribes; consultation with these tribes; and meetings with the Havasupai and Hopi tribes.  A.R. 10601-11.   The Mine Review concluded that "[a] review of the NHPA Section 106 compliance analysis and the ROD for the Canyon Mine indicates that the agency did adequately address all the effects to historic properties that had been identified in the ROD."  A.R. 10602; *see also* A.R. 10611 ("it appears that the [Forest Service] was diligent and thorough in its efforts to solicit tribal input and understand tribal concerns"); A.R. 10612 ("All of the Tribal comments were responded to and the EIS was substantially revised to reflect the information provided by the Havasupai and Hopi.").[14]

With the "undertaking" of mining having been approved in 1986 after compliance with § 106, the Court cannot conclude that resumed mining under the same Plan constitutes a new undertaking.   The Court agrees with the conclusion in the Mine Review: "Since [Energy Fuels] has not proposed any new activities which would require modification of the existing [Plan] or a new [Plan], there will be no new federal undertakings subject to NHPA Section 106 compliance."  A.R. 10601.

Of course, one significant change has occurred since the 1986 approval – Red Butte and surrounding land, including the location of the mine, have been designated a TCP and added to the National Register of Historic Places.  Recognizing this change, the

_____

[14] In its decision on the sufficiency of the 1986 EIS and ROD, this Court noted that the Forest Service distributed more than 100 copies of the proposed Plan for the Canyon Mine to interested parties; received over 200 letters in response; and, following the decision to do a full EIS, distributed more than 2,000 scoping letters to federal, state, and local government agencies, Indian tribes, news media and other interested parties. *Havasupai Tribe*, 752 F. Supp. at 1476-77.

Forest Service chose to treat Red Butte's TCP status as a new discovery and to apply the NHPA regulations for new discoveries.  The Forest Service followed the procedures in 36 C.F.R. § 800.13(b)(3).  Plaintiffs claim this was error.

**B.    The Forest Service's Decision to Apply (b)(3) Was Reasonable.**

Section 800.13 of the applicable regulations sets forth the NHPA's consultation process for "[p]ost-review discoveries."  36 C.F.R. § 800.13.  These are discoveries of historic properties, or effects on historic properties, made after a § 106 process has been completed.  Paragraph (a) states that agreements made during the § 106 process can anticipate such discoveries and lay out procedures for dealing with them.  Paragraph (b) applies when no such procedures are in place.  It states that "[i]f historic properties are discovered or unanticipated effects on historic properties found after the agency official has completed the section 106 process . . . , the agency official shall make reasonable efforts to avoid, minimize or mitigate adverse effects to such properties" and shall comply with subparagraphs (b)(1) through (b)(3).  *Id.*, § 800.13(b).

Subparagraph (b)(1) applies when the § 106 process is finished but "the agency official has not approved the undertaking or . . . construction on an approved undertaking has not commenced[.]"  *Id.*, § 800.13(b)(1).  It requires the agency to comply with § 800.6, which sets forth detailed procedures for resolving adverse effects during a full § 106 process.  *Id.*  Among other requirements, § 800.6 requires that the agency adopt a memorandum of agreement evidencing the agency's "compliance with section 106" and governing "the undertaking and all of its parts."  36 C.F.R. § 800.6.  The agency must "ensure that the undertaking is carried out in accordance with the memorandum of agreement."  *Id.*

Subparagraph (b)(2) applies when the newly discovered site is relevant only for data collection purposes.  § 800.13(b)(2).  It is not at issue in this case.

Subparagraph (b)(3) applies "[i]f the agency official has approved the undertaking and construction has commenced[.]"  *Id.*, § 800.13(b)(3).  It requires the agency to "determine actions that the agency official can take to resolve adverse effects" and to

1    notify interested parties, including Indian tribes, "within 48 hours of the discovery." *Id.*

2    Interested parties must respond within 48 hours of receiving notice, and the agency then

3    must take into account their recommendations and "carry out appropriate actions." *Id.*

4    By merely requiring that the agency "carry out appropriate actions," (b)(3) is less

5    demanding than (b)(1) and its requirement of a detailed consultations process resulting in

6    a memorandum of agreement that governs the undertaking in the future.

