**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Grand Canyon Trust; Center for Biological
Diversity; Sierra Club; and Havasupai Tribe,

              Plaintiffs,

v.

Heather Provencio, Forest Supervisor,
Kaibab National Forest; and
United States Forest Service,
U.S. Department of Agriculture,

              Defendants,

and

Energy Fuels Resources (USA), Inc.; and
EFR Arizona Strip LLC,

              Intervenor-Defendants.

No. CV-13-8045-PCT-DGC

**ORDER**

This case arises from the proposed reopening of the Canyon Mine, a 17-acre uranium mine located six miles south of the Grand Canyon in the Kaibab National Forest. The Havasupai Tribe and three environmental groups – Grand Canyon Trust, Center for Biological Diversity, and Sierra Club – brought this suit for declaratory and injunctive relief against the United States Forest Service and the Supervisor of the Kaibab National Forest (collectively, the "Forest Service"). Doc. 1. The Canyon Mine's owners and operators, Energy Fuels Resources (USA), Inc. and EFR Arizona Strip, LLC (together, "Energy Fuels"), intervened as Defendants. Docs. 30, 31, 35.

1

The parties have filed motions for summary judgment on the only remaining claim in the case – claim four – which challenges the Forest Service's determination that Energy Fuels had "valid existing rights" at the Canyon Mine when the Department of the Interior ("DOI") withdrew public lands around the Grand Canyon from new mining claims. Docs. 226, 233, 234; *see* Doc. 115 ¶¶ 89-92.  The Court heard oral argument by telephone conference on May 11, 2020. *See* Doc. 242.  For reasons stated below, the Court will grant summary judgment in favor of Defendants.

## I.   Background.

The history of the Canyon Mine spans more than 30 years.  In October 1984, Energy Fuels submitted to the Forest Service a proposed Plan of Operations for the mine.  AR Doc. 2 at 193-221.[1]  The Forest Service completed a Final Environmental Impact Statement ("FEIS") pursuant to the National Environmental Policy Act ("NEPA").  AR Doc. 3.  In September 1986, the Forest Service issued a Record of Decision ("ROD") approving construction and operation of the Canyon Mine under a modified version of the Plan (the "1986 Plan").  AR Doc. 6.  Several administrative appeals followed, and the Forest Service affirmed the ROD.  AR Doc. 188 at 3972.  The Ninth Circuit rejected a challenge to the ROD in August 1991. *See Havasupai Tribe v. United States*, 943 F.2d 32 (9th Cir. 1991).

Shortly thereafter, Energy Fuels began constructing the mine.  It built surface structures and sank the first 50 feet of a 1,500-foot shaft, but placed the mine on standby status in 1992 because of low prices in the uranium market.  AR Doc. 525 at 10487.  For the next 20 years, the mine was inactive but maintained under the interim management portions of the 1986 Plan.  AR Doc. 481 at 10314.

In January 2012, the Secretary of the DOI, acting under authority of the Federal Land Policy and Management Act ("FLPMA"), withdrew for 20 years some one million acres of public land from mineral location and entry under the Mining Law of 1872, 30

---

[1] Citations to the administrative record are denoted "AR," followed by the relevant document and page number.  Citations to documents filed in the Court's docket are denoted "Doc.," and pin cites are to page numbers placed at the top of each page by the Court's electronic filing system.  For simplicity, the Court will refer to all entities that have owned the Canyon Mine during the last 30 years as "Energy Fuels."

U.S.C. § 22 (the "Withdrawal").  AR Doc. 481 at 10308-31; 77 Fed. Reg. 2563, 2012 WL 122658 (Jan. 18, 2012); *see* 43 U.S.C. § 1714; *Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845 (9th Cir. 2017).[2]  The Withdrawal covered the location of the Canyon Mine, but did not disturb valid existing mining rights.  77 Fed. Reg. 2563.  Before approving the Withdrawal, which had been proposed in 2009, the DOI prepared an Environmental Impact Statement.  AR Docs. 446, 447; 74 Fed. Reg. 35,887-01, 2009 WL 2143370 (July 21, 2009).  The statement noted the existence of the Canyon Mine and assumed it would resume operations at some point.  AR Doc. 446 at 9090, 9093.

In August 2011, Energy Fuels notified the Forest Service that it intended to resume mining under the 1986 Plan.  AR Doc. 439.  In response, the Forest Service decided to prepare a mineral report to determine whether the Canyon Mine had "valid existing rights," and therefore was not affected by the Withdrawal (the "VER Determination").  *See* 43 C.F.R. § 3809.100(a).  Although Energy Fuels initially asserted that additional government approvals were not required before the mine reopened (AR Doc. 443), Energy Fuels agreed to withhold shaft sinking until the VER Determination was finished (Doc. 123-2 at 2-3).[3]

The Mining Law of 1872 provides that citizens may acquire rights to "valuable mineral deposits" on federal lands.  30 U.S.C. § 22.  To determine whether Energy Fuels had valid existing rights in the Canyon Mine at the time of the Withdrawal, the Forest Service therefore assessed whether the rights were "valuable."  The VER Determination, finished on April 18, 2012, found that a "valuable mineral deposit" existed at the Canyon Mine because, "under present economic conditions, the uranium deposit . . . could be mined, removed, transported, milled and marketed at a profit."  AR Doc. 525 at 10483,

---

[2] Mineral entry refers to "the right of entry on public land to mine valuable mineral deposits," and mineral location is "the act or series of acts whereby the boundaries of a claim are marked."  *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 750 n.3 (D.C. Cir. 2007).  The Withdrawal foreclosed the development of new mining claims.

[3] Energy Fuels resumed sinking the shaft after the VER Determination was completed in 2012, and finished the shaft in March 2018.  *See U.S. Dep't of Agric., Forest Serv., Canyon Uranium Mine*, https://www.fs.usda.gov/detail/kaibab/home/?cid=fsm91050263 (last visited May 4, 2020).  Energy Fuels advised the Forest Service that ore production would not occur immediately due to low uranium prices, and has provided no estimate for when ore production will begin.  *Id.*

10506.  The Forest Service concluded that Energy Fuels had "valid existing rights that were established prior to the Withdrawal," and that further operations at the mine were not barred by the Withdrawal.  *Id.*

In addition to the VER Determination, the Forest Service performed a "Mine Review" before the mine reopened.  AR Doc. 533.  The review was conducted by a 13-person interdisciplinary team with expertise in minerals and geology, surface and groundwater, air quality, transportation, tribal consultation, heritage resources, vegetation, the NEPA, and socioeconomic issues.  *Id.* at 10597.  Among other matters, the team evaluated the sufficiency of the 1986 Plan and the original FEIS and ROD; historical and religious issues related to local tribes; the effect of resumed operations on the quality of air, surface water, and groundwater; and the effect of resumed operations on wildlife and any threatened, endangered, or sensitive species.  *Id.* at 10592–637.  The Mine Review was finished on June 25, 2012, and concluded that operations could resume at the Canyon Mine under the 1986 Plan.  *Id.* at 10594.

Plaintiffs filed this lawsuit in March 2013, seeking declaratory and injunctive relief under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  Doc. 1.  Plaintiffs' amended complaint asserted four claims: (1) the Forest Service violated the NEPA by not conducting a new environmental impact study in connection with the VER Determination (Doc. 115 ¶¶ 70-77); (2) the Forest Service violated the National Historic Preservation Act ("NHPA") by failing to complete a full § 106 historic property review before approving resumed operations at the mine (*id.* ¶¶ 78-83); (3) the Forest Service alternatively violated the NHPA by not properly updating its original § 106 analysis (*id.* ¶¶ 79-88); and (4) the Forest Service violated the Mining Law, the FLPMA, and the 1897 Organic Act by failing to account for various costs in the VER Determination (*id.* ¶¶ 89-92).

On April 7, 2015, the Court granted summary judgment to Defendants on all claims. Doc. 166.  On claims one through three, the Court held that the VER Determination was not a "major federal action" requiring a new environmental impact study under the NEPA or an "undertaking" requiring a full § 106 consultation under the NHPA, and that the Forest

Service's NHPA review under 36 C.F.R. § 800.13(b)(3) was appropriate and reasonable. *Id.* at 22-41. On claim four, the Court held that Plaintiffs had Article III standing and that the VER Determination was a "final agency action" subject to review under the APA, but that Plaintiffs lacked prudential standing because claim four fell outside the Mining Law's "zone of interests." *Id.* at 13-21; *see Grand Canyon Trust v. Williams*, 98 F. Supp. 3d 1044 (D. Ariz. 2015).

The Ninth Circuit initially affirmed on all grounds. *See Havasupai Tribe v. Provencio*, 876 F.3d 1242 (9th Cir. 2017). One year later, however, the Ninth Circuit withdrew its original decision and entered an amended order that affirmed the rulings on claims one through three, but held that claim four fell within the FLPMA's zone of interests. The Ninth Circuit remanded claim four for consideration on the merits. *Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1166-67 (9th Cir. 2018).

The parties now move for summary judgment on claim four. Docs. 226, 233, 234. Plaintiffs argue that the VER Determination is invalid because the Forest Service failed to consider all relevant costs in its profitability analysis of the Canyon Mine. Doc. 228 at 13-22. Defendants contend that Plaintiffs lack Article III standing and otherwise are entitled to no relief because the VER Determination was not legally required. Docs. 233-1 at 8-11, 234-1 at 12-20. Defendants further contend that claim four fails on the merits because the VER Determination included all relevant costs and must be upheld under the APA's deferential standard of review. Docs. 233-1 at 11-20, 234-1.