7        In conducting the Mine Review, the Forest Service recognized that Red Butte had

8    not been listed on the National Register at the time of the previous § 106 process.[15]

9    A.R. 10602.    Therefore, the Forest Service decided to treat Red Butte as a newly

10   discovered historic property and looked to § 800.13 of the regulations:

11

12       Because the earlier definition [of historic property] did not include
         properties of traditional religious and cultural importance, Red Butte was

13       only recorded as a TCP and evaluated as eligible on the NR after the [1986]
         ROD but before the project has been completed.  Therefore, it could be

14       considered a newly "discovered" historic property, and section 36 C.F.R.

15       800.13(b) of the regulations would apply.

16

17   A.R. 10603.

18       The question, then, was whether the Forest Service should proceed under

19   subparagraph (b)(1) or (b)(3).  Because the Canyon Mine had been approved in 1986 and

20   construction of the mine had commenced, the Forest Service decided that subparagraph

21   (b)(3) applied.  *Id.*  The Forest Service acknowledged that "[t]he Canyon Mine project is

22   a somewhat unusual situation in that the Section 106 process was completed more

23   than 20 years ago."  *Id.*  But the Forest Service concluded that it could provide the notice

24   required by subparagraph (b)(3), allow the tribes and other interested parties 30 days to

25   respond because there was no timing emergency requiring a 48-hour response, and

26   address ways to avoid or minimize adverse effects on Red Butte from the Canyon Mine

27   _____

28       [15] In 1986, the NHPA did not allow tribal religious sites to be listed.  A.R. 10602-
     03.

operations.  *Id.*  Notices were mailed on June 25, 2012, meetings were held with the tribes, a memorandum of agreement was considered, but this lawsuit intervened.  *See*, *e.g.*, A.R. 10540 (email to SHPO regarding consultation for MOA); A.R. 10542 (email to ACHP regarding consultation for MOA); A.R. 10643-44 (consultation notice letters to chairman of Kaibab Paiute Tribes), 10690-91 (Havasupai Tribe),  10737-38 (Hopi Cultural Preservation Office), 10784-85 (Hopi Tribe), 10831-32 (Hualapai Tribe), 10878-79 (Hualapai Tribe), 10925-26 (Navajo cultural specialist), 10972-73 (Navajo Nation), 11019-20 (Kaibab Band of Paiute Indians), 11066-67 (Yavapai-Prescott Indian Tribe), 11113-14 (Yavapai-Prescott Indian Tribe), 11160-61 (Pueblo of Zuni); A.R. 11380 (Aug. 15, 2012 emails discussing Havasupai MOA) A.R. 11390-91 (Hopi meeting agenda); A.R. 11411 (Sept. 6, 2012 meeting notes with Kaibab Band of Paiute Indians); A.R. 11790 (Sept. 19, 2012 meeting notes and agenda re: Hopi Cultural Preservation Office); A.R. 11796 (Sept. 20, 2012 meeting notes and agenda re: Navajo Nation); A.R. 11799 (Sept. 20, 2012 meeting notes and agenda re: Pueblo of Zuni); A.R. 11809 (Oct. 4, 2012 meeting notes re: Havasupai Tribal Council); A.R. 11832 (Oct. 19, 2012 meeting notes re: Hopi Cultural Resources Task Team); A.R. 12238 (Jan. 7, 2013 intertribal meeting notes); A.R. 12387 (summary of communications with tribes).

Because Plaintiffs' claim is brought under the APA, the Court can set aside the Forest Service's decision to follow the (b)(3) procedure only if it was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).  This is a "highly deferential" standard of review.  *Nw. Ecosystem Alliance*, 475 F.3d at 1140.  Plaintiffs make several arguments that do not satisfy this standard.

### 1.    The Undertaking Was Approved Previously.

Plaintiffs argue that the "undertaking" in this case was the resumption of mining operations at the Canyon Mine, that the undertaking as so defined has never been approved before, and that § 800.13(b)(3) therefore did not apply.  For reasons explained

above, however, the Court does not agree that the "undertaking" was the resumption of mining activities.  Operations were to continue under the Plan approved in 1986, without modification.  The "undertaking" was mining at the site, and that undertaking was approved by the Forest Service in 1986.  Plaintiffs do not argue that a new Plan of Operations was required for mining activities to resume.  Indeed, that argument was rejected by this Court and the Ninth Circuit in *CBD*.  *CBD*, 791 F. Supp. 2d at 692-96; 706 F.3d at 1091-94.  Thus, the Plan under which mining would continue was fully approved by the Forest Service in 1986 after a § 106 consultation process, and no new undertaking required another approval.