## II.   Article III Standing.

The Court previously held that the Forest Service's VER Determination was not required by law – that mining could have resumed at the Canyon Mine on the basis of the 1986 Plan. Doc. 166 at 6-11. Based on this holding, the Forest Service now contends that Plaintiffs lack Article III standing to bring claim four. Doc. 234-1 at 12-20. It argues that because authorization to operate the mine derives solely from the 1986 Plan approval, and not from the VER Determination, Plaintiffs' alleged injuries are traceable to the 1986 Plan approval alone. *Id.* at 19. As a result, claim four fails two requirements of Article III

1    standing: Plaintiffs' injuries are not fairly traceable to the VER Determination and will not

2    be redressed by setting it aside.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61

3    (1992).

4         The Court previously held that claim four satisfied these standing requirements.

5    Doc. 166 at 13-16.  On appeal, the Ninth Circuit also was "satisfied that plaintiffs have

6    suffered injuries in fact that are fairly traceable to the Service's actions and that could be

7    redressed by a favorable judicial determination."  *Havasupai Tribe*, 906 F.3d at 1162 n.3.

8    Plaintiffs argue that this Ninth Circuit conclusion is "both law of the case and binding

9    precedent."  Doc. 238 at 7 (quoting *Nordstrom v. Ryan*, 856 F.3d 1265, 1270 (9th Cir.

10   2017)).  The Court agrees.

11        The Ninth Circuit specifically found that Plaintiffs satisfy the elements of Article III

12   standing on claim four.  *See Havasupai Tribe*, 906 F.3d at 1162 n.3.  This ruling was not

13   dictum, as the Forest Service contends (Doc. 234-1 at 19), but a holding essential to the

14   court's judgment.  "The federal courts are under an independent obligation to examine their

15   own jurisdiction, and standing is perhaps the most important of the jurisdictional

16   doctrines."  *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quotation marks,

17   brackets, and citations omitted).

18        Nor would the Ninth Circuit have reached the issue it addressed on appeal – whether

19   claim four satisfied the zone-of-interests test – without first confirming that Plaintiffs have

20   Article III standing to bring the claim.  *See Nordstrom*, 856 F.3d at 1270 ("In *Nordstrom I*,

21   we necessarily decided that Nordstrom had standing to bring his Sixth Amendment

22   claim"); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-102 (1998)

23   (Article III standing must be determined before addressing whether a cause of action

24   exists); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127-28 (2014)

25   (noting that "prudential standing" is a misnomer and holding that the zone-of-interests

26   requirement is not jurisdictional, but concerns whether a cause of action exists).  The Ninth

27   Circuit's decision "is both the law of the case and binding precedent that [the Court] must

28   follow."  *Nordstrom*, 856 F.3d at 1270; *see California v. U.S. Dep't of Health & Human*

*Servs.*, 941 F.3d 410, 421 (9th Cir. 2019).  The Court will deny the Forest Service's motion on the issue of standing.

**III.    Defendants' Arguments Based on Plaintiffs' Requested Relief.**

Plaintiffs ask the Court to set aside the VER Determination and enjoin all activity at the Canyon Mine until a new VER Determination can be completed.  Doc. 228 at 22; *see* Doc. 115 at 28-29.  Energy Fuels argues that because the VER Determination was not legally required and has no effect on the 1986 Plan or continued operations at the mine, Plaintiffs are entitled to no relief.  Doc. 233-1 at 8-11.  The Court concludes that Plaintiffs, if successful, could have the VER Determination set aside, but could not obtain an injunction of activity at the Canyon Mine.  The Court will address the injunction issue first.

**A.    Enjoining Activity at the Canyon Mine.**

By its own terms, the Withdrawal did not extinguish mining rights that already existed.  The Court previously held that the Withdrawal required a validity determination only for mines which required a new plan of operations.  Doc. 166 at 8-9 (citing AR Doc. 481 at 10310; Fed. Reg. 2563, 2012 WL 122658 (Jan. 18, 2012)); *see* 43 C.F.R. § 3809.100(a); *Vane Minerals (US), LLC v. United States*, 116 Fed. Cl. 48, 57-58 (2014); *In re Goergen*, 144 IBLA 293, 297-98 (1998).  Because the 1986 Plan was already approved and the Canyon Mine did not require approval of a new plan, the VER Determination was not "legally required before operations at the Canyon Mine could resume."  Doc. 166 at 6, 10.

Given this holding, which was not disturbed on appeal, the Court concludes that Plaintiffs would have no legal basis to enjoin mine operations if the VER Determination was set aside.  *Cf. In re Ctr. for Biological Diversity*, 162 IBLA 268, 281 (2004) ("[U]ntil the [DOI] undertakes a mining or mill site claim contest . . . and renders a final determination of invalidity, it is well established that the claimant will be permitted to engage in mining and processing operations.") (citations omitted); *In re Sw. Res. Council*, 96 IBLA 105, 118-24 (1987) (explaining that "[t]he holder of a valid mining claim has the right, from the time of location, to extract, process and market the locatable mineral

1    resources thereon"). The Court will grant Energy Fuels' motion for summary judgment on

2    claim four to the extent Plaintiffs seek to enjoin operations at the Canyon Mine.

3        **B.    Setting Aside the VER Determination.**

4        Energy Fuels argues that the Court need not reach the merits of claim four because

5    the VER Determination was not legally required and setting it aside would have no effect

6    on the mining project. Doc. 233-1 at 10-11. But federal agencies often have discretion on

7    whether to take a particular action. *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998).

8    When they do, those adversely affected by the action generally may sue to have it set aside.

9    *Id.*; *see Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967) (discussing presumption of

10   reviewability of agency action); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S.

11   402, 410 (1971) (same). If a reviewing court finds that the agency abused its discretion or

12   committed legal error, the court "will set aside the agency's action and remand the case –

13   even though the agency . . . might later, in the exercise of its lawful discretion, reach the

14   same result for a different reason." *Fed. Election Comm'n*, 524 U.S. at 25 (citing *SEC v.

15   Chenery Corp.*, 318 U.S. 80 (1943)).[4]

16       VER determinations also enable the Forest Service and the DOI to make "a decision

17   on whether or not to contest the [mining] claim." Forest Service Manual § 2819.1

18   (AR 7312); *see Grand Canyon Tr.*, 98 F. Supp. 3d at 1052; 43 C.F.R. § 4.451-1. Plaintiffs

19   note, correctly, that the Forest Service's VER Determination serves as a certification of

20   claim validity that protects Energy Fuels from a claims contest. Doc. 228 at 12; *see

21   Freeman v. U.S. Dep't of the Interior*, 37 F. Supp. 3d 313, 325 (D.D.C. 2014).

22       The VER Determination is subject to judicial review.[5]

23       ─────────────────────

24   [4] The Forest Service claims that even if the Court were to set aside the VER
     Determination, Plaintiffs' injuries would not be redressed because there is no indication
25   the Forest Service would undertake another review. Doc. 234-1 at 16. But the Forest
     Service presents no evidence that it would decline to make another VER Determination,
26   and its "speculation do[es] not amount to evidence sufficient to warrant granting summary
     judgment." *Carling v. Veneman*, No. 3:04-CV-00211-JKS, 2006 WL 8438430, at *7 (D.
27   Alaska July 6, 2006).

28   [5] This ruling is consistent with the Court's earlier ruling on the reviewability of the
     VER Determination, which was affirmed on appeal. The Forest Service argued in its
     motion to dismiss that the VER Determination was not a final agency action subject to

## IV.    APA Standard of Review.

"The APA's standard of review is 'highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Cal. Pac. Bank v. Fed. Deposit Ins. Corp.*, 885 F.3d 560, 570 (9th Cir. 2018) (quoting *Indep. Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000)).  A court may set aside a final agency action only where the plaintiffs show that the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  This scope of review "is narrow and a court is not to substitute its judgment for that of the agency.  Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (citation omitted); *see also Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976) ("Absent a showing of arbitrary action, we must assume that the agencies have exercised this discretion appropriately.").

## V.    The Profitability Test and the VER Determination.

In determining that valuable mineral rights existed at the Canyon Mine, and that Energy Fuels therefore had valid existing rights under the 1872 Mining Law, the Forest service applied the "prudent man" and "marketability" tests recognized in *United States v. Coleman*, 390 U.S. 599, 602 (1968).  It concluded that uranium at the mine could, under present economic conditions, "be mined, removed, transported, milled and marketed at a profit."  AR Doc. 525 at 10483, 10486, 10506.

Plaintiffs contend that this determination is invalid because the Forest Service failed to consider costs of environmental monitoring, wildlife conservation, future environmental

judicial review.  Doc. 71 at 21-23.  The Court disagreed, finding that the determination "marked the consummation of the Forest Service's validity determination" and was "a practical requirement before the Canyon Mine resumed operations" under *Bennett v. Spear*, 520 U.S. 154 (1997).  Doc. 131 at 7.  The Court then concluded that such a practical requirement could satisfy the second prong of the *Bennett* test, which requires that agency action be "one by which rights or obligations have been determined, or from which legal consequences will flow."  *Id.* at 9-10 (quoting *Bennett*, 520 U.S. at 178); *see also* Doc. 166 at 21.  The Ninth Circuit agreed.  *See Havasupai Tribe*, 906 F.3d at 1162-63 ("[T]he Mineral Report *determined* that such rights existed with respect to Canyon Mine, and that is all *Bennett* requires.") (emphasis in original).

mitigation measures, as well as sunk costs.  Docs. 228 at 14-22, 238 at 12.  Defendants argue that all relevant costs were considered and that the VER Determination must be upheld under the APA's deferential standard of review.  Docs. 233-1 at 11-21, 234-1 at 21-23.