### 2.  The Language of (b)(3) Is Not Limited to Emergencies.

Plaintiffs argue that § 800.13(b)(3) is an emergency measure that does not apply to the Canyon Mine.  They cite the history of the regulation and argue that it was intended to apply when a historically significant property is uncovered in the midst of constructing an approved undertaking, which did not occur here.  Doc. 140-1 at 41.  The citations provided by Plaintiffs, however, are not persuasive.

Plaintiffs cite prior titles in § 800.13(b)(3).  In one, the title refers to "[r]esources discovered during construction."  44 Fed. Reg. 6068, 6077 (Jan. 30, 1979).  In the other, the title refers to "[p]roperties discovered during implementation."  51 Fed. Reg. 31115, 31123 (Sept. 2, 1986).  Although these titles suggest that the section applies when a discovery is made in the midst of construction, the actual text of these earlier regulations is worded differently – it refers to discoveries that occur "after beginning to carry out the undertaking," which accurately describes the Canyon Mine situation.  51 Fed. Reg. at 31123; *see also* 44 Fed. Reg. at 6077 (noting that section applies if "an Agency Official finds or is notified *after* construction has started") (emphasis added).  Text usually controls over titles in a statute or regulation.  *See generally Bhd. of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 528-29 (1947) (recognizing that "the title of a statute and the heading of a section cannot limit the plain meaning of the text").  Thus, the Court cannot conclude from these earlier versions of the regulation that (b)(3) was

limited to emergency situations.

More importantly, the Court must apply the current regulation.  The title of the current version is "Post-review discoveries," suggesting that it applies to discoveries made after the § 106 review is completed and is not necessarily limited to events occurring in the midst of active, ongoing construction.  36 C.F.R. § 800.13(b).  What is more, courts resort to statutory or regulatory history to construe statutes or regulations only when those statutes or regulations are ambiguous.  *See United States v. Williams*, 659 F.3d 1223, 1225 (9th Cir. 2011).  Subparagraph (b)(3) is not ambiguous.  It applies when "the agency official has approved the undertaking and construction has commenced[.]"  36 C.F.R. § 800.13(b)(3).  No further limitation is imposed.  The undertaking in this case – operation of the Canyon Mine – was approved by the Forest Service in 1986 and construction commenced in 1991.  As noted earlier, the mine owner built access roads, storage buildings, a power line, a perimeter fence, diversion structures, a holding pond, a 100-foot tall head frame, a hoist, and support buildings, and sunk the mine shaft to a depth of 50 feet.  A.R. 10487; Doc. 146-1 at 17; Hangan Declaration, Doc. 53-4, ¶ 4.  The situation at the Canyon Mine thus fell squarely within the plain language of subparagraph (b)(3).

### 3.      Deference to the ACHP Is Not Warranted.

The ACHP is the agency that promulgates NHPA regulations, including § 800.13. 16 U.S.C. § 470s.  In *Auer v. Robbins*, the Supreme Court held that an agency's interpretation of its own regulation is controlling unless it is plainly erroneous or inconsistent with the language of the regulation.  519 U.S. 452, 461 (1997).  Plaintiffs argue that the ACHP interpreted subparagraph (b)(3) in this case and the Court must defer to that interpretation.  For several reasons, the Court does not agree.

The "interpretation" relied on by Plaintiffs is contained in a letter the ACHP wrote to the Forest Service on August 1, 2012.  The letter provides this explanation:

In this situation, we understand that the Plan of Operations for the undertaking has been approved, and that some construction has occurred. Based upon the information you provided, it appears this construction

activity has started and stopped over the years. The intent of Section 800.13(b)(3) is to provide an expedited review process where construction activities have begun and would be ongoing, and thus, the agency has limited time and opportunity for consultation. Should the Forest Service pursue this approach, we are concerned that it would continue the unproductive conflict between the Forest Service and the Indian tribes that consider Red Butte a sacred place. Further, because of the nature and timing of this undertaking and the current request to resume previously halted mining operations, we believe consultation in accordance with Section 800.13(b)(l) to develop and execute a Section 106 agreement is the appropriate way forward.

A.R. 11335.