### A.    The Prudent Man and Marketability Tests.

Congress has delegated to the Secretary of the Interior "the responsibility of determining the validity of mining claims."  *Rawls v. Sec'y of Interior*, 460 F.2d 1200, 1200-01 (9th Cir. 1972).  For more than 100 years, the Secretary has applied a "prudent man" test to assess claim validity.  *See Castle v. Womble*, 19 L.D. 455, 457 (1894).  Under this test, a mineral deposit is "valuable" as required by the Mining Law if it is "of such a character that 'a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine.'"  *Coleman*, 390 U.S. at 602 (quoting *Castle*, 19 L.D. at 457).  The Supreme Court "has approved the prudent-man formulation and interpretation on numerous occasions." *Id.* (citing *Chrisman v. Miller*, 197 U.S. 313, 322 (1905); *Cameron v. United States*, 252 U.S. 450, 459 (1920); *Best v. Humboldt Placer Mining Co.*, 371 U.S. 334, 335-36 (1963)); *see also Watt v. W. Nuclear, Inc.*, 462 U.S. 36, 58 n.18 (1983).

In *Coleman*, the Supreme Court addressed another test developed by the Secretary known as "the marketability test."  390 U.S. at 600.  That test requires a mine claimant to show "that the mineral can be 'extracted, removed and marketed at a profit.'"  *Id.*  The Court upheld "the marketability test [as] an admirable effort to identify with greater precision and objectivity the factors relevant to a determination that a mineral deposit is 'valuable.'"  *Id.* at 602.  The Supreme Court found that "the prudent-man test and the marketability test are not distinct standards, but are complementary in that the latter is a refinement of the former."  *Id.* at 603.

### B.    The VER Determination.

Consistent with this law, the VER Determination considered whether, "under present economic conditions, the uranium deposit [at the Canyon Mine] could be mined,

removed, transported, milled and marketed at a profit."  AR Doc. 525 at 10486.  The analysis was done by two Forest Service certified mineral examiners: Michael Linden, a Salable Mineral Specialist, and Mike Doran, a Locatable Minerals Lead.  *Id.* at 10482-83. Linden and Doran followed the valuation approach set forth in the Bureau of Land Management Surface Management Handbook, H-3809-1 ("BLM Handbook"), and prepared a 45-page report setting forth their methods of investigation, work performed, information relied on, and analysis.  AR Doc. 525.  Their findings were approved by Locatable Minerals Specialist Greg Visconty.  *Id.* at 10482.

The relevant dates for determining the validity of the mining claims were July 21, 2009, the date when the Withdrawal was first proposed by the Secretary, and April 18, 2012, the date of the VER Determination.  AR Doc. 525 at 10487; *see* 65 Fed. Reg. 41,724, 41,725-26 (July 6, 2000) (DOI policy explaining applicable "marketability dates").  The actual mineral examination was conducted over several months in late 2011 and early 2012. AR Doc. 525 at 10483, 10486.

The Forest Service examiners made multiple trips to the Canyon Mine and also visited Energy Fuels' offices in Fredonia, Arizona, its Arizona One Mine north of the Grand Canyon, and its White Mesa Mill in Blanding, Utah.  *Id.* at 10486.  Their field work included verifying the mine boundaries, documenting development activities, and examining and testing drill core samples.  *Id.* at 10487, 10495-97.  The examiners analyzed geological reports and maps to obtain information about mineralization of the area, including the many uranium-bearing breccia pipes on the Colorado Plateau.  *Id.* at 10487-95.  They reviewed Forest Service case files and Energy Fuels' records and data for the Canyon Mine and the Arizona One Mine.  *Id.* at 10487-89.  They evaluated the methods and results of Energy Fuels' mining and milling operations.  *Id.* at 10498-99.  They also performed an economic analysis based, among other things, on the tonnage and grade of the uranium ore to be mined, Energy Fuels' capital and operating costs, commodity pricing, and a cash flow feasibility analysis.  *Id.* at 10499-10505.

Their economic analysis relied in part on cost information provided by Energy Fuels. *Id.* at 10500 (citing Appendix C for specific costs). Plaintiffs criticize the Forest Service for looking to Energy Fuels for such information, but the BLM Handbook specifically approves such a procedure. AR Doc. 374 at 7435-36. In addition, Energy Fuels is uniquely qualified to provide relevant information about uranium mining near the Grand Canyon. It is the only company that has mined breccia pipe uranium mines on federal lands subject to the Withdrawal, including the Arizona One, Pinenut, and Kanab North Mines. AR Doc. 669 at 12396. Its Arizona One Mine, like the Canyon Mine, is located about 6 miles from the rim of the Grand Canyon and was deemed to have valid existing rights at the time of the Withdrawal. It too was subject to environmental evaluation and approval by the Forest Service – approvals challenged unsuccessfully by some of the Plaintiffs in this Court. *See Ctr. for Biological Diversity v. Salazar*, 791 F. Supp. 2d 687, 704 (D. Ariz. 2011), *aff'd*, 706 F.3d 1085 (9th Cir. 2013). The examiners found that "[c]osts for the Canyon Mine are expected to be similar to the currently operating Arizona One Mine." AR Doc. 525 at 10500.[6] But the examiners did not simply accept Energy Fuels' cost information. They looked to independent sources to verify such items as the costs of labor and transportation and the projected sale price for uranium. *Id.* at 10502, 10504.

After completing their mineral review, the examiners made the following findings:

- The Colorado Plateau hosts many uranium-bearing breccia pipes, and numerous studies have documented their importance as a source of uranium resources for the country. More than 17 million pounds of uranium have been produced from breccia pipe deposits on the Colorado Plateau over the last 50 years. *Id.* at 10491.

- Drilling [at the Canyon Mine] over the years has confirmed the presence of a breccia pipe containing more than 84,000 tons of uranium ore grading at

---

[6] This was an appropriate consideration for the examiners. As the BLM Handbook notes in its discussion of how to estimate mining costs: "Neighboring mining operations within a particular mining district often use similar mining methods. The removal cost per ton of rock or cubic yard of gravel will usually vary by only a few percent between properties." AR Doc. 374 at 7437.

0.97% "U3O8," which equates to more than 1.6 million pounds of uranium. *Id.* at 10486.[7]

- Chemical examinations of core samples confirm the presence of uranium and certain other associated metals at the Canyon Mine. Energy Fuels' exploration drilling blocked out three different ore bodies which confirmed that the Canyon Mine uranium deposit can be classified as a proven reserve. *Id.* at 10496-97 (citing Appendix E).

- The proposed mining method at that Canyon Mine is a combination of modified block-caving and shrink-stopping. The underground workings are to include the main shaft, an escape shaft and air-flow path, cross-cut levels, and a series of "corkscrew" workings to follow the ore. The underground workings would be very similar to those used at the Arizona One Mine. *Id.* at 10498.

- Energy Fuels' White Mesa Mill is the sole conventional uranium mill operating in North America. Uranium ore extracted from the Canyon Mine is transported to the mill in trucks. Each truck contains about 25 tons of material. Haulage distance to the mill is about 330 miles, one-way. The mill uses conventional uranium processing methods (ore screening and grinding, leaching, solvent extraction, and drying). The resulting "yellowcake" is stored in 55-gallon drums as a final product for sale that ultimately will be used as fuel for nuclear power plants. The milling process recovers 95% of available uranium. *Id.* at 10498-99, 10501.

- Energy Fuels developed ore tonnage and grade estimates from the results of 45 surface holes totaling 61,400 feet with an average depth of about 1,364 feet. Two different resource calculations were made for the Canyon Mine deposit. Energy Fuels' numbers were reasonable and acceptable for the examiners to evaluate the Canyon Mine claims. Based on experience gained from mining older breccia pipe deposits, the ore tonnage estimates likely will be much higher once untested portions of the Canyon Pipe are drilled. *Id.* at 10498-99.

- Capital and operating cost estimates for the Canyon Mine are expected to be similar to the costs for the Arizona One Mine. A review of Energy Fuels' cost estimates found them to be reasonable and at an adequate level to spot

---

[7] Uranium can take many chemical forms, but in nature it is generally found as an oxide. Triuranium octoxide ($U_3O_8$), a "yellowcake" substance, is the most stable form of uranium oxide and the form most commonly found in nature. *See ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 38 (D.D.C. 2014).

check specific operating costs.  Labor and transportation costs were spot-checked and independently verified.  *Id.* at 10500.

- The Plan approved in 1986 included the sinking of a 1,500-foot vertical shaft with development levels between 900 and 1,500 feet.  Mine production would be approximately 200 tons per day.  The estimated annual production is 35,287 tons of ore and 623,940 pounds of U3O8.  The development program is expected to last three years to completion, and the minimal mine life is five years.  *Id.* at 10500-01.