The letter does describe the intent of (b)(3) as applying to emergency situations, but its recommendation that the Forest Service proceed under (b)(1) appears to be more tactical advice than an interpretation of the regulation. The ACHP suggests that the Forest Service use (b)(1) not because the language of that provision applies, but because the ACHP is concerned that applying (b)(3) "would continue the unproductive conflict between the Forest Service and the Indian tribes that consider Red Butte a sacred place." *Id.* This reasoning is more a comment on the situation facing the Forest Service than on the meaning of the regulation. The Court therefore doubts that the letter constitutes the kind of regulatory interpretation entitled to deference under *Auer*.

But even if the ACHP letter constituted an interpretation of (b)(1) and (b)(3), it is not entitled to deference. The Supreme Court has explained that "*Auer* deference is warranted only when the language of the regulation is ambiguous." *Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000). "To defer to the agency's position [when a regulation is not ambiguous] would be to permit the agency, under the guise of interpreting a regulation, to create de facto a new regulation." *Id.*; *see also Bassiri v. Xerox Corp.*, 463 F.3d 927, 931 (9th Cir. 2006) ("Under *Auer*, as amplified by *Christensen*, the court must first determine whether the regulation was ambiguous.").

As noted above, § 800.13(b) is not ambiguous. Subparagraph (b)(1) applies when the agency "has not approved the undertaking" or "construction on an approved

undertaking has not commenced." Subparagraph (b)(3) applies when neither of the (b)(1) conditions is present – when the agency "has approved the undertaking and construction has commenced." Subparagraphs (b)(1) and (b)(3) thus cover all possible scenarios for discoveries of historical properties after a § 106 process is completed. If the undertaking is not yet approved, (b)(1) applies. If the undertaking is approved but construction has not yet commenced, (b)(1) applies. If the undertaking is approved and construction has commenced, (b)(3) applies. The Court sees no ambiguity in these provisions. Every eventuality is addressed.

Plaintiffs argue that the scenario in this case – the undertaking has been approved, construction has commenced, and construction has stopped – is not covered by the regulations. The Court does not agree. This scenario falls within (b)(3) because the regulations do not make work stoppage a factor in deciding which subparagraph applies. If an undertaking has been approved and construction has commenced, the criteria for (b)(3) are fully satisfied. Although undertakings where the construction has subsequently stopped may be a subset of the scenarios covered by (b)(3), it is a subset that is not assigned in the regulations to different treatment. It is fully covered by the (b)(3) criteria. Certainly it is not assigned to (b)(1), which applies only if there has been no undertaking approval or no start of construction.

Plaintiffs suggest that an ambiguity is created because the 48-hour provisions in (b)(3) clearly show that it is designed for emergency situations, and restart of the Canyon Mine is not an emergency situation. Although the 48-hour provisions do suggest that (b)(3) was designed primarily for emergency situations, nothing in (b)(3) states that it is limited to those situations. Subparagraph (b)(3) does not say that it applies when "the agency has approved the undertaking, construction has commenced, and 48-hour notice is necessary," or comparable language.

Because the Court does not find § 800.13(b) ambiguous, *Auer* deference is not warranted. *Christensen*, 529 U.S. at 588; *Bassiri*, 463 F.3d at 931. And with no deference being required for the ACHP interpretation, the Court cannot say that the

1    Forest Service's reading of § 800.13(b) – applying its plain language – was arbitrary and

2    capricious, an abuse of discretion, or not in accordance with the law.

3           What is more, even if the Court were to find some ambiguity in § 800.13(b), *Auer*

4    deference would be warranted only if the ACHP's interpretation is not "inconsistent with

5    the regulation." *Auer*, 519 U.S. at 461.  The Court finds that the ACHP interpretation is

6    inconsistent with the plain language.  Subparagraph (b)(1) applies only when the agency

7    "has not approved the undertaking" or "construction on an approved undertaking has not

8    commenced."  Under no reading could this provision apply to the Canyon Mine, where

9    the undertaking was approved in 1986 and construction commenced in 1991.  ACHP's

10    advice that subparagraph (b)(1) applies is simply contrary to the language of (b)(1).

11           As noted, the ACHP letter appears to be based more on the factual situation

12    related to the Canyon Mine than the meaning of (b)(1) and (b)(3).  But if viewed as an

13    attempt to construe those provisions, the letter appears to create a new category under

14    § 800.13(b) for undertakings approved, started, and then stopped.  That category does not

15    exist in the current version of the regulations.  Accepting it would, as the Supreme Court

16    warned, "permit the agency, under the guise of interpreting a regulation, to create de

17    facto a new regulation." *Christensen*, 529 U.S. at 588.