- Energy Fuels planned to move its surface infrastructure and workforce from the Arizona One Mine to the Canyon Mine.  Much of the surface development at the Canyon Mine is complete, and includes the main headframe, hoist house, warehouse and shop, sediment ponds, and power lines.  These costs are considered "sunk" costs because they were previously completed for mine development and are fixed assets on the claims.  Most of the capital expenses are future underground development costs.  *Id.* at 10497, 10500-01 (citing Appendices B and D).

- The total capital cost is $19,109,161.  This amount includes a nearly $1.7 million contingency fund and $450,000 in reclamation costs.  *Id.* at 10500-01.[8]

- Estimated operating costs for each ton of ore at the Canyon Mine are $110.42 for mining, $66.00 for haulage, $141.04 for milling, and $36.56 in indirect costs.  The total operating cost is $354.02 per ton of ore, and the per-pound cost of U3O8 is $17.36.  *Id.* at 10501-02 (see Tables 4 & 5).

- Based on the feasibility analysis performed using the APEX program, Energy Fuels would earn a profit of $29,350,736 based on a uranium (U3O8) price of $56.00 per pound (net present values were $22,250,758 at a 10% discount rate, $19,336,119 at a 15% discount rate, and $16,755,429 at a 20% discount rate).  *Id.* at 10504-05 (see Table 6).

- At a uranium price of $56.00 per pound, the Canyon Mine would have a 78% rate of return and a one-year payback period.  Using a more conservative uranium price of $42.00 per pound, the mine would still be

_____

[8] The capital costs are summarized in Table 3 of the economic evaluation section of the report (AR Doc. 525 at 10500), and specific costs are set forth in Appendix C (*see* Doc. 228-1 at 5-12).

14

profitable with a 36% rate of return.  The minimum rate of return for the mining industry is about 12%.  *Id.* at 10505.[9]

- We conclude that a discovery of a valuable mineral deposit existed at the time of the segregated withdrawal on July 21, 2009 . . . as required under the 1872 Mining law (30 USC 21-54).  Furthermore, the company has shown that on July 21, 2009 and under present economic conditions, the uranium deposit on the claims could be mined, removed, transported, milled and marketed at a profit.  We conclude that the test for discovery of a valuable mineral . . . has been met . . . .  The [Canyon Mine has] valid existing rights that were established prior to the mineral withdrawal.

*Id.* at 10506.

## VI.   Plaintiffs' APA Challenge to the VER Determination.

Plaintiffs contend that the VER Determination is invalid under the APA because: (1) Energy Fuels did not estimate, and the Forest Service did not consider, environmental costs for monitoring radiation, surface water, and groundwater, costs for wildlife conservation, and costs of future environmental mitigation measures; and (2) the Forest Service did not include "sunk costs" in its estimate of the mine's value.  Doc. 228 at 13-22. Before addressing these arguments, a few broader points deserve mention.

The examiners "performed several independent discounted cash flow analyses" using APEX software, which is "well-accepted as a reliable evaluation tool by the mining industry for a variety of commodities and mine designs."  AR Doc. 525 at 10504.  Data needed to run the cash flow analyses included the mine's capital and operating costs,

---

[9] Plaintiffs argue that the mine would lose more than $10 million if the uranium price was $23.00 per pound.  Docs. 228 at 10, 238 at 9.  But Plaintiffs do not dispute that the Forest Service used the correct marketability dates when it determined the relevant price per pound – the date of the initial Withdrawal and the date of the VER Determination – or correct methods for determining price under the BLM Handbook.  *See* 65 Fed. Reg. 41,724-5.  Nor do Plaintiffs dispute that the Forest Service used the lower of the two prices produced by these dates in its validity analysis ($56.00 per pound).  *See* Doc. 233-1 at 12-13.  What is more, the $23.00 per pound figure cited by Plaintiffs is a multi-year average that is not consistent with BLM guidance and that comes from the declaration of Roger Clark, attached as Exhibit 4 to Plaintiffs' motion for summary judgment (Doc. 228-1 at 34-35), a document submitted solely to support Plaintiffs' standing arguments and not considered by the Court on the merits (Doc. 238 at 12).  The $10 million loss also is found in an exhibit to Plaintiffs' motion that cannot be considered on the merits.  *See* Doc. 228, Ex. 2.  Thus, the $23.00 per pound price is irrelevant on multiple levels.

1    reserve tonnages, production rates, ore grades, commodity prices, and applicable federal

2    and state taxes.  *Id.* at 10504-05.  Plaintiffs do not challenge the use of the APEX software.

3        The ultimate objective of the Forest Service's evaluation was to determine whether

4    the Canyon Mine would be profitable.  In addressing this question, the mineral examiners

5    took a conservative approach – they erred on the side of understating the mine's potential

6    profitability.

7        For example, a key component was the price Energy Fuels could receive for

8    uranium.  In estimating this price, the examiners used the BLM Handbook method, which

9    looked at spot prices for uranium during the month of the valuation date and the preceding

10   36 months.  *Id.* at 10502.  When applied to the June 2009 valuation date, this method

11   produced an average uranium price of $70.79 per pound.  *Id.*  When applied to January

12   2012 (while the VER Determination was underway), it produced an average price of $49.69

13   per pound.  *Id.*  After identifying these average spot prices, the examiners noted that

14   uranium producers typically have long-term contracts for uranium delivery with prices

15   "higher than the spot price" and that "include provisions for cost inflation, fuel surcharges

16   and other factors."  *Id.*  Energy Fuels' long-term contracts between January 2009 and

17   January 2012, which accounted for about half of its sales from the Arizona One Mine,

18   varied between $61 and $57 per pound.  Its short-term prices were $52 per pound.  *Id.*

19   at 10502-03.  The examiners took an average of this range – $56 per pound – and used it

20   for their estimated price in the analysis.[10]  Thus, the examiners intentionally selected a

21   lower price estimate than the $70.79 per pound that was available under BLM guidance for

22   the 2009 marketability date, noting that "[i]t should be remembered that this is the lower

23   price of the two time periods to consider, since the earlier time frame of July 21, 2009 and

24   36 months prior to that, would yield significantly higher prices using the BLM guidance

25   policy."  *Id.* at 10503.

26

27   ───────────────

28       [10] BLM guidance notes that actual mine prices may be considered in arriving at a
     price estimate, so the examiners' look at Energy Fuels' actual contract prices was not error.
     *See* 65 Fed. Reg. at 41,726 ¶ 4.

The examiners also acted conservatively in estimating the amount of uranium the mine would produce:  "From experience gained from [Energy Fuels'] properties with the other Colorado Plateau breccias mines, and from experience learned in mining older breccias deposits[,] . . . the ore tonnage estimates will likely go *much higher* once other 'un-tested' portions of the breccias pipe are drilled."  *Id.* at 10499-500 (emphasis added). Indeed, of six Colorado Plateau uranium mines reported by Energy Fuels, the amount of ore ultimately removed from the mines averaged more than three times higher than the initial estimates.  *See* Doc. 525, Appx. C at 12560 (actual mine production averaged 3.37 higher than initial surface calculations).

Using conservative estimates of the mine's ore production capacity and uranium prices, and adding in a contingency of $1,700,000 for unexpected costs, the APEX program estimated that the Canyon Mine would earn a profit of $29,350,736.  *Id.* at 10504-05.  This would be a 78% rate of return – six times the industry minimum.  *Id.*  The examiners then performed a "sensitivity analysis" by lowering the assumed uranium price by 25% below the lowest estimate produced by the BLM method (to $42 per pound), and found the mine still would be profitable and earn returns three times more than the industry minimum rate. *Id.* at 10505.  Given this analysis, the mine was "of such a character that 'a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine.'"  *Coleman*, 390 U.S. at 602 (citation omitted).

One additional point should be noted.  The law "does not require a guaranteed profit to constitute a discovery" under the Mining Law.  *United States v. Mannix*, 50 IBLA 110, 117-18 (1980).  It requires only "a reasonable prospect of success in developing a valuable mine."  *Id.* at 112; *see also Coleman*, 390 U.S. at 602 (requiring only a "reasonable prospect of success"); *Ideal Basic Indus., Inc. v. Morton*, 542 F.2d 1364, 1369 (9th Cir. 1976) (requiring "reasonable prospect of success").  The conservative approach taken by the mineral examiners confirms that the Canyon Mine has a reasonable prospect of success.

Against this backdrop, the Court will address the deficiencies alleged by Plaintiffs.

1    **A.     Environmental Costs.**

2         **1.     Environmental Monitoring.**

3         Plaintiffs note that the 1986 Plan requires Energy Fuels to monitor radiation around

4    the mine, surface water in nearby streams, and groundwater beneath the mine, including a

5    year's worth of pre-operation samples to establish baseline radioactivity and radon values.

6    Doc. 228 at 14-15.  According to the FEIS, the monitoring includes radiation measurements

7    at 12 locations, radon measurements at the mine site and the nearby town of Tusayan,

8    surface water samples at five locations, and soil samples at six locations.   AR Doc. 3

9    at 527-28.  Groundwater will be sampled quarterly.  *Id.* at 530.  The FEIS estimated the

10   total cost of these monitoring efforts at $112,000.  *Id.* at 538 ($70,000 for radiation

11   monitoring of air, soil, and water, and $42,000 for groundwater sampling).