18           The cases cited by Plaintiffs do not require a different result.  *See* Doc. 140-1

19    at 42.  The decision in *CTIA–The Wireless Ass'n v. FCC*, 466 F.3d 105,115-16 (D.C.

20    Cir. 2006), did not address *Auer* deference – deferring to an agency's interpretation of its

21    own regulation.  It addressed deferring to an agency's interpretation of a statute through

22    promulgated regulations.  *Id.* at 116.  That is a different kind of deference.  *See Go v.*

23    *Holder*, 744 F.3d 604, 612 (9th Cir. 2014) (Wallace, J., concurring) (noting the

24    distinction recognized in *Price v. Stevedoring Services of America, Inc.*, 697 F.3d 820,

25    829 (9th Cir. 2012), between "an agency's informal interpretations of its own regulations

26    [which are entitled to *Auer* deference] and of its governing statute [which are entitled to

27    *Chevron* deference].") (brackets in original).  Plaintiffs' other cases, *Stinson v. United*

28    *States*, 508 U.S. 36, 45 (1993), *Karuk Tribe of California v. U.S. Forest Service*, 681

F.3d 1006, 1017 (9th Cir. 2012), and *Sayler Park Village Council v. U.S. Army Corps of Engineers*, 2002 WL 32191511, at *6 n.5 (S.D. Ohio, Dec. 30, 2002), simply restate the rule established in *Auer*.  They do not detract from the fact that *Auer* deference applies only when a regulation is ambiguous, nor from the fact that an agency's interpretation of an ambiguous regulation must, if deference is to be accorded, comport with the regulation's language.

In summary, the Court does not find that the Forest Service's decision to apply (b)(3) was arbitrary, capricious, an abuse of discretion, or not in accordance with law.

**C.  Compliance with (b)(3).**

Plaintiffs also argue that the Forest Service failed to comply with (b)(3).  Plaintiffs claim that (1) no notice was sent out to interested parties within 48 hours, (2) no actions were proposed to mitigate adverse effects, (3) the local tribes' responses to the notice went unaccounted for, and (4) no reports of any actions were provided to interested parties.  The Court disagrees with Plaintiffs' characterization of the Forest Service's efforts.

The same day that the Forest Service concluded (b)(3) applied, it sent a consultation letter to Don Watahomigie, Chairman of the Havasupai Tribe (A.R. 10690), as well as to the Hopi Tribe, Hualapai Tribe, the Kaibab Band of Paiute Indians, the Navajo Nation, the Yavapai-Prescott Indian Tribe, and the Pueblo of Zuni, to initiate consultation under § 800.13(b)(3).  A.R. 12388.  Plaintiffs argue that the notice was required within 48 hours of Energy Fuels' informing the Forest Service of its intent to reopen the Canyon Mine.  As the Forest Service acknowledges, however, this was an unusual situation.  A.R. 10603.  It took some time for the Forest Service to determine what kind of review was required.  Once it determined – correctly, as explained above – that the situation was governed by (b)(3), it sent the notice required by that section within 48 hours.  A.R. 10603-04.

Over the course of the next several months, the Forest Service entertained objections and responses from the various tribes, met with representatives from various

tribes, conducted field visits, and engaged in discussions regarding the potential impacts of the Canyon Mine.  A.R. 12388-89.  For example, in August 2012, the Forest Service conducted field visits with representatives from the Zuni Cultural Resource Advisory Task Team at Red Butte.  A.R. 12389.  In September, the Forest Service met with the Kaibab Band of Paiute Indians in Pipe Springs, Arizona to discuss several projects, including the Canyon Mine.  *Id.*  Throughout September and October, Forest Service representatives responded to letters sent by various tribes and met multiple times with the Hopi Tribe in Kykotsmovi, Arizona; the Navajo Nation in Window Rock, Arizona; and the Pueblo of Zuni in Zuni, New Mexico.  Representatives also hiked eight miles to Supai, Arizona to consult with the Havasupai Tribe.  *Id.*  In January 2013, the Forest Service and Energy Fuels met with representatives from multiple tribes and conducted a field visit to the Canyon Mine site.  *Id.*  The next day, a MOA workshop was conducted with several tribes in Flagstaff, Arizona.  *Id.*  Two months later, Plaintiffs filed this lawsuit, effectively ending the consultation process.