12        Plaintiffs claim that these monitoring costs were not considered by the Forest

13   Service in the VER Determination.  *Id*.  Energy Fuels contends that the costs were included.

14   As support, Energy Fuels cites the declaration of Harold R. Roberts, asserting that

15   environmental monitoring costs were included in the "Mining & Site G&A" category

16   included in Energy Fuels' cost spreadsheet.  Doc 233-2, ¶ 8.  But the Roberts declaration

17   is not in the administrative record and will not be considered by the Court.  *See Camp v.*

18   *Pitts*, 411 U.S. 138, 142 (1973) ("the focal point for judicial review should be the

19   administrative record already in existence, not some new record made initially in the

20   reviewing court"); *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 992

21   (9th Cir. 2014).

22        Plaintiffs also cite evidence outside the record, but assert that Exhibits 2-5 to their

23   motion for summary judgment are provided only to support their standing argument.

24   Doc. 238 at 12.  The Court will not consider those exhibits on the merits.  Plaintiffs'

25   Exhibit 1 purports to be a re-creation of Excel spreadsheets that the Forest Service used

26   during the VER Determination, but the Court cannot conclude that the spreadsheets are

27

28

identical to those considered by the Forest Service and therefore will confine its review to the .pdf copies of spreadsheets in the administrative record.[11]

Looking only to the record evidence, the Court cannot resolve the dispute between the parties on whether the environmental monitoring costs were included in the VER Determination. Energy Fuels asserts that they are included in the "Mining & Site G&A" entry in the spreadsheets, but Plaintiffs note that this entry appears to include only "Sublevel development," "Utilities," and "Production." Doc. 228 at 15-16. The Court cannot determine what is included in "Production." Plaintiffs note that the production number is based on a per-ton estimate developed from Energy Fuels' Arizona One Mine, and assert that the environmental monitoring costs could not possibly be the same at the mine. *Id.* at 17. But as already noted, the Arizona One Mine is a breccia pipe uranium mine located 6.5 miles from the north rim of the Grand Canyon. *See* Doc. 228-1 at 34. It presumably raises environmental issues very similar to those arising at the Canyon Mine, 6 miles from the other side of the Grand Canyon.

The spreadsheets in the record also include entries for "Permitting & Engineering" and "Reclamation," as well as labor costs for "Radon Security" and "Engineer/ Environmental" (AR Docs. 673, 680), but these categories are not described in any detail. Thus, although it is possible that at least some environmental monitoring costs were included in the financial numbers used by the Forest Service, the Court cannot make that determination from the administrative record as a matter of undisputed fact. For purposes of the APA analysis below, the Court therefore will assume these costs were not included.

Energy Fuels further argues that the baseline environmental monitoring work identified by Plaintiffs was completed before the VER Determination in April 2012. Doc. 233-1 at 15. The ROD also asserts that it was completed. AR Doc. 6 at 928 ("Baseline measurements of radiation values in soil, air and water have been taken."). If

---

[11] The Exhibit 1 spreadsheets were created by Plaintiffs for this litigation. *See* Doc. 228, Ex. 3. The declaration that attempts to show they are identical to those in the record acknowledges that some values in the record spreadsheets are redacted and the Exhibit 1 spreadsheets therefore did not perform the same calculations. *Id.* ¶¶ 8-9.

this is correct, these would be sunk costs, which are addressed below. But the Forest Service told the Court in November 2013 that the baseline monitoring had not been done and would occur shortly before mine operations are to begin. *See* Doc 95 at 6. Again, the Court cannot determine whether the baseline monitoring costs were included in the financial estimates relied on for the VER Determination, and will assume they were not included.

Plaintiffs acknowledge that the groundwater monitoring well (which is included in their discussion of environmental monitoring costs) was installed before the VER Determination. Docs. 228 at 9, 15; 238 at 15. This cost, therefore, is a sunk cost. Whether sunk costs should have been included in the VER Determination is addressed below.

### 2. Wildlife Conservation Measures.

The ROD requires Energy Fuels to replace 32 acres of elk foraging habitat and a watering source that would be displaced by the mine. AR Doc. 6 at 925. The elk habitat would be replaced by mechanically thinning trees and brush in a 32-acre area comparable to the mine site. AR Doc. 3 at 532; *see also* AR Doc. 628 at 11874 (specifying "mechanical thinning of conifers" as the means of restoration). The watering source would be replaced by constructing one earthen tank in a suitable location. *Id.* The FEIS estimated the cost of these measures at $14,420. AR Doc. 3 at 538 ($8,250 for the construction of the new water tank and $6,170 for creation of the new 32-acre foraging area).[12]

The Forest Service also received a recommendation from the U.S. Fish and Wildlife Service ("FWS") regarding measures for protecting California condors. AR Doc. 507. The recommended measures mostly were informational, such as advising mine employees to avoid interactions with condors and to report condor sightings to the FWS, and ensuring that the site remains clean so as not to attract the birds. *Id.* at 10433-34. The FWS also recommended that evaporation ponds at the site be made inaccessible to condors. *Id.*

---

[12] A Forest Service letter in the administrative record states that Energy Fuels has spent $12,000 for the reconstruction and sealing of nine earthen wildlife and livestock tanks, and that this "may exceed the total scope of work specified in the Canyon Mine EIS." AR Doc. 326 at 5859. This letter confirms the approximate cost of the water-source work required in the ROD.

at 10434.  No method was specified, but this presumably would mean providing a covering of some sort for the ponds.  Energy Fuels suggests that this could be done by covering the ponds with a net, which seems logical because more substantial coverings would likely impede the ponds' evaporation purpose.  Doc. 233-1 at 17 n.5.  Plaintiffs claim that the Forest Service failed to consider the costs of these wildlife conservation measures. Doc. 228 at 16.

Defendants contend that the condor protection costs are included in the "Surface Facilities, rehab, impoundment, ore pad" category of costs in the VER Determination.  AR Doc. 525 at 10500.  Plaintiffs disagree, citing specific components of this category that do not appear to include condor protection.  Doc. 228 at 17.  The Court cannot conclude from the administrative record that these costs were included in the VER Determination.[13]

For purposes of the APA review, the Court will assume that the VER Determination did not include the elk habitat restoration or the condor net.

### 3.    Future Mitigation Measures.

Plaintiffs assert that environmental monitoring may identify contamination at the mine that will require future environmental mitigation measures.  Doc. 228 at 15.  They argue that the Forest Service should have estimated these potential future mitigation costs, such as possible pumping and treatment of groundwater if it is contaminated by the mine, and included them in the VER Determination.  *Id*.  Energy Fuels counters that the Forest Service is not required to speculate about unknown future costs when evaluating a mine's profitability.  Doc. 233-1 at 18 (citing *United States v. Dwyer*, 175 IBLA 100, 118 (2008) (affirming the ALJ's finding that the "proposed measures for reducing costs and increasing profits amount to speculation")).  The Court agrees with Defendants.

---

[13] It is not clear whether a net will be needed to protect condors.  Energy Fuels asserts that no net has been installed to date because no condors have been seen at the mine and a net could be dangerous to birds.  Doc. 233-1 at 17 n.5.  The 2012 Mine Review also seemed to recognize that the need for a net was uncertain, stating that the Forest Service would "work with the mining company to determine the necessity and practicality of such a covering or determine if there are any other actions the company could take to mitigate this possibility of an impact to the condor when standing water is in the evaporation pond." AR Doc. 533 at 10621.

The FEIS includes a detailed discussion of the mine's potential effect on groundwater and, using conservative assumptions, concludes that "the possibility for significant deterioration of water quality at any [point of] discharge is very small."  AR Doc. 3 at 650.  The ROD provides that groundwater monitoring will help "assure that important water sources, including springs which are sacred to the Hopi and Havasupai Tribes, will not be adversely affected by the Canyon mine."  AR Doc. 6 at 924.  And the 2012 Mine Review confirmed the validity of the FEIS and ROD.   AR Doc. 533 at 10592-637.  The review found that "[t]here does not seem to be any reason to reevaluate groundwater conditions or mining effects on them, as there is no new information or changed circumstances related to ground water that would indicate the original analysis was insufficient."  *Id.* at 10624.

Thus, whether groundwater will ever become contaminated from the mine, and whether Energy Fuels will ever incur costs for remediation of the groundwater, are simply unknown.  Predicting the cost for such a future possibility would require much speculation.  The profitability of the mine should be based on "present economic conditions" – what is known today – rather than speculation.  *See United States v. Garcia*, 161 IBLA 235, 257 (2004) ("As the Board has stated many times, 'the prudent man test is objective, and subjective considerations have no place in the calculus of prudence."); *United States v. Clouser*, 144 IBLA 110, 130 (1998) ("[W]e agree with [the ALJ] that . . . speculative cost reductions do not alter the Government's profitability determination"); *In re Pac. Coast Molybdenum Co.*, 75 IBLA 16, 29 1983) ("a mining claimant must show that, *as a present fact*, considering historic price and cost factors and assuming that they will continue, there is a reasonable likelihood of success that a paying mine can be developed.") (emphasis added); *United States v. Highsmith*, 137 IBLA 262, 278 (1977) ("No evidence has been offered by contestees as to the impact of [the] dump on marketability of the resources on the claims, . . . and we decline to speculate on this matter[.]")); *see also* Doc. 228 at 13 (Plaintiffs' acknowledgement that "[t]he rule is one of 'present marketability,' a limitation

impose by courts to thwart speculative claims").  Plaintiffs have not shown that the Forest Service erred in omitting speculative future mitigation measures.