Notwithstanding the above, Plaintiffs assert that the Forest Service failed to take unilateral action to avoid or mitigate effects to Red Butte and falsely informed the tribes that the only mitigation measures that would occur would be voluntarily undertaken by Energy Fuels.  Doc. 140-1 at 23-25.  But the procedures set forth in (b)(3) do not direct the Forest Service to undertake unilateral action or impose a memorandum of agreement on the mine operator, and Plaintiffs' arguments again fail to recognize the extensive efforts the Forest Service did undertake to consult with the tribes, efforts that were cut short when Plaintiffs filed this lawsuit.  The Forest Service engaged in discussions with the tribes in order to address their concerns and sought to memorialize their obligations in a MOA.

The Forest Service's ongoing environmental analysis and tribal consultation over the past twenty years evidences its efforts to comply with the NHPA.  In 1985, the Forest Service traveled to the Supai Village to meet with representatives from the Havasupai Tribe for two days.  *Havasupai Tribe*, 752 F. Supp. at 1495.  When Energy Fuels'

predecessor submitted its original plan in 1984, over 100 copies were sent to interested parties and several meetings were held to address public and tribal concern.  *Id.* at 1476-77.  More than 2,000 scoping letters were sent to the media and interested parties and a "public scoping session" was held in Flagstaff, Arizona in May 1985.  *Id.* at 1477.  In 1994, the Forest Service sent a letter to the Havasupai, Navajo, and Hopi Tribes requesting permission to conduct water sampling for ongoing monitoring of the site.  A.R. 5955.  In February 2008, twenty letters were sent to representatives from the Navajo Nation, Havasupai Tribe, Hopi Tribe, and Hualapai Tribe regarding projects in the Kaibab National Forest, including the Canyon Mine.  A.R. 7518-86.  Follow-up letters were sent in May.  A.R. 7589-643.  In August 2008, a Memorandum of Understanding was reached between the Forest Service and the Havasupai Tribe to establish areas in which the Forest Service would carry out tribal consultations.  A.R. 7646-54.  In January 2011, the Forest Service sent emails to representatives from the Sierra Club addressing further analysis of the Canyon Mine EIS.  A.R. 8517.  In October 2011, the Forest Service confirmed dates and sent an agenda for a meeting with Havasupai tribal elders.  A.R. 10140.  Proposed meetings were also negotiated with the Navajo Nation, the Pueblo of Zuni, and the Hopi Tribe.  A.R. 10239, 10240, 10263.  Conference calls were scheduled and held regarding the Canyon Mine with the Kaibab Band of Paiute Indians, Hualapai Tribe, Navajo Nation, Yavapai Prescott Indian Tribe, and Pueblo of Zuni.  A.R. 10282; 10283; 10286; 10291; 10297; 10298.  In fact, the Forest Service reviewed all of the documents prepared in connection with the 1986 ROD when it was deciding whether to apply (b)(1) or (b)(3) and noted that the "tribal scoping process used during development of the EIS probably exceed the standards of the time."  A.R. 10611.

In summary, for some twenty years the Forest Service has been engaging in environmental analyses and consultation meetings with tribes and environmental organizations regarding the Canyon Mine.  Recognizing the unique situation it faced when mining was to resume, the Forest Service reviewed the regulations, found that (b)(3) applied, and engaged in consultation with the tribes to "seek reasonable ways to

minimize the effects" of mining at the site.   A.R. 10604.   It did this by providing immediate notice of its decision, initiating consultation with tribes and environmental groups, and planning and attending meetings to discuss cultural and environmental impacts over several months.  Had this lawsuit not intervened, the Forest Service and the tribes might well have executed a memorandum of agreement regarding appropriate ways to minimize effects on Red Butte.  The Court cannot conclude that the Forest Service's application of the (b)(3) process was arbitrary, capricious, an abuse of discretion, or not in accordance with law.

**VI.   Conclusion.**

The Court finds that Plaintiffs have failed to establish a NEPA violation in claim one or a NHPA violation in claims two and three, and that Plaintiffs lack prudential standing to assert claim four.  The Court accordingly will grant summary judgment in favor of Defendants.

**IT IS ORDERED:**

1.   Defendants' and Defendant-Intervenors' motions for summary judgment are **granted** on all counts.  Docs. 146, 147.

2.   Plaintiffs' motion for summary judgment is **denied**.  Doc. 140.

3.   The Clerk shall enter judgment and terminate this action.

Dated this 7th day of April, 2015.


_____
David G. Campbell
United States District Judge