### 4.    Harmless Error.

Even if the Court assumes that the VER Determination omitted environmental monitoring, elk habitat restoration, and a net to protect condors, it cannot conclude that these relatively modest expenses would make the Canyon Mine unprofitable.  Plaintiffs themselves do not assert that the mine would be unprofitable if these costs were considered.  They claim only that "[t]he profitability forecast would have dropped substantially[.]"  Doc. 228 at 10.  But a drop in profits is not enough to defeat valid existing rights if the mine remains profitable.

In light of the relatively minor costs asserted by Plaintiffs, the Court directed the parties to address the harmless error rule during oral argument.  Doc. 244.  That subject consumed a majority of the hearing.  After considering the parties' arguments and the cases cited during the hearing, the Court concludes that any error in omitting these environmental costs was harmless in the overall profitability analysis.

Section 706 of the APA instructs that "the court shall review the whole record or those parts of it cited by a party, and *due account shall be taken of the rule of prejudicial error*."  5 U.S.C. § 706 (emphasis added).  The Supreme Court has interpreted this language to impose a harmless error rule like that adopted by courts in civil cases.  *Shinseki v. Sanders*, 556 U.S. 396, 406 (2009) ("we have previously described § 706 as an administrative law harmless error rule.") (quotation marks, ellipsis, and citation omitted); *see also Ludwig v. Astrue*, 681 F.3d 1047, 1054 (9th Cir. 2012) ("*Sanders* establishes that administrative adjudications are subject to the same harmless error rule as generally applies to civil cases.").

Plaintiffs bear the burden of showing that their alleged errors were harmful.  *Shinseki*, 556 U.S. at 409 ("the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination") (quotation marks and citation omitted); *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 969 (9th Cir. 2015)

("not every violation of the APA invalidates an agency action; rather, it is the burden of the opponent of the action to demonstrate than an error is prejudicial."); *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1092 (9th Cir. 2011) ("*Sanders* clarifies that the burden of showing an agency's deviation from the APA was not harmless rests with the petitioner[.]").

### a.    Procedural Error.

In attempting to avoid the effect of the harmless error rule, Plaintiffs emphasize Ninth Circuit cases which state that an agency error is harmless where it "clearly had no bearing on the *procedure used* or the *substance* of [the] decision reached." *Cal. Wilderness Coal.*, 631 F.3d at 1091-92 (emphasis added); *see Nw. Res. Info. Ctr., Inc. v. Nw. Power & Conservation Council*, 730 F.3d 1008, 1020 (9th Cir. 2013) (same). Plaintiffs argue that the failure to address the environmental costs they have identified is a procedural error sufficient to overcome the harmless error rule, regardless of the amount of costs omitted or their effect on the mine's profitability. The Court is not convinced.

Plaintiffs' Ninth Circuit cases focus on procedural errors in administrative rulemaking, an area of law where procedure matters greatly. The Ninth Circuit has instructed that the harmless error rule should be applied to congressionally-mandated rulemaking procedures only rarely. *See Cal. Wilderness Coal.*, 631 F.3d at 1020-21 (courts "must exercise great caution in applying the harmless error rule *in the administrative rulemaking context*" because "[h]armless error is more readily abused there than in the civil or criminal context"); *see also Nw. Res. Info. Ctr.*, 730 F.3d at 1020 ("As noted above, this court has defined 'harmless error' *in the administrative-rulemaking context* as an error that 'clearly had no bearing on the procedure used or the substance of [the] decision reached.'") (emphasis added).

This case does not involve administrative rulemaking. Plaintiffs challenge the Forest Service's evaluation of a factual issue – whether the Canyon Mine is likely sufficiently profitable to constitute a "valuable" mineral discovery under the Mining Law. No specific procedures are prescribed for such a determination. *See* 65 Fed. Reg. 41,724

("When determining the validity of mining claims, Federal land management agencies conduct examinations of your asserted discovery to evaluate whether the mineral deposit can be removed and marketed at a profit given the production costs and the prevailing market on a given date.  The Bureau of Land Management, the National Park Service, and the U.S. Forest Service each employ certified mineral examiners who conduct these examinations on behalf of the Secretary of the Interior.").[14]

Plaintiffs cite *Independence Mining Co. v. Babbit*, 105 F.3d 502, 506-07 (9th Cir. 1997), but that case does not impose specific procedures on validity determinations.  It states only that "a mineral examiner must . . . estimate the . . . cost of extracting, processing and marketing the minerals, including the costs of complying with any environmental and reclamation laws."  Plaintiffs' other cases make similarly general statements.  *See Clouser v. Espy*, 42 F.3d 1522, 1530 (9th Cir. 1994) (observing that measures to "reduce incidental environmental damage" will increase operating costs and thereby affect claim validity); *United States v. E. K. Lehmann & Assoc.*, 161 IBLA 40, 104 n.25 (Mar. 16, 2004) ("It is well-established that the costs of compliance with . . . environmental laws . . . are properly considered in determining whether . . . the mineral deposit is presently marketable at a profit.").  These cases reinforce the requirement that an agency must estimate all costs of operation when determining whether a mine will be profitable, but they do not establish the kind of procedure at issue in the agency rulemaking cases.

---

[14] The BLM Handbook followed by the Forest Service in this case requires mineral examiners to "evaluat[e] a mineral deposit to determine if the operator has a reasonable prospect of success in developing a valuable mine."  AR Doc. 374 at 7427.  Part of this evaluation requires consideration of operating costs, but the process is one of estimation.  *See id.* at 7436-7 ("Preparing a Cost Estimate," "Estimation Methods," "Cost estimating").  The BLM Handbook directs examiners to estimate all relevant costs, including equipment costs, labor costs, environmental compliance costs, milling costs, smelter and refining costs, and others.  *Id.* at 7438-9.  The Court cannot conclude that the BLM Handbook's mention of environmental compliance costs establishes a procedural rule comparable to the procedures required for agency rulemaking.  In addition to the fact that the BLM Handbook requires only estimation, the handbook does not appear to have the force of law because it is a statement of agency policy, rather than being legislative in nature, and it has not been adopted through formal public comment processes.  *See River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1071 (9th Cir. 2010).

25

Thus, the Court cannot conclude that the environmental cost omissions identified by Plaintiffs' are harmful merely because they are procedural requirements. The relevant question is whether the alleged omissions had a harmful effect on the overall profitability determination for the Canyon Mine. This question is found in the other prong of the Ninth Circuit's harmless error rule.

### b.  Substantive Error.

The second prong of the Ninth Circuit's harmless error doctrine in APA cases asks whether the error affected "the substance of [the] decision reached." *Cal. Wilderness Coal.*, 631 F.3d at 1091-92. As the Supreme Court has explained:

> Often the circumstances of the case will make clear to the appellate judge that the ruling, if erroneous, was harmful and nothing further need be said. But, if not, then the party seeking reversal normally must explain why the erroneous ruling caused harm. If, for example, the party seeking an affirmance makes a strong argument that the evidence on the point was overwhelming regardless, it normally makes sense to ask the party seeking reversal to provide an explanation, say, by marshaling the facts and evidence showing the contrary.

*Shinseki*, 556 U.S. at 410.

In this case, the Forest Service found that the Canyon Mine would be very profitable, making more than $29 million in profits, a rate of return more than six times the industry minimum. These substantial profits were predicted using conservative estimates of the amount of ore that would be mined and the prices at which it would be sold. And they included a $1.7 million contingency for unknown expenses and $450,000 for reclamation of the mine site after mining is finished.[15] Given this factual context, it "makes sense to ask the party seeking reversal to provide an explanation [of why the errors were harmful], say, by marshaling the facts and evidence showing the contrary." *Id.*

---

[15] Plaintiffs note that the contingency amount is set forth in the capital cost section of the VER Determination (*see* AR 10501), but provide no support for their contention that contingency funds may not be used "to cover expenses omitted from the estimates, like managing groundwater infiltration and pollution or protecting wildlife." Doc. 238 at 16.

Plaintiffs make no such attempt.  They do not try to quantify the allegedly omitted costs of environmental monitoring, elk habitat restoration, or a condor net, even though grounds for estimating most of those costs can be found in the administrative record.  And they provide absolutely no basis for the Court to conclude that these costs would alter the Canyon Mine's profitability.

As noted above, the FEIS estimates the costs of environmental monitoring at $112,000 and of wildlife habitat restoration at $14,420, for a total of $126,420.  If the Court takes judicial notice of the inflation rate between 1986 (the year of the FEIS) and 2012 (the year of the VER Determination), the approximate cost of these measures in 2012 would be $261,000.  *See* U.S. Dep't of Labor, Inflation and Consumer Spending, Inflation Calculator,  https://data.bls.gov/cgi-bin/cpicalc.pl?cost1=126420&year1=198601&year2=201201 (last visited May 21, 2020).  The FEIS cautions that these cost estimates are based on data from contractors, trade journals, and similar sources, are used for comparison of the various alternatives evaluated in the FEIS, and that "actual costs could vary significantly from these estimates."  AR Doc. 3 at 538 n.1.  But even if the costs were to increase four-fold, to approximately $1 million, they would not come close to making the Canyon Mine unprofitable.

The Court can find no administrative record estimate of the cost for a net to cover the evaporation ponds to protect condors.  But Plaintiffs have provided no basis for suspecting that a net would cost anywhere near enough to eliminate $29 million in profits, even when the other environmental costs are considered.

In short, Plaintiffs have not carried their burden of showing that their alleged errors were harmful.  *See Tongass Conservation Soc'y v. U.S. Forest Serv.*, 455 F. App'x 774, 777 (9th Cir. 2011) ("[E]ven if we were to find some merit to some aspect of TCS's arguments concerning the cumulative impact of future projects, we would still deny TCS relief on the ground that the error was harmless."); *Ludwig*, 681 F.3d at 1054 (determining

1    whether an alleged agency error is harmful "requires 'case-specific application of

2    judgment, based upon examination of the record'") (quoting *Sanders*, 556 U.S. at 407).[16]

3        **B.    Sunk Costs.**

4        The Forest Service did not include certain past costs in its evaluation of the Canyon

5    Mine's profitability.  These were costs for work done or facilities installed at the mine

6    before the VER Determination, including construction of the mine's head frame, hoist

7    house, warehouse, shop, sediment ponds, and power lines.  AR Doc. 525 at 10497, 10500

8    (*see* Appendices B and D).  The Forest Service excluded these costs and the cost of the

9    groundwater monitoring well because they "are considered 'sunk' costs."  *Id.* at 10500.

10   This decision was consistent with guidance from the BLM Handbook:

11           Sunk costs are the unrecoverable past capital costs of certain types of
12           equipment that the claimant already owned or the costs of improvements
             already made before the marketability date.  Do not include as expenses in
13           the operation's cash flow those capital costs that were sunk before the date
14           of marketability.

15   AR Doc. 374 at 7438 (footnotes omitted).

16       Exclusion of sunk costs complied with decisions from the Interior Board of Land

17   Appeals ("Board"), an entity within the DOI charged with reviewing mine valuation

18   determinations.  In *Mannix*, the Board held that sunk costs should not be included in the

19   calculation of mining profits:

20           The Government argues that all earlier expenses in development of the
21           property must be considered, e.g., the cost of constructing cabins, sheds, and
             an access road and the purchase of rail and ore cars, and that such expenses
22           must be recouped before it can be said that the mine is a profitable venture.
23           We think the Government errs in its argument and analysis. . . .  [I]f the
             mineral material may be now mined, removed, and marketed at a present
24           profit over and above the costs of such operations, we would hold that the
25           requirements of discovery have been met.

26

27       [16] Plaintiffs  note the Supreme Court's statement in *Shinseki* that the burden of
28   showing that an alleged error was harmful is not "a particularly onerous requirement[,]"
     556 U.S. at 410, but it is nonetheless a requirement, and Plaintiffs provide nothing to meet
     it.

1    50 IBLA at 119.

2         Other Board decisions follow *Mannix*.  *See United States v. Coppel*, 81 IBLA 109,

3    129 (1984) ("As this Board has noted, while consideration of the likelihood of recovery of

4    capitalization costs yet to be expended is a necessary element of determining the existence

5    of present discovery, where the expenditures have already been made prior to either the

6    contest or a withdrawal of the land, such factors are not properly considered in determining

7    present marketability.") (citing *Mannix*, 50 IBLA at 119); *United States v. Collord*, 128

8    IBLA 266, 288 n.24 (1994) ("Not included [in the prudent-man and marketability tests]

9    are development and capital costs that have already been spent before the date on which a

10   valuable mineral deposit must be shown to exist.") (citing *Mannix*); *Clouser*, 144 IBLA at

11   131 ("To the extent that there are existing tracks and lighting, the costs attributable to them

12   need not be considered.") (citing *Mannix*).

13        Plaintiffs claim that the Forest Service erred when it applied this law.  They argue

14   that the Board's law on sunk costs "is unsound and contrary to binding Supreme Court

15   precedent."  Doc. 228 at 19.  The Court disagrees for three reasons: Plaintiffs' argument

16   does not apply the correct standard of review; their position is not supported by Supreme

17   Court or federal court cases; and, even if Plaintiffs are correct, they have not shown that

18   the error is harmful.

19                 **1.     Plaintiffs Do Not Apply the Correct Standard of Review.**

20        The question posed by Plaintiffs' claim is not whether the Board decisions and BLM

21   Handbook are incorrect, as Plaintiffs suggest, but whether the Forest Service's reliance on

22   these DOI sources in the VER Determination was arbitrary and capricious.  "[A]gencies

23   are entitled to rely on the expertise of another agency without forgoing deferential

24   review."  *Bellion Spirits, LLC v. United States*, 393 F. Supp. 3d 5, 13 (D.D.C. 2019) (citing

25   *City of Boston Delegation v. FERC*, 897 F.3d 241, 255 (D.C. Cir. 2018) ("Agencies can be

26   expected to 'respect the views of such other agencies as to those problems' for which those

27   'other agencies are more directly responsible and more competent.'")).  Courts have

28   described Plaintiffs' burden under this deferential standard of review as "heavy."  *See Defs.*

*of Wildlife v. U.S. Dep't of Navy*, 895 F. Supp. 2d 1285, 1318 (S.D. Ga. 2012) ("Plaintiffs, as the challenging party, 'bear a heavy burden to prove that the agency was arbitrary and capricious in relying upon the [National Marine Fish Services] determination of a matter firmly within that agency's area of expertise.'") (quoting *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1222 (11th Cir.2002) (internal brackets omitted)).

Thus, the Court must focus on the reasonableness of the Forest Service's reliance on the Board cases and BLM Handbook, not on the validity of the cases themselves. *See WildEarth Guardians v. U.S. Forest Serv.*, 828 F. Supp. 2d 1223, 1238 (D. Colo. 2011) ("[T]he Forest Service conducted its own analysis but relied on the expertise of the [DOI's Mine Safety and Health Administration] regarding whether such a [flaring] system would be approved for use in the mine. Again, although WildEarth clearly disagrees with the MSHA's assessment, it does not demonstrate that the Forest Service's reliance on MSHA's statements of its position as to whether such a system would be approved for use was arbitrary, capricious, or unsupported by the record."); *City of Tacoma, Wash. v. F.E.R.C.*, 460 F.3d 53, 75 (D.C. Cir. 2006) ("[W]hen we are reviewing the decision of an action agency to rely on a [biological opinion prepared by other agencies], the focus of our review is quite different than when we are reviewing a [biological opinion] directly. In the former case, the critical question is whether the action agency's reliance was arbitrary and capricious, not whether the [biological opinion] itself is somehow flawed.") (citing *Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin.*, 175 F.3d 1156, 1160 (9th Cir.1999); *Pyramid Lake Paiute Tribe v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415 (9th Cir.1990); *Stop H-3 Ass'n v. Dole*, 740 F.2d 1442, 1460 (9th Cir.1984)).

A Ninth Circuit case illustrates the proper method of review. In *Pyramid Lake*, an Indian tribe challenged a biological opinion adopted by the Department of the Navy but issued by the FWS, which was not a party to the action. The Ninth Circuit refused to consider whether the FWS had violated the Endangered Species Act, stating:

> The Tribe argues at length that the FWS's biological opinions which contain the "no jeopardy" findings are based on faulty analysis. . . . The Tribe's argument misses the mark, however, because the FWS is not a party to this

action.  The FWS's actions, or lack thereof, in preparing its opinions are relevant on appeal only to the extent that they demonstrate whether the Navy's reliance on the reports is "arbitrary and capricious."

898 F.2d at 1415; *see Aluminum Co. of Am.*, 175 F.3d at 1160 ("The [plaintiffs] advance arguments targeted at both NMFS's actions in preparing the 1995 BiOp and the BPA's decision to adopt NMFS's 'jeopardy' finding and RPA.  The former claims, at least as they challenge the analysis of NMFS, which is not a party to this action, are beyond the scope of our review[.]"); *see also Stop H-3 Ass'n*, 740 F.2d at 1460 ("Remand is not required . . . because we are able to determine from the record that as a matter of law FHWA's decision to rely on FWS's biological opinion was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' . . . On its face, this does not seem to be a 'clear error of judgment.'") (internal citations omitted).

Plaintiffs provide no basis for concluding that the Forest Service acted arbitrarily or capriciously when it chose to follow existing Board cases and the BLM Handbook on the treatment of sunk costs.  They do not contend that the Board cases or Handbook were misapplied, nor that any federal court has found them incorrect.  The Forest Service is entitled to rely on the expertise of DOI in making the mine profitability determination, and the Court cannot conclude that it acted improperly when it followed DOI guidance on sunk costs.  Plaintiffs have not carried their heavy burden on this issue.

### 2.     Plaintiffs' Position Is Not Supported by Federal Case Law.

Plaintiffs argue that the Board's treatment of sunk costs is contrary to Supreme Court precedent.  Plaintiffs first cite *Cameron v. United States*, which held that a valuable mineral discovery is one that "would justify a person of ordinary prudence in the further expenditure of his time and means in an effort to develop a paying mine."  252 U.S. at 459. Plaintiffs also cite *Coleman*, which held that a mineral deposit is valuable if "'a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine.'"  390 U.S. at 602 (citation omitted).  Plaintiffs further cite the Ninth Circuit's decision in *Ideal Basic*, which

1    stated that valuable minerals exist when "the deposits [are] of such a character as to justify

2    a man of ordinary prudence in expending further labor and means with a reasonable

3    prospect of success in developing a valuable mine," and that "the mineral could be

4    extracted and marketed at a profit."   542 F.2d at 1369 (citations omitted).  The Ninth

5    Circuit further noted that "[a]pplication of these tests makes it clear that profit over cost

6    must be realizable from the material itself and it is that profit which must attract the

7    reasonable man." *Id.*

8         None of these cases addresses the costs to be considered in the profitability

9    calculation, and they certainly do not address the specific question presented here –

10   whether past development costs must be included.  Plaintiffs argue that these cases imply

11   a requirement that all past costs be considered, but the cases do not say so, and the Court

12   therefore cannot conclude that they clearly conflict with the Board's decisions as Plaintiffs

13   claim.  As the Board noted in *Mannix*, "[t]here is no case law of which we have knowledge,

14   nor has the government adduced any, that compels consideration of the above mentioned

15   development costs in determining if an ongoing operation is presently profitable."  50

16   IBLA at 119.

17        Plaintiffs suggest that the "valuable mineral deposit" requirement of the 1872

18   Mining Law necessarily focuses on the value of the minerals themselves, not on the

19   profitability of the specific operation that will mine them.  From this premise, Plaintiffs

20   assert that all costs related to the ore extraction, future and past, must be considered in

21   deciding whether the claim has value.  Although there is some logic to this argument, the

22   language from the cases seems to focus on the claim's value as of the date of valuation.

23        As noted above, the valuation of a mine is made on a "marketability" date.  *See*

24   *Coleman*, 390 U.S. at 602; 65 Fed. Reg. 41,724, 2000 WL 87795741 (July 6, 2000).  For

25   mining claims on withdrawn lands, marketability is addressed "both as of the date of the

26   withdrawal and the date of the mineral examination."  65 Fed. Reg. at 41,725.  Language

27   from the Supreme Court suggests that the comparison of costs and revenue to determine

28   profitability looks forward from the marketability date:  a mineral deposit is "valuable" if

it is "of such a character that 'a person of ordinary prudence would be justified in the *further expenditure* of his labor and means, with a reasonable prospect of success, in developing a valuable mine.'" *Coleman*, 390 U.S. at 602 (emphasis added); *see also Cameron*, 252 U.S. at 459 ("the discovery should be such as would justify a person of ordinary prudence in the *further expenditure* of his time and means in an effort to develop a paying mine.") (emphasis added); *Ideal Basic*, 252 F2d. at 1369 (asking whether "deposits were of such a character as to justify a man of ordinary prudence *in expending further labor and means with a reasonable prospect of success in developing a valuable mine*") (emphasis added).[17]

Plaintiffs suggest that *United States v. Armstrong*, 184 IBLA 180 (2013), is inconsistent with the Board's holding in *Mannix*.  Doc. 228 at 21.  But *Armstrong* makes no mention of *Mannix* and does not hold that sunk costs should be considered in evaluating profitability.  The claimant in *Armstrong* argued that certain portable equipment he owned was a sunk cost that should be excluded from the profitability analysis.  184 IBLA at 219.  The government's expert testified that "anything that has been used and done on the property and cannot be transferred, is a sunk cost, while things that have value and can be applied to a different property or sold are an investment of the operator." *Id.*  The Board agreed that "this is the standard approach to economic valuations in [mine] operations" and that "the portable equipment owned by [the claimant] is not a sunk cost." *Id.*[18]

---

[17] If the Court were called upon to review the sunk costs cases decided by the Board and reflected in the BLM Handbook, the task would not be to determine which approach to sunk costs is better, Plaintiffs' or the Board's.  The task would be to determine whether the Board's approach is arbitrary and capricious.  *See Ctr. for Biological Diversity v. United States Dep't of the Interior*, No. CV-01-1758-PHX-ROS, 2005 WL 8159960, at *4 (D. Ariz. Sept. 30, 2005) (citing *IMC Kalium Carlsbad, Inc. v. Interior Bd. of Land Appeals*, 206 F.3d 1003, 1009-10 (10th Cir. 2000)) ("Deference is warranted where the Court is satisfied that the IBLA's decision is supported by the record and is not arbitrary or capricious.").  The Court could not find the sunk costs approach of *Mannix* – which has been in existence for 40 years – arbitrary and capricious.  The *Mannix* rule has not been contradicted by any federal court decision that has addressed sunk costs and comports with the forward-looking language of Supreme Court and Ninth Circuit cases.

[18] *See also United States v. Feezor*, 130 IBLA 146, 222 (1994) ("Utilization of either presently unused equipment or presently uninvested capital represents consumption of the opportunity value attributable to both, and this lost opportunity value is properly assessed against any income in determining the net profitability of an enterprise."); *United States v. Garner*, 30 IBLA 42, 67 (1977) ("costs necessarily must include the amortization cost of the equipment used in the mining operations, even though the claimant by fortuitous

33

The BLM Handbook likewise distinguishes between portable equipment and the type of unrecoverable surface development at the Canyon Mine. AR 7438 ("Purchase of new equipment or planned replacement of equipment or facilities after the date of marketability, consumable stores, repairs, and daily operating expenses are not sunk costs."). The rationale for including the opportunity cost of useable assets such as portable equipment does not apply to fixed assets such as a groundwater well, which cannot be sold or used at another location. *See* Doc. 228 at 22. *Armstrong* did not reject the principle that properly recognized sunk costs should be excluded from a future profitability determination. 184 IBLA at 219.[19]

### 3. Any "Sunk Costs" Error Was Harmless.

In any event, Plaintiffs do not show that the value of the sunk costs at the Canyon Mine would, if considered, render the mine unprofitable. They do not suggest that such costs are close to the more than $29 million in profits predicted by the VER Determination. Thus, even if the Court somehow could conclude that the Forest Service's treatment of sunk costs was error, Plaintiffs have not met their burden of showing that it was harmful error.[20]

### C. Merits Conclusion.

As explained above, the Court cannot find that the VER Determination included all environmental monitoring and wildlife conservation costs. But even if those costs were not considered, Plaintiffs have not met their burden of showing that the omission was harmful given the Canyon Mine's more than $29 million in conservatively estimated

---

circumstance has access to machinery at a cost less than the average prudent person would have to pay") (citations omitted).

[19] Plaintiffs argue that the *Mannix* approach to sunk costs could allow miners to game the system by investing substantial sums in a mine before they seek a determination of valid existing rights. But Plaintiff do not explain why a miner would seek to lose money in a mining operation, and they provide no evidence that such gaming has occurred or is occurring here.

[20] Plaintiffs attach a value of more than $6 million to the sunk costs, but do so by citing a source outside of the administrative record that the Court cannot consider. *See* Doc. 228 at 9 (citing Roberts Declaration, Doc. 31-3 ¶ 17). And yet even this amount would not render the Canyon Mine unprofitable.

profits.  The exclusion of sunk costs was not error; and even if it was, Plaintiffs have not shown that it was harmful.  As a result, Plaintiffs have not shown that the VER Determination should be set aside.

As already noted, the Court must treat an agency's decision "with deference, particularly 'when the agency is making predictions, within its special expertise[.]"  *Ctr. for Biological Diversity*, 409 F. Supp. 3d at 752 (quoting *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir. 2003)).  The agency's decision "need only be a reasonable, not the best or most reasonable, decision."  *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1067 (9th Cir. 2010) (citation omitted); *see Forest Guardians*, 329 F.3d at 1099 ("An agency's actions need not be perfect; we may only set aside decisions that have no basis in fact[.]").  In this case, "[t]he [Forest] Service 'articulated a rational connection between the facts found and the choice made."  *Forest Guardians*, 329 F.3d at 1099 (quoting *Pyramid Lake*, 898 F.2d at 1414); *see Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *Cal. Pac. Bank*, 885 F.3d at 570; *Indep. Acceptance Co.*, 204 F.3d at 1251.  The Court will grant summary judgment to Defendants on claim four.

## VII.    Energy Fuels' Motion to Seal.

Energy Fuels moves to seal Plaintiffs' unredacted summary judgment motion and reply brief because they mention Energy Fuels' confidential cost information that is exempt from public disclosure under the Freedom of Information Act and applicable Forest Service regulations and guidance for mineral examiners. Doc. 232; *see* Docs. 226, 238.  Plaintiffs' have lodged the proposed unredacted sealed versions of the documents with the Court and have filed redacted public versions on the docket.  *See* Docs. 226, 228, 237, 238; LRCiv 5.6(b)-(c).

Sealing Plaintiffs' motion and reply will have no effect on the public's ability to understand the issues addressed in this order because lightly redacted copies have been filed in the public docket.  The Court finds compelling reasons to seal and will grant Energy Fuels' motion.  *See Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006).

**IT IS ORDERED:**

1.       Plaintiffs' motion for summary judgment on claim four (Doc. 226) is **denied**.

2.       Energy Fuels' motion for summary judgment (Doc. 233) is **granted** with respect to Plaintiffs' request to enjoin activities at the Canyon Mine and on the merits of claim four, and **denied** with respect to the argument that Plaintiffs are entitled to no relief because the VER Determination was not legally required. Energy Fuels' motion to strike (Doc. 233-1 at 21) is **denied** as moot.

3.        The Forest Service's motion for summary judgment (Doc. 234) is **granted** on the merits of claim four and **denied** on the issue of standing.

4.       Energy Fuels' motion to seal (Doc. 232) is **granted**.  The Clerk of Court shall accept for filing under seal the documents lodged on the Court's docket as Docs. 228 and 238.

5.       The Clerk is directed enter judgment and terminate this action.

Dated this 22nd day of May, 2020.

David G. Campbell
Senior United States District Judge